UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
--------------------------------------------------------X

UNITED STATES OF AMERICA

    – against –

JULIAN ELIE KHATER,

        Defendant.

--------------------------------------------------------X

**Docket No. 21-CR-00222 (TFH)**

### DEFENDANT JULIAN KHATER'S MEMORANDUM OF LAW IN SUPPORT OF HIS PRE-TRIAL RELEASE

Joseph Tacopina, Esq.
Chad Seigel, Esq.
Tacopina Seigel & DeOreo
Attorneys for Defendant *Julian Khater*
275 Madison Avenue, 35th Floor
New York, N.Y. 10016
Tel: (212) 227-8877

Alvin H. Thomas , Jr., Esq.
Law Office of Alvin H. Thomas Jr., PLLC
Attorney for Defendant *Julian Khater*
938 E. Swann Creek Road, #325
Fort Washington, MD. 20744
Tel: (301) 203-0893

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Court Should Grant Defendant Julian Khater's Release Pending Trial . . . . . . . . . . . . 2

       A.    The Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       B.    Julian Khater Does Not Pose a Danger to the Community . . . . . . . . . . . . . 4

           1.    The History and Characteristics of the
                 Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           2.    The Weight of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

           3.    The Nature and Circumstances of the Offense
                 Charged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           4.    The Nature and Circumstances of the Danger
                 to Any Person or the Community That Would
                 Be Posed by the Person's Release . . . . . . . . . . . . . . . . . . . . . . 17

       C.    Julian Khater Does Not Pose a Risk of Flight . . . . . . . . . . . . . . . . . . . . 18

       D.    The Prospective Sureties and Collateral . . . . . . . . . . . . . . . . . . . . . . . . 18

       E.    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGES**

*United States v. Ali*, 965 F.Supp.2d 139 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Munchel*, 2021 WL 1149196 (D.C. Cir. 2021) . . . . . . . . . . . . . . . . . . . . . 3, 16, 17

*United States v. Patriaca*, 948 F.2d 789 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

*United States v. Salerno,* 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

*United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Smith*, 79 F.3d 1208, 1209  (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Taylor*, 289 F.Supp.3d 55 (D.D.C. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

*United States v. Vasquez-Benitez*, 919 F.3d 546 (D.C. Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATUTES**                                                                                   **PAGES**

18 U.S.C. § 111  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 U.S.C. § 3142  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------------------X

UNITED STATES OF AMERICA

                                            **Docket No. 21-CR-00222 (TFH)**

    – against –

JULIAN ELIE KHATER,

        Defendant.

-------------------------------------------------------X

## DEFENDANT JULIAN KHATER'S MEMORANDUM OF LAW IN SUPPORT OF HIS PRE-TRIAL RELEASE

### PRELIMINARY STATEMENT

At the outset, the defense recognizes that the surrounding circumstances of this case evoke a great deal of emotion. It is hard not to think of the events that unfolded on January 6th and not have a visceral reaction – particularly, as rioters entered the Capitol Building by breaking windows and ramming open doors.

But Julian Khater was not one of them. He never entered the Capitol Building, never sought to threaten members of Congress, and never intended to forcibly interfere with the peaceful transfer of power. Instead, the act attributed to him was a limited and isolated one, that never transgressed the barrier that lay directly before him. Moreover, according to the detailed criminal complaint that was filed in this case [Dkt. No. 1], that singular act – of using a bear spray canister which he personally did not purchase or carry to the Capitol – occurred as much as eight feet away from officers, only after he emphatically yelled out that he, himself, was just sprayed.

Clearly, the circumstances giving rise to this case are extraordinarily unique. In accord with that fact, as discussed below, many defendants charged with violent and/or aggressive behavior on January 6th have been released pending trial.

These factors, coupled with the upstanding history and characteristics of Mr. Khater, who has absolutely no prior contact with the criminal justice system, support his pre-trial release. In fact, any notion that he poses a risk of flight or danger to the community is undercut by the dozen and a-half letters attached to this submission. In those letters, people who know Mr. Khater best extol his exemplary background and character.

Accordingly, for the reasons further detailed below, the defense requests that he be released on a substantial bail package with stringent pre-trial conditions, including: (1) a $15 million bond (a) secured by five properties comprising approximately $1.5 million in equity and (b) guaranteed by 16 family members who will co-sign as financially responsible sureties; (2) home detention with electronic monitoring; and (3) a condition that Mr. Khater surrender any and all passports in his possession.

## ARGUMENT

### THE COURT SHOULD GRANT DEFENDANT JULIAN KHATER'S RELEASE PENDING TRIAL

#### A.     The Applicable Law

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). Thus, "[d]etention until trial is relatively difficult to impose," *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999), and "the default position of the law . . . is that a defendant should be released pending trial." *United States v. Taylor*, 289 F.Supp.3d 55, 62 (D.D.C. 2018) (*quoting United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

In light of the foregoing, to detain a defendant, the Government must establish by clear and convincing evidence that there exists absolutely "*no* condition or combination of conditions [which]

will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1) (emphasis added). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). In other words, to warrant the defendant's pre-trial detention, the Government must prove that such drastic recourse is the *only* means by which to reasonably assure his appearance and the safety of the community. *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).

Furthermore, with regard to the "danger to the community" prong, the evidence must prove that the defendant actually poses such a danger, not that he does so in theory. *United States v. Patriaca*, 948 F.2d 789 (1st Cir. 1991). And, with regard to that consideration, as the Court of Appeals recently observed in *United States v. Munchel*, 2021 WL 1149196, at *7 (D.C. Cir. 2021), "[t]he threat must [ ] be considered in context," as well as the defendant's "means of [carrying out that threat] in the future." Accordingly, "[w]hether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant." *Id.*, at *7.

In assessing whether pre-trial detention is warranted for dangerousness, district courts consider four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and circumstances of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).

Importantly, throughout this proceeding, the Government bears the burden of both production and persuasion, as there is no presumption that detention is necessary.[1] To the contrary, as noted

---

[1] None of the criteria triggering a "rebuttable presumption" in favor of detention exist in this case. *See* 18 U.S.C. § 3142 (e)(3)(A)–(E).

3

above,"the default position of the law . . . is that a defendant *should be released* pending trial"
*Taylor*, 289 F.Supp.3d at 62 (emphasis added).  And that presumption may only be overcome if the
Government can carry its ultimate burden of showing that no conditions whatsoever can be imposed
to reasonably assure the defendant's appearance and the safety of the community.  As explained in
*United States v. Ali*,

> the government retains the ultimate burden of persuasion by clear and
> convincing evidence that the defendant presents a danger to the community,
> and by the lesser standard of a preponderance of the evidence that the
> defendant presents a risk of flight.

965 F.Supp.2d 139, 147 (D.D.C. 2013) (internal quotations, ellipses, and brackets omitted).

For the reasons set forth below, the Government cannot carry its burden of proving that the
substantial bail package available will not reasonably assure the safety of the community or the
defendant's appearance at all future proceedings.  And that is particularly true in light of the statutory
bail factors to be considered.

**B.      Julian Khater Does Not Pose a Danger to the Community**

A consideration of the relevant factors under 18 U.S.C. § 3142(g) demonstrates by clear and
convincing evidence that detention is not necessary to protect the community from Julian Khater.

**1.      The History and Characteristics of the Defendant**

Julian Khater is an American citizen who was born in this country.  And at age 32, he has
never before had any contact with the criminal justice system.  He has no prior arrests, because he
does not have a criminal disposition.  To the contrary, this alleged offense is an anomaly in an
otherwise law-abiding life.

4

By way of background, Mr. Khater – who hails from a supportive and close-knit family – is one of four sons born to the previous marriage of Elie Khater and Eleanor Fox. Both his father, mother, and siblings are all hard-working and productive members of society. And the same holds true for Mr. Khater, who graduated from Fairleigh Dickinson University with a Bachelor's degree in Business Administration and Management in 2011. Thereafter, he secured full-time employment as a financial sales consultant for PNC Bank, where he remained until taking a position in 2016, as an event planner for Topgolf, a sports entertainment company. Then, in 2018, he started working for Frutta Bowls, a healthfood café, which he managed and co-owned with his family. And Mr. Khater continued to work at that business until May 2020, when the pandemic forced the business to shutter its doors. As a result, Mr. Khater was living with his father from then until the date of his arrest.

As his history readily reveals, Mr. Khater has worked hard to make something of himself, living a law-abiding life marked by education and gainful employment.

In accord with his unblemished history, unlike others associated with the events of January 6th, Mr. Khater is not, nor has ever been, part of some far-right, neo-fascist organization that promotes and engages in political violence. In fact, separate and apart from the Government's present accusation, there is no question that Mr. Khater has never participated in a single act of violence. And that is because Mr. Khater is not inherently a violent or aggressive person. To the contrary, he is a kind and compassionate person, as evidenced by an outpouring of letters written on his behalf.

All in all, a dozen and a-half people who know Julian Khater best have submitted letters in support of his release, which are annexed hereto as Exhibits A through R. In their letters, these

people – comprising family members, a family friend, and a former coworker – collectively attest

to all of the information detailed above regarding Mr. Khater's upstanding history and

characteristics. For instance, Mr. Khater's former co-worker at PNC Bank, Maggie Dawoud, states:

> ....I was a coworker of Julian's at PNC Bank, Somerset, New Jersey from 2015 to 2016. Julian was the nicest and most conscientious person to work with. He learned everything in record time and never missed an opportunity to better himself within our branch. He was always upbeat and humorous, and whatever he was tasked with he would accomplish with good grace and efficiency. I was shocked to see that the media were portraying him to be violent or a trouble maker! This is not the Julian I knew and worked with! He was such a quiet and shy person! He was always polite and courteous to customers and all who worked with him. As far as I'm concerned, Julian doesn't have the mildest inkling of a temper! I have no doubt that whatever has been leveled against him is a mistake and my thoughts and prayers are with him and his family. I would work with Julian again in a heartbeat! **[Exhibit A]**.

Mr. Khater's work ethic and positive nature are attributes that were undoubtedly instilled in

him by his parents. His mother, Eleanor Fox, explains:

> Julian is my second of four sons. My first, third and fourth were all little fireballs. Julian was always the quiet one, the sweet one; as my father Dr. Robin Fox would say, "the little elves brought Julian!" He was the one to hold the younger ones' hands; he would not go and play with the other children in order to stay behind and play with his younger cousins who couldn't go off with the older kids.... Julian has never been in trouble, has never caused trouble, and has never given me a sleepless night.
>
> I was raised in a family of intellectuals and Liberals. My father, Dr Robin Fox, founded the Anthropology department at Rutgers University in 1969. He is the author of over 30 books on the subject and was inducted into the National Academy of Sciences. My mother was university educated and we have lived in the US since 1969. I also attended Rutgers University. My sisters are both anthropologists, my younger sister Dr. Anne Fox has a PHD in the subject, and my older sister, Kate Fox, is a renowned author. My son Julian was raised to study, work hard, and espouse a liberality of ideas and cultures.
>    *    *    *    *

6

Julian was always easy as a child, and continued that way through school and college. [He] went on to gain a Bachelor's degree from Fairleigh Dickinson in Business and Marketing. His father and I raised our boys to respect teachers, and all of his teachers' comments were how polite and respectful he was. Our home was one of laughter and discipline, and my boys always came to me with their problems. Julian wanted to become a police officer. I worried about that, but he felt a strong sense of community for where we lived in New Jersey and had friends who had joined the police force. His career took different paths, but I was the most shocked when the media reports came out that said that Julian had supposedly attacked an officer!! He wanted to BE an officer! **[Exhibit B]**.

Julian's Khater's father, Elie Khater, echoes his mother's sentiments, while expounding upon his higher education and gainful work history:

I always strived and worked hard to raise a good family. I· brought up my four sons to be productive members of society. I instilled in them good values, teaching them to be caring and respectful of others.

They all attended college, and Julian in particular always kept busy studying and working. He attended Raritan Valley College where he earned his Associates Degree in Business (2007-2009). He then attended Fairleigh Dickinson University from 2009 to 2011 where he earned his Bachelor's Degree in Business Administration and Management. While Julian attended college he always was employed. He worked at Peter's Liquors in New Brunswick from 2007 to 2012. He also worked as bar manager at Panico's Restaurant from 2011-2016, and from 2014 to 2016 as a financial sales consultant at PNC Bank in Somerset, New Jersey. From December 2016 to January 2018, he worked as an event ambassador and bartender at Top Golf in Edison, New Jersey. From January 2018 to January 2019 he managed and co- owned Frutta Bowls in Chapel Hill, North Carolina. Then from January 2019 to May 2020 he ran the Frutta Bowls in State college, Pennsylvania. He has worked and studied continuously since he was 17.

Julian always worked in the service industry. He was always well-liked by everyone and loved by his customers. He loved people and people loved him. Julian is a loving, caring, quiet and gentle human being.... Julian is always respectful and considerate of others, and he has never ever harmed a living being in his entire life. Julian always loved and cherished law enforcement (police, fire fighters, army etc.). Anyone who served our country in any capacity was his hero. In fact, one of his ambitions was to join the Sherriff's Department in Franklin Township, NJ.

Julian always kept busy with studies and work and was never involved in anything else. I was shocked and devastated to learn of his arrest in connection with the events of January 6th. **[Exhibit C]**.

Mr. Khater's three brothers all share similar accounts regarding his kind and gentle spirit, his unblemished history, and the aberrational nature of this allegation. First, his older brother, Michael Khater, conveys:

Julian was the quiet, sweet, gentle, shy, smiling, cheerful child that all parents wanted their kids to be friends with.... These are some of many reasons why I chose Julian to be the Godfather of my firstborn son. He is dependable, reliable, well-rounded, absolutely fantastic with my kids, and, most of all, calm, considerate, gentle, and *ALWAYS* nice. Julian would never hurt a fly. At least, in the 32 years he's been alive, I haven't seen it or even thought it could be possible. The thought of Julian planning or executing anything detrimental to himself or to others is simply inconceivable. When we would go out to eat together, sometimes after a long day at work, Julian couldn't even plan where and what to have for dinner, let alone plan anything else. He was a work-to-home, home-to work type of a person, always.

While I understand the dark cloud hanging above this issue, I am writing to assure you that Julian is not the person he is being painted out to be. He is sweet, gentle, calm, and would never hurt anything or anyone, ever. His academic and entrepreneurial success, combined with his complete lack of any history of anything negative whatsoever, are testament to his character.... [Exhibit D].

Michael Khater's high opinion of Julian Khater is held equally by their younger brother, Christopher Khater, who states:

Julian was always a funny, loving and caring older brother to me. He was always there when I needed him, and had my back through all of the ups and downs I have been through. Julian is a very friendly person and is always looking to crack jokes, go to events, and have a good time with his friends and family. I know my brother is not capable of intentionally harming anyone or being a part of any type of violence whatsoever. All of his friends, family, and co-workers can attest to his joking and kind-hearted nature.

When I heard of my brother's arrest I was in absolute shock, and the allegations made against him and the smear stories circulating of him in the

media are an absolute misrepresentation of him and his character. My brother does have his beliefs and opinions, but would never take part in violent actions in order to voice his opinions. These stories and allegations truly do not represent my brother, our family, or his character at all. **[Exhibit E]**.

John Khater, Julian's remaining brother, 13 months his junior, confirms the foregoing:

My brother Julian is not the person portrayed in the news. The person I have had to read about is the opposite of my brother. He was always kind and protective of me, and I am sure I can speak for of all his siblings, cousins, and friends on that matter. He has never been an activist for anything. He had never attended a rally before. He is quiet and shy. He never even raises his voice. He is the kindest to children, and the chosen Godfather of many, many of our family's young in the next generation.

Julian has only ever been a caring, funny, thoughtful, compassionate, empathetic and protective brother. I cannot believe what is being said and circulated about him. This is not who Julian is in any way, shape, or form. **[Exhibit F]**.

Because violence of any sort is so antithetical to his nature, Mr. Khater's close family friend, Alissa Latner, a councilwoman in the borough of Closter, New Jersey, was dumbstruck by the instant accusation:

I always thought of Julian as a shy, quiet, gentle boy. He was always well behaved, considerate of others, attentive to the younger children, and a helper around the house. Of course I was completely shocked when I heard about his recent arrest as well as the idea of him being involved in anything violent, which totally defies the young man I have known him to be. I merely would like to attest to his good character, and that ... I find it very hard to accept what he is being accused of, as it truly defies the Julian that I know. **[Exhibit G]**.

As referenced previously, Julian Khater is part of an extraordinarily close-knit and extended family. To that end, included in the attached letters are those from four of his cousins, his sister-in-law, his uncle, and five of his aunts. These individuals provide a clear and convincing account of Mr. Khater's upstanding role within their family and the community. For example, Mr. Khater's cousin, Jennifer Bozovic, states:

I was at work when I saw the news of my cousin Julian. I was shocked and speechless. Out of everyone in the world, Julian would be the last person I would think his could happen to.... Julian has three brothers. Out of all of the siblings, Julian was always the calmest, most reasonable, pragmatic and always kept his brothers out of trouble.... Julian attended Farleigh Dickinson University and graduated with a degree in finance. He has always worked hard, never got in trouble and is a contributing member of society. He joined our local church group with me where we helped the homeless, went on several religious retreats to help the people in need and held many events to raise money for our church and other not for profit organizations.

He has had many jobs with different areas of expertise and experience which he excelled at and was commended by all his employers. He has never been in trouble with the law. He is very family oriented and makes a special effort to see his nephews and our family.... Julian [is] a kind soul [and] loving person and is truly loved and supported by our entire family, many friends and people in our community. He is the last person on earth that would harm anyone, not even a bug. **[Exhibit H]**.

Another of Mr. Khater's cousin, Joseph Khater, expresses a similar view of him:

Upon hearing the news of Julian being detained, I was in shock. Having known Julian all [o]f his life, and basically growing up together, I know he is one of the most considerate and kind people. We spent countless hours riding bikes, climbing, and playing tag. He was such a gentle person he could not even kill a bug without getting upset. He is an amazing uncle to his nephews and nieces, playing hide and seek and making funny faces to keep them entertained for hours. He never misses an opportunity to hang out with his family.... He comes from a very loving, tight-knit family that is well-respected in the community. Even as adults, we have spent many a holiday playing board games and charades after the main courses and deserts are completed, he has played tirelessly to keep everyone engaged in the game.

In his work life he was the utmost professional employee and coworker. He was an exceptionally good team player and loved by many of the customers he served whether it was at PNC Bank, Top Golf, or even Panico's Restaurant. Also, while at Top Golf he exceeded performance in his job and was managing larger party bookings always being on top of any situation that should arise and diffusing any conflict peacefully. In short, he operates with integrity and is well liked by everyone. Julian is a person of high moral character, he never hesitates if someone needs a helping hand, and always one to ask if you need something before you even get a chance to ask.

As a whole Julian is a reliable, trustworthy and loving person. I leave you with this example, Julian is the godfather of one of my nephews and during the ceremony my nephew would not sit still or stop crying, so Julian ever the problem solver spent most of the ceremony tickling my nephew's feet and playing peek-a-boo so he would not be crying the whole time. That is the Julian we all know and love. **[Exhibit I]**.

Mr. Khater's cousin, Joanna Khater, also speaks fondly about his positive attributes:

I have known him my whole life, and have always known him to be an affectionate and thoughtful person. When I was informed about Julian being in trouble, like the rest of the family, I was in disbelief. Julian would never hurt anyone or anything. He is one of the kindest and most empathetic people I know. I am one of the younger cousins in our family, and Julian would always stay behind to play with me when I wasn't able to partake in the older kids' activities. He would never let anyone feel left out or upset, and would rather sacrifice his wants just to put a smile on someone else's face.

Julian Khater is an honorable person, with good morals and a family that loves and misses him incredibly. He is an amazing uncle and Godfather, always putting his nieces and nephews needs before his own. He is an adored brother and son, always supporting his family in times of need. He is very involved in all family businesses and takes on many responsibilities to ensure the happiness of his family and the success of their investments. When his father became interested in the "Frutta bowls" chain, Julian was by his side, no questions asked..... He is a very trustworthy and family oriented man. He is a hard worker, and is thought of with the utmost respect with regards to his occupations and his everyday self. Julian could not hurt a fly, much less another person, and I know that will all of my heart. He comes from an upstanding family, with good morals.... **[Exhibit J]**.

Given his gentle nature, the last of Mr. Khater's cousins to write on his behalf, Amine Khater, was, like his other relatives, shocked upon learning of his arrest in this matter:

When the news broke I was in complete shock, this is not my cousin Julian. Julian would never harm a fly. In fact, Julian was the one who avoided any conflicts, and the first to try to resolve any differences cordially. He spent his entire life working in the service industry. Julian worked in restaurants, taverns and even financial services industry with PNC Bank for some time. He was never involved in any altercation throughout his entire career.... Julian is a very likable man, gentle and down to earth. Julian has never had any run-in with the law his entire life. This whole situation has left the entire family in disarray. **[Exhibit K]**.

The wave of shock and dismay that rippled through Mr. Khater's family upon learning of his arrest was palpable, as the instant accusation stands in stark contrast to his true character. Indeed, his sister-in-law, Geeta Khater, writes:

> I have know Julian for 14 years and have watched him grow into a wonderful man. When I heard about the incident Julian was involved in, I was shocked and then heartbroken. This could not be happening. Not once did I believe Julian could have done the things he was being accused off.... He is my son Jason's Godfather and I know God chose him for a reason. He is always there when we need him and has never missed a family event. When the kids see him coming they get so excited!
>
> I have also lived and worked with Julian and can attest to his amazing work ethic and consideration for those around him. He has always had a positive outlook on any problem we deal with at work and always kept himself busy. When the days were long, he kept me laughing. **[Exhibit L]**.

Consistent with the preceding accounts, Mr. Khater's uncle, Pierre Khater, experienced his own shock upon hearing of his nephew's arrest:

> Julian is a very hard working responsible person. Julian is always very kind to everyone. He is also a great uncle and cousin to all of the children in the family. Julian has always been a great employee and manager in all of his endeavors. My nephew has never had any run-ins with the law, and always respected all law enforcement. Julian never harmed anyone in his life and would never do anything to upset anyone; he is of a very quiet nature. I was shocked to hear the news; this is not my nephew. **[Exhibit M]**.

As the testimonials now presented make clear, Mr. Khater does not have a propensity for violence or aggression. And that is precisely why news of Mr. Khater's arrest struck his entire family with such consternation. His aunt, Leila Farrelly, explains:

> When we heard of the event involving Julian, we were in total shock, because it absolutely defies the young man I have known him to be. Julian has always had high moral standards and great responsibility in his actions. I have always known him to be a peaceful, loving, great young man, and it is very hard to accept and believe what he is being accused of. Again, I have known Julian all his life and he has a great personality as well as great character, and he does not have a mean bone in his body. **[Exhibit N]**.

12

Similarly, Wadad Khater, another of Mr. Khater's aunts, expresses that he is "the sweetest kid to this day," has "never hurt anybody or did something bad to the community," and is "always honest, helpful, polite, respectful of others and hard working..." **[Exhibit O]**. That view is corroborated by still another of Mr. Khater's aunts, Katie Fox, who states:

> Julian always struck me as a kind, considerate and serious person. To my knowledge, he has never previously engaged in violence of any kind at all. Quite the opposite: even as a child and teenager, he was remarkably gentle and thoughtful - a peacekeeper and mediator, not a fighter. I have health problems, and it was always Julian who noticed when I was getting tired or struggling with something, always Julian who jumped to offer help. As he grew up, Julian increasingly longed to do something meaningful with his life, to make a difference. He has a strong sense of duty, and his ambition was to join the Sheriffs department. **[Exhibit P]**.

Mr. Khater's kind and amiable nature is corroborated by his aunt, Irina Khater:

> He is a great, upstanding, extremely polite, hard working person with a big heart. He is always happy to help with absolutely anything, from preparing to cleaning after the family party, to fixing stuff around the house, to help anyone who just simply need any type of help. He is from a religious family, he goes to church and participates in church events. He is [a] sweet, smart, generous, friendly, honest and very reliable man. He is amazing with kids, he is a great cousin to my sons and to everyone I know.... [H]e is a great man, [with a] big heart and open arms! **[Exhibit Q]**.

Lastly, with regard to his upright character, Dr. Anne Fox, another of Mr. Khater's aunts, writes:

> Julian has always been dear to me as he is such an empathetic person. Even as a young boy, I noticed that it was always Julian who carried my suitcase and made sure that I had everything I needed. As he grew up, I noticed that he was always keenly aware of the needs of others. Although a very quiet child, at school, whenever I would pick him up, or when I came across him, he would be surrounded by other children, adjudicating squabbles with calm fairness. As a young man, he was studious and incredibly hard-working. He was always determined to do something meaningful with his life. He threw himself into his business enterprise with the unwavering belief that he was also doing good for the community. **[Exhibit R]**.

13

In addition to wanting to do "good for the community," Dr. Fox makes clear that Mr. Khater is also steadfastly devoted to his family, writing that "Julian is fiercely loyal [and] will stand by his ... family ... no matter what." *Id.* Given that fact, there is every reason to believe that he will not leave the 16 family members prepared to co-sign his bond in financial ruin by violating any condition of his release. And that conclusion is further buttressed by Mr. Khater's otherwise exemplary history and character. As a testament thereto, those closest to Mr. Khater have described him as "polite and courteous," the "nicest and most conscientious person," a "kind," "quiet and shy" "responsible young man," "caring, funny, thoughtful, compassionate [and] emphathetic," "shy, quiet, [and] gentle," "kind-hearted," a person who is "honest, helpful, polite, respectful of others, and hardworking," "studious and hard-working," "remarkably gentle and thoughtful," "sweet, gentle, [and] calm," a person "of high moral character," and a "person with a big heart." These are just some of the terms used to describe Mr. Khater by those who know him best. As the Court will undoubtedly recognize, a person does not suddenly develop such a character after he is arrested. Rather, it is the hallmark of a person's true nature. There is a reason that shock is a central theme running throughout all the letters provided – the instant Indictment does not at all reflect Julian Khater's upstanding history and characteristics.

## 2.   The Weight of the Evidence

As noted above, the weight of the evidence against a defendant is a factor to be considered for bail. Here, defendant Julian Khater is charged with violating 18 U.S.C. §§ 111(a)(1) and (b), and related offenses, for allegedly assaulting, resisting, or impeding certain officers using a dangerous weapon, *i.e.*, a bear spray cannister. Specifically, as detailed in the criminal complaint, Mr. Khater is accused of "appearing" to hold such a cannister while spraying it in one continuous sweeping

motion of his arm "from side to side" and "in the direction" of law enforcement officers, while standing as much as "eight feet away from [them]" after "emphatically" yelling out, "They just [ ] sprayed me." [Dkt. No. 1, pp.3, 5].

While the Government has not yet provided discovery, the defense notes that certain information gleaned from the criminal complaint raises questions regarding the accusations against Mr. Khater.  First, the reference to him "appearing" to hold a cannister of bear spray is less than definitive.

Second, proof that he took aim at officers is, at best, equivocal, given the Government's claim that he stood as much as "eight feet away from the officers" and did not spray directly at them but only "in the officers' direction." For that matter, any notion that he took deliberative aim at any officer is undercut by the very allegation that he was haphazardly "moving his right arm from side to side" in the midst of an unruly crowd after, himself, being sprayed with a chemical agent.  Indeed, according to the Government itself, the act attributed to Mr. Khater occurred only after he "emphatically" yelled out, "They just [ ] sprayed me."

Third, a more than cursory reading of the criminal complaint reveals that the Government's case is far from impermeable.  To be clear, the Government has not alleged beyond contestation that whatever Mr. Khater purportedly discharged, in fact, struck any officer.  Rather, the criminal complaint alleges only that "*something* struck them in the face." [Dkt. No. 1, p.4] (emphasis added). And on that point, it bears emphasis that other spray had been discharged during the course of this episode, as evidenced by the fact Mr. Khater excitedly uttered that he had "just [been] sprayed." In fact, as depicted in the criminal complaint, at the exact moment Mr. Khater is alleged to be holding a cannister, an officer is doing so as well. [Dkt. No., p.4]. And, significantly, the winds were not at

15

all moderate in Washington D.C. at the time of this incident, blowing as much as 20 miles per hour, the strongest of the day.[2]

Given these circumstances, the Government will seemingly have difficulty establishing that it was Mr. Khater and not another, even possibly law enforcement, responsible for the "something" that struck the officers in this case.

In any event, regardless of what the Government believes its proof may show, the fact remains that conditions of release can be fashioned to reasonably assure Mr. Khater's appearance as required and the safety of the community. In fact, that conclusion is further supported by an examination of the unique nature and circumstances of the offense charged.

### 3.    The Nature and Circumstances of the Offense Charged

The criminal conduct charged in this case must be viewed against the extraordinarily unique and specific circumstances of January 6th. A large group of people gathered at the Capitol during the electoral college vote, encouraged to do so by the then-Commander-in-Chief, as he and a growing mob of protestors inflamed passions. Clearly, the conduct attributed to Mr. Khater in this case could only, by virtue of the incredibly atypical events of that day, be a one-off circumstance. And that factor is critical when assessing a defendant's threat of danger, for such a threat must be actual and not theoretical. *See United States v. Patriaca*, 948 F.2d 789 (1st Cir. 1991).

In making that evaluation, the "[t]he threat must [ ] be considered in context," as should the defendant's "means of [carrying out that threat] in the future." *United States v. Munchel*, 2021 WL 1149196, at *7 (D.C. Cir. 2021). "Whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant." *Id.*, at *7.

---

[2]https://www.timeanddate.com/weather/usa/washington-dc/historic?month=1&year=2021.

Here, the nature and circumstances of the offense charged, and any attendant danger, are so atypical that there is in actuality no real risk that the defendant will pose such a threat "in the future." *Munchel, id.*

**4.    The Nature and Circumstances of the Danger to Any Person or the Community That Would Be Posed by the Person's Release**

The circumstances set forth above amply demonstrate that the release of Mr. Khater will not pose any actual threat of danger to another or the community. As stated initially, the circumstances reflected in the criminal complaint were the product of an emotionally charged powder keg, inflamed by sudden passions and a mob mentality. But, even in the midst of such heightened emotionality, as many others entered the Capitol Building by breaking windows and ramming open doors, Mr. Khater never transgressed the barrier that lay directly before him. While the Government may attempt to paint the portrait of some zealot hellbent on destroying democracy, the facts simply do not give rise to such a fanciful image.

Rather, as the testimonials provided make clear, Mr. Khater is a kind and compassionate man who has absolutely no prior contact with the criminal justice system, a history of continuous employment, and a supportive and close-knit family. Plainly, his 32 years of peaceful and gainful existence far outweigh the singular and aberrational allegation attributed to him on January 6th. Indeed, in all that time, there has never before been one allegation of misconduct, violent or otherwise, against him.

Notwithstanding the foregoing, in order to allay any possible lingering concerns, Mr. Khater is prepared to subject himself to the most stringent of pre-trial release conditions, home detention with electronic monitoring. Although the defense submits that such a condition is unnecessary, Mr. Khater yearns to return home to his loved ones and is prepared to sacrifice certain liberties to do so.

Along the same lines, while the face amount of the proposed bond, the volume of prospective sureties, and the enormous value of collateral offered is also unnecessary to ensure Mr. Khater's compliance with the conditions of release, his family is wholly prepared to support such a substantial bail package, because they earnestly know he will comply with any release conditions and truly belongs home.

### C.    Julian Khater Does Not Pose a Risk of Flight

Home is where Mr. Khater longs to be, alongside his family.  Accordingly, any notion that he somehow poses a risk of flight is ill-conceived and belied by the objective facts, including his substantial ties to the community and his relevant Guidelines exposure.  With regard to the latter, the defense has calculated a Guidelines range of 87 to 108 months applicable to the combined charges in this case, conservatively giving the Government the benefit of every arguable Guidelines enhancement for purposes of this motion.[3]  In addition, while the defense does not now state U.S.S.G. § 3E1.1 will apply, were it ultimately deemed to do so, the aforementioned Guidelines range would be reduced to 63 to 78 months; *i.e.*, approximately five years on the low end.

Clearly, Mr. Khater is not about to throw away everything he knows – his entire life, his friends, and his family, thereby destroying them financially and emotionally in the process – to avoid such exposure.  For the sake of emphasis, Mr. Khater's aunt, Dr. Anne Fox, has confirmed that "Julian is fiercely loyal [and] will stand by his ... family ... no matter what." [Exhibit R].

### D.    The Prospective Sureties and Collateral

Just as Mr. Khater is loyal to his family members, so too are they to him.  That is why 16 of them are prepared to sign their names to an incredibly high $15 million bond, putting their lives on

---

[3]That range is based on a combined total offense level of 29 and a criminal history category of I.

the line for him. These family members, many from whom the Court is now in receipt of a character letter, include: (1) his mother Eleanor Fox [Exhibit B]; (2) his father Elie M. Khater [Exhibit C]; (3) his brother Michael Khater [Exhibit D]; (4) his brother Christopher Kater [Exhibit E]; (5) his brother John Khater [Exhibit F]; (6) his cousin Jennifer Bozovic [Exhibit H]; (7) his cousin Josephine Khater [Exhibit I]; (8) his cousin Joanna Khater [Exhibit J]; (9) his cousin Amine Khater [Exhibit K]; (10) his cousin Elie F. Khater; (11) his cousin Ivan Bozovic; (12) his sister-in-law Geeta Khater [Exhibit L]; (13) his sister-in-law's cousin, Anup Kumar; (14) his uncle Pierre Khater [Exhibit M]; (15) his aunt Leila Khater [Exhibit N]; and (16) his aunt Wadad Khater [Exhibit O].[4]

As referenced above, Mr. Khater and his family are also prepared to post as collateral for a bond five properties located in New Jersey, containing in the aggregate approximately $1.5 million in equity.[5]

The preceding extraordinary guarantees, coupled with home detention and electronic monitoring, is more than sufficient to support Mr. Khater's pre-trial release. Presently, Mr. Khater is detained at the Correctional Treatment Facility in Washington D.C. where he is currently locked down in his cell 23 hours a day in the midst of a once-in-a-lifetime pandemic. According to a recent article in the Washington Post dated March 29, 2021, entitled "End the coronavirus lockdown in the D.C. jail"[6]:

---

[4] The defense has already provided to the Government a spreadsheet identifying each of these people, as well as his of her contact information, occupation, and employer.

[5] Four of these properties are owned by Mr. Khater's father and one of them by Mr. Khater himself. To demonstrate ownership and equity with respect to them, the defense has already provided to the Government information relating to all such properties, including proof of ownership, any mortgage statements, and property tax assessments.

[6] https://www.google.com/amp/s/www.washingtonpost.com/opinions/2021/03/29/its-time-end-cor onavirus-lockdown-dc-jail/%3foutputType=amp.

For nearly a year, the D.C. Jail has been on a coronavirus lockdown. Inmates have lived in their cells for 23 hours a day. They are not permitted to see their families or friends. Even interaction with attorneys is sparse. One inmate disclosed that he hadn't "seen sunlight for literally a year." Reports of inmate violence have risen, as have mental health problems. And though employees and inmates are now eligible for vaccination, D.C. Jail administrators have not yet outlined a plan to end this pandemic-induced purgatory of isolation and confinement.

    \*          \*          \*          \*

Inmates are still isolated, and their welfare has not been prioritized. According to one of several lawsuits filed in response to the D.C. Jail's handling of the public health crisis, instead of receiving medical care, inmates with the coronavirus have at times been locked in solitary confinement with no emergency buttons and insufficient hygienic products. These practices are inconsistent with science. According to the Center for Disease Control and Prevention and public health experts, vaccination and decarceration are the best ways to stem the spread of the coronavirus in jails and prisons.

    \*          \*          \*          \*

A federal court has consistently demanded, most recently in January, that administrators address the still-unacceptable medical care, sanitation and isolation conditions.[7] The moral imperative is just as clear: Continued lockdown promises to exacerbate health problems, rather than alleviate them. Prolonged isolation can cause anxiety, violent outbursts and suicidal thoughts. People who experience solitary confinement could lose the ability to live around other people, and inmates may become less capable of reentering their communities....

No pre-trial detention let alone that under these onerous conditions, for however long the pendency of this case may last, is necessary to reasonably assure the safety of the community and Mr. Khater's return to Court.

### E.    Summary

In light of Julian Khater's upstanding history and characteristics, his lack of any prior criminal history, his relatively limited Guidelines sentencing exposure in this case, his lack of dangerousness, and the absence of any risk of flight, we submit that the substantial bail package

---

[7]The article refers to a civil proceeding in this District captioned *Banks, et. al. v. Booth, et. al.*, docket no. 20-849 (CKK).

presented is more than sufficient to satisfy the release requirements of the Bail Reform Act, 18 U.S.C. § 3142.

As stated in *United States v. Salerno*, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." 481 U.S. at 755 (1987). In accordance with that axiom, many defendants charged with violent and/or aggressive behavior on January 6th have been released pending trial. *See United States v. Palmer*, 21-mj-301 (GMH) (detention not justified for defendant accused of throwing a wooden plank at officers, spraying the contents of a fire extinguisher at officers, throwing the fire extinguisher at them, and then picking it up and throwing it at them a second time); *United States v. Mackrell*, 21-cr-276 (CKK) (detention not justified for defendant accused of striking officer and grabbing officer's mask under face shield to expose officer to bear spray, before stating, "whatever it takes for my country," "I'm not done," and "I'm going back in."); *United States v. Blair*, 21-cr-186 (CRC) (detention not justified for defendant accused of striking officer in chest area with large stick attached to Confederate flag and shouting, "what's up motherfucker, what's up, what's up bitch," while in possession of a knife, and yelling to crowd approached by officers, "hell naw, quit backing up, don't be scared, we're Americans, don't be scared, let's go quit backing up, quit being scared."); *United States v. Cua*, 2021 WL 918255 (D.D.C. March 10, 2021), slip op. at *1 (detention not justified for defendant who previously called for execution of elected officials and "glorified violent protest," and who on January 6, 2021, walked through Capitol building twirling a black baton, attempted to open office doors in the Capitol, thrice shoved aside a police officer to enter the Senate Chamber, sat "atop the Senate dais in the chair previously occupied by former Vice President Mike Pence, with his feet up on [ ] the desk," and photographed senators' papers in the chamber); *United States v. Leffingwell*, 21-cr-5 (ABJ)

21

(detention not justified for defendant who repeatedly punched a police officer at Capitol with a closed fist and breached line of officers attempting to keep people out of the building); *United States v. Capsel*, 21-mj-122 (RMM) (detention not justified for defendant captured on video physically fighting National Guardsmen who were attempting to hold a boundary, and who did not desist until he was sprayed with pepper spray); *United States v. Bisignano*, 21-cr-36 (CJN) (detention not justified for defendant accused of being an "instigator, a director, and an active participant in the violence, destruction and obstruction at the Capitol," who was on the front lines pushing against the police, shouted through a bullhorn, "Everybody, we need gas masks! We need weapons! We need strong, angry patriots to help our boys!" and is charged with destruction of property); *United States v. Hunter Ehmke*, 21-cr-29 (TSC) (detention not justified for defendant who broke window of Capitol building and did not cease when ordered to do so by police officer); *United States v. Jones*, 21-mj-76 (ZMF) (detention not justified for defendant who violently broke glass of doorway to House chamber Ashli Babbitt tried to climb through seconds later)); *United States v. Gossjankowski*, 21-cr-123 (PLF) (detention not justified for defendant who activated taser in Capitol multiple times); *United States v. Miller*, 21-cr-75 (RDM) (detention not justified for defendant who discharged fire extinguisher onto police officers and used a crowd barrier fence as a ladder to scale the Capitol building walls); *United States v. Powell*, 21-cr-179 (RCL) (detention not justified for defendant who used a battering ram to break a window of the Capitol, climbed in, came back out, used bullhorn to direct others inside with what seemed to be detailed knowledge of the floor plan, and exhorted others to break another window); *United States v. Biggs*, 21-mj-126 (RMM) (detention not justified for Proud Boy defendant who posted plans on social media before attack, was at front of crowd who breached and entered Capitol building within 20 seconds of breach, and communicated with other

Proud Boy members with walkie-talkies during riot); *United States v. Colt*, 21-cr-74 (TFH) (detention not justified for defendant wearing assault gear who scaled the wall of the Senate chamber, later proclaimed on social media that he was the first person to sit in former Vice President Pence's chair, and called Speaker Pelosi a "traitor"); *United States v. DeCarlo/Ochs*, 21-cr-73 (BAH) (detention not justified for Proud Boy organizers who planned and fundraised for the riot, one of whom had Proud Boys name tattooed on his body, who posted their obstructionist intent on social media, defaced the Capitol building with the words, "Murder the Media," and took flexicuffs from the Capitol); *United States v. Cudd*, 21-cr-68 (TNM) (detention not justified for defendant who livestreamed video from inside Capitol building stating that to gain entrance "we just pushed, pushed, and pushed, and yelled go and yelled charge," and said "fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes, I am proud of my actions," and later told a new station, "Yes, I would absolutely do it again").

Notably, every single defendant referenced above was released on an *unsecured* bond, as evidenced by the orders and/or appearance bonds annexed hereto as **Exhibit S**.

Here, the defense proposes that Julian Khater be released upon what amounts to a very substantial and secured bail package. Specifically, as detailed above, the defense respectfully requests that the Court grant Mr. Khater's pre-trial release upon stringent conditions of home detention and electronic monitoring, the immediate surrender of any and all passports, and the posting of a $15 million bond, secured by five properties containing approximately $1.5 million in equity and co-signed by 16 financially responsible people.

## CONCLUSION

For the reasons set forth herein, the defense respectfully submits that the Court should grant

the relief sought in the annexed Notice of Motion, so as to release defendant Julian Khater pending

trial, as well as such other and further relief as this Court deems just and proper.

DATED this 20th day of April, 2021.



_____
Joseph Tacopina, Esq.
Chad Seigel, Esq.
Tacopina Seigel & DeOreo
Attorneys for Defendant *Julian Khater*
275 Madison Avenue, 35th Floor
New York, N.Y. 10016
Tel: (212) 227-8877



/s/ Alvin H. Thomas, Jr.
_____
Alvin H. Thomas , Jr., Esq.
Law Office of Alvin H. Thomas Jr., PLLC
Attorney for Defendant *Julian Khater*
938 E. Swann Creek Road, #325
Fort Washington, MD. 20744
Tel: (301) 203-0893

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
--------------------------------------------------------X

UNITED STATES OF AMERICA

                        **Docket No. 21-CR-00222 (TFH)**

– against –

JULIAN ELIE KHATER,

           Defendant.

--------------------------------------------------------X

## CERTIFICATE OF SERVICE

       I hereby certify that on April 20, 2021, I caused a true and correct copy of the foregoing

Defendant's Motion for Pre-Trial Release and accompanying documents to be delivered to the

parties in this matter via Electronic Case Filing (ECF).

 

Chad Seigel, Esq.
Tacopina Seigel & DeOreo
Attorneys for Defendant *Julian Khater*
275 Madison Avenue, 35th Floor
New York, N.Y. 10016
Tel: (212) 227-8877