1                   UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF WEST VIRGINIA

3                              - - -

4       UNITED STATES OF AMERICA,          :

5                          Plaintiff,   : CRIMINAL ACTION NO. 1:21-mj-27
                                            :
6                                           :
        V.                                  :
7                                           :
        GEORGE PIERRE TANIOS,               :
8                                           :
                           Defendant.    :
9
                                 - - -
10          Proceedings had in the DETENTION HEARING in the
        above-styled action on March 22, 2021 before the
11      UNITED STATES MAGISTRATE JUDGE, MICHAEL JOHN ALOI at
        Clarksburg, West Virginia.
12                              - - -

13      APPEARANCES:

14      For the United States:       Sarah E Wagner
                                     U.S. Attorney's Office -
15                                   Clarksburg
                                     320 W. Pike St.
16                                   Suite 300
                                     Clarksburg, WV 26301
17
        For the Defendant:          Elizabeth B. Gross
18                                  L. Richard Walker
                                    Federal Public Defender
19                                  Office-Clk.
                                    The Huntington Bank Bldg.
20                                  230 W. Pike St.
                                    Suite 360
21                                  Clarksburg, WV 26302

22

23      Defendant was present in person.

24
            Proceedings recorded by mechanical stenography,
25      transcript produced by computer-aided transcription.

1                           INDEX

2

3    **DEFENSE WITNESSES**

4    MAGEY TANIOS
     Direct Examination.............................. Page 44
5
     AMANDA PLUMLEY
6    Direct Examination.............................. Page 51

7    SHADOE LOWERS
     Direct Examination.............................. Page 56
8
     MICHELA SCOTTODILUZIO
9    Direct Examination.............................. Page 61

10   MARIA BOUTROS
     Direct Examination.............................. Page 65
11

12   RILEY PALMERTREE
     Cross-Examination............................... Page 73
13

14                           - - -

15   **GOVERNMENT'S EXHIBITS**

16

     | | Exhibit | Description | Identified | Admitted |
     |---|---|---|---|---|
17   | 1 | Photograph of J. Khater | | 29 | 16 |
18   | 2 | Photograph of G. Tanios | | 29 | 16 |
19   | 3 | Video | | 30 | 16 |
20   | 4 | Video | | 30 | 16 |
21   | 5 | Video | | 30 | 16 |
22   | 6 | Video | | 31 | 16 |
23   | 7 | Video | | 32 | 16 |
24   | 8 | Video | | 32 | 16 |

25

3

1                                    INDEX CONTINUED

2         **GOVERNMENT'S EXHIBITS**

3         Exhibit            Description              Identified  Admitted
          9          Video                                 33          16
4
          10         Officer Hawkins' body cam             34          16
5
          11         Video                                 35          16
6
          12         Video                                 35          16
7
          13         Photograph of G. Tanios and J.        38          16
8                    Khater

9         14         Photograph of bear spray              38          16

10        15         Supplies for bear spray               38          16

11

12                                       - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 10:00 a.m. in open court.)

2              THE COURT:  If the clerk would please call the next

3    case.

4              THE CLERK:  The United States of America versus

5    George Pierre Tanios.  Case number 1:21-MJ-27.  This matter

6    comes on for a detention and Rule 5 hearing.

7          Will counsel please note their appearance for the record.

8              MS. WAGNER:  Sarah Wagner on behalf of the United

9    States.

10             MS. GROSS:  Beth Gross and Richard Walker

11   representing Mr. Tanios.

12             THE COURT:  Okay.  Thank you, counsel.  And just a

13   note to counsel, I always appreciate the courtesy of standing,

14   but you are going to be staying at your tables and it's okay

15   to sit down and speak directly into the mic, so I appreciate

16   that.  It makes it easier for all of us.

17         As you all are aware, circumstances have changed since we

18   last met in that an indictment now has been returned against

19   Mr. Tanios.  So I am going to have a Rule 5 initial appearance

20   on the new indictment.

21         Mr. Walker and Ms. Gross, do you all have a copy of the

22   indictment?

23             MS. GROSS:  Yes, Judge.

24             THE COURT:  Okay.  And you've shared that with

25   Mr. Tanios?

1        MS. GROSS:  Yes, Judge.

2        THE COURT:  Okay.  Mr. Tanios, do you understand

3    English?

4        THE DEFENDANT:  Yes, Judge.

5        THE COURT:  Mr. Tanios, my name is -- thank you,

6    Ms. Gross -- my name is Michael John Aloi.  I'm a United

7    States Magistrate Judge.  At this time I would ask the clerk

8    to please swear in Mr. Tanios.

9        GEORGE PIERRE TANIOS, DEFENDANT, SWORN

10       THE COURT:  Now, Mr. Tanios, are you a citizen of the

11   United States?

12       THE DEFENDANT:  Yes.  Yes, Judge.

13       THE COURT:  Mr. Tanios, all persons are brought

14   before a judge as soon as possible after their arrest.  And so

15   we're not here today to determine your guilt or innocence.

16   This is an initial appearance.  And the purpose of an initial

17   appearance is to tell you the alleged violations against you,

18   to let you know that you have a right to an attorney, and to

19   determine whether you will be released pending trial, or if we

20   will set a detention hearing.

21       Now, Mr. Tanios, you have been charged in the United

22   States District Court for the District of Columbia, by the

23   grand jury sworn in on January 8, 2021, with the following

24   offenses.  Count 1 charges you as follows:  Commencing on or

25   about January 6th, 2021, in the District of Columbia, and

1    elsewhere, that the defendants, Julian Elie Khater and George
2    Pierre Tanios, knowingly and willfully did conspire and agree
3    together with each other to injure U.S. Capitol Police Officer
4    B. Sicknick, U.S. Capitol Police Officer C. Edwards,
5    Metropolitan Police Officer D. Chapman, and other officers
6    while those officers were engaged in, or on account of, the
7    lawful discharge of their duties of their office or in order
8    to interrupt, hinder, and impede them in the discharge of
9    their official duties, in violation of Title 18, U.S. Code,
10   Section 372.  Among the means by which the defendants in
11   co-conspirators carried out the object of the conspiracy,
12   were; the defendant Julian Elie Khater and George Pierre
13   Tanios, armed themselves with a chemical spray and utilized
14   the chemical spray against members of the U.S. Capitol Police
15   and members of the Metropolitan Police Department who were
16   assisting the U.S. Capitol Police.
17        Now, in furtherance of the conspiracy and to the effect
18   the object thereof, the defendants performed the following
19   overt acts:  On or about January 6, 2021, in the District of
20   Columbia, that the defendants Julian Elie Khater and George
21   Pierre Tanios, joined with others at the U.S. Capitol, which
22   was closed to the public and guarded by members of the United
23   States Capitol Police and members of the Metropolitan Police
24   who were assisting the U.S. Capitol Police.
25        On or about January 6, 2021, in the District of Columbia,

1    the defendants Khater and Tanios, jointly and in concert,

2    moved close to the police line that was guarding the perimeter

3    of the Lower West Terrace of the U.S. Capitol building.

4        On or about January 6, 2021, District of Columbia, the

5    defendant Tanios carried a canister of chemical spray within a

6    backpack he was wearing.

7        January 6, 2021, in the District of Columbia, defendant

8    Khater, asked defendant Tanios for the chemical spray and

9    defendant Khater then retrieved a chemical spray from the

10    backpack that defendant Tanios was wearing.

11        On or about January 6, 2021, in the District of Columbia,

12    Khater and Tanios planned and discussed the timing of when to

13    utilize the chemical spray against law enforcement.

14        On or about January 6, 2021, in the District of Columbia,

15    defendant Khater deployed a chemical spray directly at law

16    enforcement officers in the police line guarding the Lower

17    West Terrace of the U.S. Capitol building.

18        On January 6, 2021, in the District of Columbia,

19    defendant Khater utilized a chemical spray against U.S.

20    Capitol Police Officer B. Sicknick, U.S. Capitol Police

21    Officer C. Edwards, and Metropolitan Police Officer D.

22    Chapman, and other lawful enforcement officers.

23        Now, Count 2 is assaulting, resisting or impeding certain

24    officers using a dangerous weapon and aiding and abetting.

25        On or about January 6, 2021, within the District of

1    Columbia, Julian Elie Khater and George Pierre Tanios, using a
2    deadly or dangerous weapon, that is, a chemical spray, did
3    forcibly assault, resist, oppose, impede, intimidate, and
4    interfere with an officer and employee of the United States
5    and of any branch of the United States government including
6    any member of the uniformed services, that is Officer B.
7    Sicknick, an officer of the U.S. Capitol Police Department,
8    while such officer or employee was -- I'm sorry -- engaged in
9    or on account of the performance of official duties, and where
10   the acts involved physical contact with the victim and the
11   intent to commit another felony.

12       Now, Count 3, assaulting, resisting, or impeding certain
13   officers using a dangerous weapon in aiding and abetting.  On
14   or about January 6, 2021, District of Columbia, Khater and --
15   defendants Khater and Tanios using a deadly or dangerous
16   weapon, that is, a chemical spray did forcibly assault,
17   resist, oppose, impede, intimidate, and interfere with, an
18   officer or employee of the United States, and any branch of
19   the U.S. Government including any member of the uniformed
20   services, that is Officer C. Edwards, an officer of the United
21   States Capitol Police Department, while such officer or
22   employee was engaged in or on account of the performance of
23   official duties and when the acts involved physical contact
24   with the victim with the intent to commit another felony.

25       Count 4, also assault, resisting, or impeding certain

1    officers using a dangerous weapon and aiding and abetting.  On

2    or about January 6, 2021, within the District of Columbia,

3    defendants Khater and Tanios, using a deadly or dangerous

4    weapon, that is, a chemical spray, did forcibly assault,

5    resist, oppose, impede, intimidate, and interfere with, an

6    officer and employee of the United States, and any branch of

7    the United States Government including any member of the

8    uniformed services, and that is, Officer D. Chapman, an

9    officer of the Metropolitan Police Department, who was

10   assisting the U.S. Capitol Police while such officer or

11   employee was engaged in or on account of the performance of

12   official duties and where the acts involved physical contact

13   with the victim in the intent to commit another felony.

14       Now, Count 5 he is charged with civil disorder.  On or

15   about January 6, 2021, within the District of Columbia,

16   defendants Khater and Tanios committed and attempted to commit

17   an act to obstruct, impede, and interfere with law enforcement

18   officers, that is, Officers Sicknick and Edwards, officers of

19   the U.S. Capitol Police and Officer D. Chapman an officer of

20   the Metropolitan Police Department for the District of

21   Columbia, lawfully engaged in the performance of their

22   official duties incident to and during the commission of a

23   civil disorder, and the civil disorder obstructed, delayed,

24   and adversely affected the conduct and performance of a

25   federally protected function.

1    Count 6, which is obstructing or impeding any official

2    proceeding, reads that, on or about January 6, 2021, within

3    the District of Columbia and elsewhere, defendants Khater and

4    Tanios, attempted to, and did, corruptly obstruct, influence,

5    and impede an official proceeding, that is, a proceeding

6    before Congress by committing an act of civil disorder, and

7    engaging in disorderly and disruptive conduct.

8    Count 7 is entering and remaining in a restricted

9    building or grounds with a deadly or dangerous weapon causing

10    significant bodily injury.  And it reads that, on or about

11    January 6, 2021, in the District of Columbia, defendants

12    Khater and Tanios, did unlawfully and knowingly enter and

13    remain in a restricted building and grounds that is, any

14    posted, cordoned-off, and otherwise restricted area within the

15    United States Capitol and its grounds, where the Vice

16    President and Vice President-elect were temporarily visiting,

17    without lawful authority to do so, and, during and in relation

18    to the offense, did use and carry a deadly and dangerous

19    weapon, that is, a chemical spray, and did cause significant

20    bodily injury.

21    Count 8 is disorderly and disruptive conduct in a

22    restricted building or grounds with a deadly or dangerous

23    weapon and causing significant bodily injury.  And it reads,

24    that, on or about January 6, 2021, in the District of

25    Columbia, that the defendants Khater and Tanios, did

1    knowingly, and with intent to impede and disrupt the orderly

2    conduct of government business and official functions, engage

3    in disorderly and disruptive conduct in and within such

4    proximity to, a restricted building and grounds, that is, any

5    posted, cordoned-off, and otherwise restricted area within the

6    U.S. Capitol and its grounds, where the Vice President and

7    Vice President-elect were temporarily visiting, when and so

8    that such conduct did in fact impede and disrupt the orderly

9    conduct of government business in official functions and

10   during and in relation to the offense, did use and carry a

11   deadly and dangerous weapon, that is, a chemical spray, and

12   did cause significant bodily injury.

13        Count 9 the charge is engaging in physical violence in a

14   restricted building or grounds with a deadly or dangerous

15   weapon and causing significant bodily harm.  And this reads

16   that, on or about January 6, 2021, in the District of

17   Columbia, that the defendants Khater and Tanios did knowingly,

18   engage in an act of physical violence against any person and

19   property in a restricted building and grounds, that is, any

20   posted, cordoned-off, and otherwise restricted area within the

21   United States Capitol and its grounds, where the Vice

22   President and Vice President-elect were temporarily visiting

23   and, during and in relation to the offense, did use and carry

24   a deadly and dangerous weapon, that is, a chemical spray, and

25   did cause significant bodily injury.

1     And finally Count 10, which is the act of physical

2  violence in the Capitol grounds or buildings, that, on or

3  about January 6, 2021, in the District of Columbia, that the

4  defendants Julian Elie Khater and George Pierre Tanios,

5  willfully and knowingly engaged in an act of physical violence

6  within the United States Capitol grounds and any of the

7  Capitol buildings.

8     Now, Mr. Tanios, the penalties for these charges are as

9  follows:  Count 1 the penalty is up to six years maximum term

10  of imprisonment, maximum fine of $250,000, three years of

11  supervised release.

12     For Counts 2, 3, and 4, it's up to a 20-year maximum term

13  of imprisonment, a maximum fine of up to $250,000 and

14  three years of supervised release.

15     Count 5, it's up to a five-year maximum term of

16  imprisonment, a maximum fine of $250,000, and three years of

17  supervised release.

18     Count 6 is up to 20 years maximum term of imprisonment,

19  maximum fine of $250,000, three years of supervised release.

20     And Count 7, 8, and 9, the dangerous deadly weapon charge

21  is up to ten years maximum term of imprisonment, a fine of

22  $250,000, three years of supervised release.

23     And Count 10 is up to six months maximum term of

24  imprisonment, and a maximum fine of $1,500, and one year of

25  supervised release.

1    Now, Mr. Tanios, as you can see, the Court has appointed

2   court-appointed attorneys for you, and we did that at your

3   initial appearance a week ago and they will at least continue

4   to represent you throughout these proceedings.  That was based

5   upon your financial record, which is of record, and that is

6   Ms. Gross and Mr. Walker.

7    I do want to advise you of your constitutional rights.

8   Those are as follows:  That you have a constitutional right to

9   remain silent.  If you give up your right to remain silent

10  anything that you say can and will be used against you in this

11  or any other court of law.  Even if you may have given a

12  statement to the police or others, you have a constitutional

13  right to make no further statement to the police or others,

14  and you have a constitutional right to make no further

15  statement to the authorities.  Even if you start to make a

16  statement, you have the constitutional right to stop in

17  mid-word or sentence and say no more.

18   You have the right to counsel to assist you in this

19  matter.  If you cannot afford an attorney, you may qualify to

20  have one appointed to represent you.  Whether appointed or

21  retained, you have the right to the assistance of counsel at

22  every stage of these proceedings against you during any

23  questioning by authorities.

24   Now, as you are aware, Mr. Tanios, and your counsel are

25  aware, you have -- the government has made a motion to detain

1    you in this matter.  The Court has entered an order of

2    temporary detention, and we had scheduled within the required

3    three days on Thursday, and you, through your counsel, asked

4    it to be continued to -- and your counsel asked that it be

5    continued so that you could be better prepared for what is a

6    significant hearing for you.

7         I do want to remind those who are participating by Zoom

8    that it is our local court rule that you are not to record

9    these proceedings.  You are not to photograph.  Even though

10   this is a Zoom proceeding, I am presiding, I am sitting in the

11   courtroom and we expect all of you to honor the standard court

12   decorum, and failure to honor that can result in action by the

13   Court.

14        Now, I do want to make sure that counsel and I are on the

15   same page about this.  I did schedule it for a preliminary

16   hearing.  A preliminary hearing would be necessary if we were

17   just proceeding on a complaint in this matter.  But in between

18   the initial hearing and after I noticed it for a preliminary,

19   we now have the indictment.  So a grand jury in Washington,

20   D.C., has found probable cause that these crimes were

21   committed and they were committed by Mr. Tanios and Mr.

22   Khater.

23        So Ms. Gross or Mr. Walker, do you agree with the Court's

24   assessment that a preliminary hearing is not necessary?

25             MS. GROSS:  Yes, Judge.

1        THE COURT:  Okay.  Thank you.  And is the government

2  of the same opinion?

3        MS. WAGNER:  Yes, Your Honor.  Thank you.

4        THE COURT:  A preliminary hearing will not be

5  necessary.  We will go ahead and proceed with the detention

6  hearing.

7    You know, Ms. Gross, I do -- maybe there isn't anyone in

8  here who is going to be a witness.  Okay.  I don't believe

9  there is.  Okay.  So with that --

10       MS. GROSS:  No, there is not.

11       THE COURT:  Thank you.  With that, the government may

12  proceed on its motion to detain, and call its first witness.

13       MS. WAGNER:  Thank you, Judge.

14    We intend to proceed by a proffer of the evidence which

15  is largely explained in the sworn affidavit of FBI Special

16  Agent Riley Palmertree, and with which this Court is already

17  familiar.  We have some additional evidence that we will

18  proffer that we have obtained since the affidavit was sworn

19  out.  But before I summarize the investigation, I would like

20  to introduce 15 exhibits that were referenced in the search

21  warrant affidavit and on which we rely this morning for the

22  purpose of detention.

23       THE COURT:  Okay.  Thank you.  And you have presented

24  those?  Do you have them stamped and numbered, and you also

25  have presented those to counsel for defendant?

1    MS. WAGNER:  Yes, Judge.  We have given defense
2    counsel a copy this morning.  Your law clerk has been provided
3    with a copy also this morning.  And I have a copy here for the
4    clerk.
5         THE COURT:  Okay.  Thank you.
6         Let me ask you, Ms. Gross or Mr. Walker, are there any
7    objections to the exhibits being introduced by the government
8    at this time?
9         MS. GROSS:  Judge, we don't object to the exhibits.
10        THE COURT:  Okay.  Thank you.  There being none,
11   Government's Exhibits 1 through 15 shall be admitted into
12   evidence and we will proceed.
13        MR. WALKER:  Judge, I would like to object.  This is
14   Richard Walker speaking.  I would like to object.  While I
15   think the government is within its rights to proffer the
16   evidence in this case, I want the Court to understand that
17   obviously the weight of the evidence is a very significant
18   factor, the weight of the evidence against Mr. Tanios.  And we
19   are fully prepared to cross-examine the agent who -- you know,
20   we agreed for the agent to appear by Zoom today with the
21   expectation that the agent would provide testimony of some
22   kind.  And we are fully prepared to cross-examine that agent
23   because we want to evaluate the weight of the evidence.
24        And at this point in time, given that we haven't received
25   any other investigative materials other than what has been

1    provided today, again, the government is within its rights to
2    withhold information until the time for discovery.  The only
3    way for us to test and the only way for the Court to
4    meaningfully assess the weight of the evidence would be
5    through cross-examination.  So I will just note that for the
6    record, that that is an objection here.
7         Now, Judge, obviously the other factor is that some day
8    this may -- some day soon this -- whether by the government's
9    request or the defendant's request, this will obviously be
10   reviewed by another court.  And again, it's virtually
11   impossible to have meaningful review as it relates to the
12   weight of the evidence until and unless there is an agent that
13   we can cross-examine or an eyewitness that we can
14   cross-examine.
15        So we take that position and I will say we are very much
16   looking forward to cross-examining that agent.  Unfortunately,
17   because of the government's decision, we won't be able to do
18   that today.  Thank you.
19             THE COURT:  Well, let me say this, Mr. Walker, and
20   since this is a bench proceeding, and certainly while I will
21   and I still overrule your objection to the extent that it
22   would preclude the introduction of the exhibits into evidence,
23   I will certainly listen to your argument as to the weight I
24   accord those exhibits, and so -- and I will note that on the
25   record.

1       But, Ms. Wagner, do you want to respond to that?

2           MS. WAGNER:  Judge, my response is that we are

3    entitled to proceed by proffer.  That's what we have chosen to

4    do today.  To the extent that this decision, your decision

5    today might be reviewed by the District Court in D.C., that is

6    a de novo review.  And so I think those concerns are sort of

7    muted by the standard of review that the District Court in

8    D.C., would take, and so that is our position, Judge.

9           THE COURT:  Okay.  You may proceed with your proffer.

10          MR. WALKER:  Judge, I would like to say one more

11   thing.  I am just going back to look at the rule.  Again, I am

12   somewhat surprised that there is no agent to testify in a case

13   like this.  I'm just going back to the rule, Judge.  And I

14   believe that 3142 is silent as it relates to the government's

15   permission to proffer.

16       I know that the rule expressly states that the defendant

17   may proffer, but I would have to refresh my recollection.  And

18   I will tell the Court that it's my recollection and my

19   understanding that the rule is silent as to permission for the

20   government to proceed by proffer.

21       So I'm going to tell the Court that I do not believe that

22   this is necessarily appropriate procedure, and if the Court is

23   going to permit the government to proceed by proffer and a

24   proffer only, I would like an opportunity to go back and

25   re-read the rule and perhaps conduct some research on that

1  point.

2       MS. WAGNER:  Judge, may I respond?

3       THE COURT:  First of all, what is the section again,

4  and the title?

5       MR. WALKER:  Well, it should be 18 United States Code

6  3142.

7       THE COURT:  Okay.  Thank you.  And --

8       MR. WALKER:  But again, I'm not taking the position

9  that I should be because I think the government should explain

10  that it has the authority to proceed only by proffer,

11  particularly again, Judge, because we expected the agent to

12  appear today.  We agreed to his appearance by video.

13       THE COURT:  Okay.  I'm going to go ahead and listen

14  to Ms. Wagner's response.

15       MS. WAGNER:  Judge, we had anticipated, and all the

16  parties anticipated, having a prelim today prior to the

17  indictment, that is why we secured permission from the Court

18  and from defense counsel to present the agent by Zoom.

19       But with respect to what 3142 provides, there is case law

20  that the government or the defendant may present evidence in

21  support of the factors listed in 3142(g) by way of proffer.

22  That's *United States versus Karni*, 298 F.2d 129.  That's a

23  decision out of the District Court of D.C., from 2004.  I

24  think that's the most recent case that I could find on the

25  subject.

1    But, Judge, this is -- it's in our opinion -- well

2    established that both the defendant and the government may

3    proceed by proffer in a 3142 hearing.

4         THE COURT:  Okay.  Thank you.

5         Did you have anything else you wanted to say, Mr. Walker?

6         MR. WALKER:  I would like an opportunity, if the

7    government doesn't have a copy of it, I would like an

8    opportunity to look at that case and research that case.  If

9    you could give us some time to do that, Judge.  I think that

10   would be appropriate.

11        I'm not convinced that the government has the right to

12   proceed by proffer.  This is entirely a surprise to us.  The

13   government hasn't provided the case law to us.  We had every

14   expectation that the agent would be here.  As they say back

15   home, Judge, not for nothing, but we spent days and days and

16   days preparing for the cross-examination of this witness, so

17   we would like an opportunity to verify the government's

18   position and to conduct some very quick recess if you could

19   give us 15 or 20 minutes to do that.

20        We have, probably, attorneys standing by in our office

21   who can assist with that.

22        THE COURT:  I -- of course, you have the officer's --

23   or the agent's affidavit, correct?

24        MR. WALKER:  It's in the record, yes.

25        THE COURT:  Okay.  And I was also prepared to permit

21

1    you to make argument in regard to that affidavit through a

2    proffer.  And I know that it is the Court's common practice to

3    permit proffers.  I understand this is a little different

4    case, but -- and I also understand Ms. Wagner's position that

5    certainly you would need testimony for a preliminary hearing

6    because you would need an agent to establish probable cause,

7    since that now has been established by a grand jury, that we

8    are now on to the detention issue.  But I will go ahead -- do

9    you want to give the case cite again, Ms. Wagner?

10            MS. WAGNER:  Yes, Judge.  It is *United States vs.*

11   *Karni*, K-A-R-N-I, 298 F.2d.  There is also --

12            THE COURT:  That's a D.C., case, correct?

13            MS. WAGNER:  Correct.  Another D.C. Circuit -- I'm

14   sorry, a D.C. Circuit case, *United States vs. Smith*, 79 F.3d

15   1208, holding that the Bail Reform Act allows the government

16   to proceed by way of proffer in lieu of presenting live

17   witnesses at a pretrial detention hearing.

18            THE COURT:  Okay.  I'm going to go ahead and take a

19   15-minute recess to give you an opportunity to review that,

20   Mr. Walker.

21             I would also indicate that since this is in the United

22   States District Court for the District of Columbia, that I

23   would be more influenced by D.C., District of Columbia, case

24   law, and the D.C. Circuit case law because I think that is the

25   one that I should be bound by in this case.

1        So with that, we will take a -- why don't we just be back

2    here at 10:45, and then we will proceed accordingly.

3        We will be in recess.  Thank you.

4        (Recess was taken at this time, 10:28 a.m. - 10:47 a.m.)

5        THE COURT:  The record should reflect that we are

6    back on the record in the matter of U.S. vs. Tanios.

7        The Court took a brief recess to give Mr. Walker the

8    opportunity to do some brief research to address the issue of

9    proffer in a detention hearing as opposed to offering live

10   testimony.

11       Do you have anything you want to offer, Mr. Walker?

12       MR. WALKER:  Yes, Judge.  Thank you for the

13   opportunity to conduct some legal research.  We have taken a

14   look at the case law the government has cited earlier today,

15   and we agree that that case law remains at this point in time

16   good law, has not been vacated, reversed or otherwise

17   overruled or invalidated in any way.

18       However, as you probably know by now, Judge, we found

19   another case from the United States District Court.  The

20   District Court in that case took a different position.  That

21   case is the *United States vs. Hammond*, from the District of

22   Maryland.  And the citation on that case is 44 F.2d 3743.

23   Again, it's a firearms case from the District of Maryland,

24   1999 case.  And as the Court can see, it's a very short

25   opinion.

1          But the bottom line is, that the District Court in that
2     case took the position that the government has the burden to
3     prove dangerousness by clear and convincing evidence.  That
4     the weight of the evidence is one of the four primary factors
5     that every judicial officer must consider when determining the
6     appropriateness of pretrial detention.
7          And in the *Hammond* case, the Court disagreed with the
8     government.  The government attempted to proceed by proffer.
9     The Court disagreed with that and determined -- required the
10    government to proceed with live testimony.
11         And I will note, Judge, in this case, that the government
12    filed a motion to detain.  The government did not take the
13    position that the rebuttable presumption in favor of detention
14    applies.  Therefore, the government has the full burden in
15    this case.  And under the Bail Reform Act, there is a
16    presumption of release.
17         So we do object to the government proceeding by proffer
18    for the reasons stated in *Hammond*, and for the reasons that I
19    previously stated, and the reasons that I am stating now, that
20    the government has the burden.  We are prepared to
21    cross-examine the agent.  We want to address the agent's
22    credibility.  The only way for us to truly explore the
23    evidence in this case and to understand the details of these
24    very serious charges in a very serious case is to hear from
25    the agent personally.  Thank you.

1          THE COURT:  I understand your argument.

2      Ms. Wagner, did you have anything else you wanted to add?

3          MS. WAGNER:  Yes, Judge, just briefly in response to

4   the *Hammond* case.  That case was very different than the case

5   we are here today on.  The District Court in *Hammond* noted

6   that the government in that case had simply referred the

7   magistrate judge to the indictment.  It had then proffered the

8   testimony of what the two law enforcement officers would have

9   been had they been presented to testify and they offered no

10  independent corroboration that the defendant there had been in

11  possession of or dropped the gun other than the eyewitness

12  testimony of those two officers.  And the precise holding in

13  *Hammond* was that when the proffered evidence is uncorroborated

14  statements of one or two police officers, the Court

15  determining detention should require live testimony of an

16  officer.

17      This case is remarkably different from that case, Judge.

18  We are here today with ten videos that capture different

19  pieces and parts of what happened on January 6, Mr. Tanios's

20  involvement in those events.

21      In addition, we are proffering corroborating information,

22  which includes Mr. Tanios's codefendant's statements after he

23  was Mirandized after his arrest last Saturday or Sunday.

24      And in addition to that, we have information from the

25  store which -- from which Mr. Tanios purchased the chemical

1    spray that was used to assault these officers in Washington,

2    D.C.  So here, Judge, we're not asking you to detain

3    Mr. Tanios on the basis of uncorroborated eyewitness

4    testimony.  We are prepared today to make a substantial

5    proffer of our evidence and we believe that this Court is --

6    will be equipped with what it needs to make that detention

7    determination.

8                    THE COURT:  Thank you.

9                    MR. WALKER:  Judge, may I respond to the information

10   about the codefendant and the information about information

11   from the store?

12       I think that that makes this situation worse for the

13   government, not better, because we're not corroborating the

14   agent's complaint or the factual statement that supported the

15   complaint with other evidence, Judge.  We are corroborating

16   with more hearsay apparently from witnesses who will not be

17   here today and apparently from witnesses who will not testify.

18       So this is hearsay on top of hearsay on top of hearsay,

19   and all the more reason, in our opinion, Judge, for this Court

20   to require the government to call the agent to explain the

21   evidence in detail.  Thank you.

22                    THE COURT:  Okay.  Thank you, Mr. Walker.

23       Again, I think all these arguments go to the weight of

24   the evidence, and it's the Court's decision, not anyone

25   else's, to determine whether or not the weight of the evidence

1   satisfies the requirements of the law.  You are absolutely

2   right that the law that Ms. Wagner cited in the District of

3   Columbia indicates and they support that burden being carried

4   by proffer.  I would also indicate that the Ninth Circuit

5   supports it as well as the Eleventh Circuit that it is common

6   at the detention hearings for both sides to proceed by

7   proffer.

8       And there are two things I might go on to add.  The

9   reason that they have decided that is by -- certainly

10  detention is a serious issue.  It's always temporary by its

11  nature.  And the trial itself certainly is the most

12  significant gathering of evidence that will determine

13  ultimately the defendant's fate.  And I would indicate that

14  the Fourth Circuit indicated in sentencing when people are

15  arguing about the contents of the presentence investigation

16  report, that they were permitted to do that by argument, and

17  that live testimony wasn't required.  And certainly sentencing

18  would be a greater deprivation of liberty interest than

19  detention.

20      In addition, I would also indicate, as you have,

21  Mr. Walker, that Mr. Tanios, whatever I do here today, whether

22  I release you on conditions of the release, or whether I

23  detain you, that is reviewable by the District Court in this

24  matter in D.C.  If I would determine to release you on bond,

25  the government could object to that, ask for a stay.  If I

1    find that you are a danger to the community or a flight risk,

2    your attorneys in D.C., could then ask that they be heard

3    before the judge in Washington, D.C.

4         So for those reasons -- certainly, Mr. Walker, I will

5    keep in mind what you have said, but I think that the vast

6    majority of the argument support, and the cases out there

7    support the practice of proffering evidence.  And I do think

8    the Maryland case was unusual in that regard.  And so I will

9    listen to the government's evidence and if concerned about the

10   quality of it or the voracity of it, then I will accord it the

11   weight I believe necessary.  And you can certainly point that

12   out in your argument in response to the proffer.

13        So with that, your objection is overruled.  We shall

14   proceed.

15        MR. WALKER:  Judge, we would like to request an

16   opportunity to call the case agent today, if that person is

17   the same person who provided the sworn statement of facts.  So

18   we reserve that right given that we weren't put on notice of

19   the fact that he wouldn't be here.  I presume that the agent

20   or someone standing in for the agent are appearing today by

21   Zoom.  They are -- naturally they would have been here had we

22   not agreed to that and I don't think we would have agreed to

23   it if we knew that the government would make the decision at

24   the 11th hour not to call that witness.

25        We reserve the right to call that person, that agent, in

1    support of our position at this hearing today or at another
2    hearing if that person is not available.  Thank you.  I
3    believe the affiant is Riley Palmertree.
4         THE COURT:  Your right is reserved.  I will make my
5    decision today.  And when my decision is made, then you can
6    talk with the D.C. counsel as to how they want to handle it,
7    whether the government appeals his release on bond or whether
8    you all appeal his detention.
9         With that, Ms. Wagner, you may continue.
10        MS. WAGNER:  Thank you, Judge.
11        And just so that it's not an awkward introduction, I have
12   our paralegal specialist who is going to be displaying photo
13   and video with us, Ms. Jones.
14        THE COURT:  Okay.  That will be fine.  Thank you.
15        MS. WAGNER:  Your Honor, the evidence shows that at
16   approximately 1:00 p.m., on January 6, 2021, a crowd of
17   violent rioters had assembled on the Lower West Terrace of the
18   United States Capitol.  United States Capitol Police had
19   formed a line of bike racks extending from one end of the
20   Lower West Terrace to the other to act as a barrier against
21   the crowd.
22        Officers were standing behind this line including
23   Officers Chapman, Edwards, and Officer Sicknick.  And they
24   were acting as a barrier.  They were standing behind this
25   barrier to fend off repeated attempts by the rioters to pull

Case 1:21-mj-00027-DJJ Document 30 Filed 03/24/21 Page 29 Page 13
Case 1:21-cr-00222-TFH Document 18-1 Filed 04/20/21 Page 29 of 113 PageID #: 120

29

1    on the bike racks with their hands or with ropes and straps.
2    The rioters were heckling, threatening, and throwing objects
3    at the officers at the police lines.
4         Surveillance footage of the incident shows George Tanios,
5    the defendant here, and his codefendant Julian Khater, working
6    together to assault law enforcement officers with an unknown
7    chemical substance by spraying the officers directly in the
8    face and eyes.  Mr. Tanios and Mr. Khater appear in the video
9    to time the deployment of these chemical substances to
10   coincide with other rioters' efforts to forcibly remove the
11   bike racks that were preventing the rioters from moving closer
12   to the Capitol building.
13        Surveillance footage shows that at 2:09 p.m., Mr. Tanios
14   can be seen walking towards the Lower West Terrace with
15   Mr. Khater just behind him.  And, Judge, I would like to show
16   Exhibit 1 at this time.
17            THE COURT:  You may.
18            MS. WAGNER:  This is Mr. Khater.  He is wearing a
19   beanie with a pom-pom on top, a dark jacket, and he has a
20   beard.
21        That's Government Exhibit 1.
22        Judge, and Government Exhibit 2, this depicts Mr. Tanios
23   who is also wearing -- I'm sorry -- who is wearing a beard, a
24   red jacket -- I'm sorry -- a beard, a red hat and a dark
25   hooded sweatshirt.  And Mr. Tanios is wearing a black

1    backpack.  That is Government Exhibit 2.

2        And you will -- Mr. Tanios was also wearing an ear piece

3    in his ear.

4        Judge, we also provided Exhibits 3 and 4 which are pole

5    cam footage.  They are quite lengthy compared to the other

6    clips, so we're not going to play the whole thing, Judge, but

7    what I want to show you that at various times between

8    2:09 p.m., and 2:14 p.m., Mr. Tanios and Mr. Khater are

9    videotaped interacting and engaging each other in animated

10   conversation while they are standing together.  So if we could

11   play Exhibit 3 for a moment.

12       THE COURT:  You may.

13       (Playing Government's Exhibit 3, a video, in open court).

14       MS. WAGNER:  And the arrows, Judge, the yellow arrow

15   is Mr. Tanios and the red arrow is Mr. Khater.  I'm sorry.  I

16   think I have that backwards.  The individual in the red cap

17   under the yellow arrow is Mr. Tanios.  And Mr. Khater is

18   wearing that beanie with the pom-pom.

19       Judge, during the investigation law enforcement

20   discovered open source media video of the incident from

21   January 6, 2021.  And on one video in particular, Mr. Khater

22   makes his way towards Mr. Tanios and asks him for bear spray

23   that Mr. Tanios is carrying for both of the men.  That is

24   Exhibit 5, which I would like to play in full now.

25       (Playing Government's Exhibit 5, a video, in open court.)

1         MS. WAGNER:  And Judge, it's a little bit hard to

2    hear because of all of the noise going on in the background,

3    but in the video, Mr. Khater asked Mr. Tanios to quote, give

4    me that bear shit.  And then he reaches into the backpack on

5    Mr. Tanios' back, that Mr. Tanios is carrying for both

6    individuals, and Mr. Tanios then states, "Hold on, hold on,

7    not yet, not yet.  It's still early."

8         And then, as I think the Court was able to hear,

9    Mr. Khater tells Mr. Tanios, "They just F-ing sprayed me."

10   And Mr. Khater is seen holding a white can with a black top

11   that appears to be a can of chemical spray.

12        The video surveillance also shows that Mr. Khater

13   continues talking with Mr. Tanios, and at approximately

14   2:20 p.m., Mr. Khater walks thru the crowd within a few steps

15   of the bike rack barrier.  And I would like to play Exhibit 6

16   in full.

17        (Playing Government's Exhibit 6, a video, in open court.)

18        MS. WAGNER:  And, Judge, what we just saw there

19   towards the end of the part where the video was slowed down

20   was Mr. Khater under the red arrow and the officers under the

21   green, yellow, and blue arrows at the moment that they were

22   being -- at the moment that they were being sprayed by

23   Mr. Khater.  Mr. Khater is standing directly across from the

24   line of officers, and those officers are U.S. Capitol Police

25   Officer Brian Sicknick and Caroline Edwards, and Metropolitan

1    Police Department Officer Damian Chapman.  And Officer Chapman

2    was wearing a body worn camera device, and you will see a clip

3    from that in one moment.

4        Officer Chapman's body cam shows that at 2:23 p.m., the

5    rioters begin pulling on the bike rack to his left using ropes

6    and their hands to pull the rack away.  Seconds later

7    Mr. Khater is observed with his right arm up in the air

8    appearing to be holding a canister in his right hand and

9    aiming it in the direction of the officers while moving his

10   right arm from side to side.  And Officer Chapman's body

11   camera, which we will now play, confirms that Mr. Khater was

12   standing only five to eight feet away from the officers.

13       (Playing Government's Exhibit 7, a video, in open court.)

14       MS. WAGNER:  And, Judge, the footage and body cam

15   video show that officers Sicknick, Chapman, and Edwards who

16   were standing within just a few feet of Mr. Khater all react

17   one by one to what appears to be getting struck in the face

18   with chemical spray by Mr. Khater.  And the officers, all

19   three, immediately retreat from the line, bringing their hands

20   to their faces and rushing to find water to rinse out their

21   eyes.

22       Now, I would like to play Exhibit 8.

23       (Playing Government's Exhibit 8, a video, in open court.)

24       MS. WAGNER:  And, Judge, at the 2:23 p.m., on the

25   surveillance footage, Mr. Khater is again observed raising his

1    arm and continuing to spray in the direction of law

2    enforcement officers.  At this point, Metropolitan Police

3    Department Lieutenant Bagshaw notices these actions and

4    approaches Mr. Khater.

5         And in Exhibit 9, you can -- you will -- it depicts

6    Lieutenant Bagshaw spraying Mr. Khater as observed both in the

7    video surveillance and Lieutenant Bagshaw's body cam.  And

8    then Mr. Khater is seen fleeing the area.

9         Judge, these are three different angles played together.

10        (Playing Government's Exhibit 9, a video, in open court.)

11        MS. WAGNER:  Judge, Officers Sicknick, Edwards, and

12   Chapman suffered injuries as a result of being sprayed in the

13   face with the unknown substance by Mr. Khater.

14        The officers were temporarily blinded by the substance or

15   temporarily disabled from performing their duties, and each

16   needed medical attention and assistance from fellow officers.

17   They were initially treated with water in an effort to wash

18   out the unknown substance from their eyes and on their face.

19   All three officers were incapacitate and unable to perform

20   their duties for at least 20 minutes or longer while they

21   recovered from the spray.

22        With respect to Officer Chapman, he immediately retreated

23   from the line to wash his eyes out with water, and after some

24   time returned to the line to assist his fellow officers, but

25   upon returning he found that his eyes were still burning.  He

1   could not fully see and he could not perform his duties to his

2   full capacity, and so he was compelled to withdraw and

3   continue to address his having been sprayed by treating his

4   eyes with water.  He confirmed later to investigators that he

5   had, in fact, been sprayed as depicted on the video camera, on

6   the video footage.

7        With respect to Officer Caroline Edwards, the body cam

8   footage of Metropolitan Police Department Officer Hawkins

9   shows Officer Edwards reacting and saying she was hit in the

10  face.

11       If we could play Exhibit 10, please.  This is Officer

12  Hawkins' body worn camera.

13       (Playing Government's Exhibit 10, a video, in open

14  court.)

15       MS. WAGNER:  Judge, as can you see, Officer Edwards

16  could not see.  She had to be aided by a fellow officer who

17  had to give her verbal directions to her and physically lead

18  her through the scaffolding to safety.  She certainly could

19  not perform her duties.  And the chemical spray burned her

20  skin to such an extent that three weeks later she still had

21  scabbing under her eyes and required follow-up care with a

22  dermatologist.  She described the spray to her face to

23  investigators as a substance as strong as, if not stronger

24  than any version of pepper spray she had been exposed to

25  during her training as a law enforcement officer.

1    Officer Sicknick reported to his supervisors and

2    colleagues that he had been pepper sprayed as well.  And we

3    have two videos of Officer Sicknick, Judge.  We are just going

4    to play a small portion of one of them, but you can see from

5    the video, that even ten minutes after the incident, Officer

6    Sicknick appears to be attempting to walk off the effects of

7    the pepper spray.  He is rubbing and rinsing his eyes with

8    more water, and pausing at times while crouched over with his

9    hands on his knees.

10   And Officer Sicknick is the officer wearing blue in this

11   video.

12   (Playing Government's Exhibit 11, a video, in open

13   court.)

14        MS. WAGNER:  And if we could play 12, also.

15   (Playing Government's Exhibit 12, a video, in open

16   court).

17        MS. WAGNER:  Judge, based on the surveillance

18   footage, law enforcement prepared flyers of photographs of

19   Mr. Khater and Mr. Tanios, which were published along with

20   other individuals involved in the violence at the U.S. Capitol

21   on January 6th.

22   A tipster to the FBI provided information that Mr. Tanios

23   and Mr. Khater knew each other.  Law enforcement received two

24   further tips that included a photo of Mr. Tanios at the

25   Capitol on January 6, 2021, that was determined to be from a

1    Facebook page belonging to an individual named George Pierre

2    Tanios, and confirmed that Mr. Tanios was wearing clothing

3    with the insignia of Sandwich University in both his profile

4    picture and his picture at the Capitol.  The hooded sweatshirt

5    that Mr. Tanios is wearing in the Capitol picture appears

6    identical to the sweatshirt worn by Mr. Tanios in the

7    surveillance video.

8        Another tipster reported to law enforcement that

9    Mr. Tanios had bragged about going to the insurrection at the

10   Capitol on Facebook and that the tipster indicated that

11   Mr. Tanios owns the quote, Fat Sandwich Restaurant, end quote,

12   which law enforcement was able to corroborate.

13       Investigators also learned that Mr. Tanios and Mr. Khater

14   utilized cellular telephones to communicate on January 6,

15   2021, at the U.S. Capitol.  Based on a review of video

16   footage, Mr. Khater was seen making or answering a telephone

17   call at 2:42 p.m., on January 6, 2021.  And Mr. Tanios does

18   not appear to be physically near Mr. Khater at that time.  The

19   call lasts approximately 20 seconds.  And a review of Verizon

20   records for the telephone number associated with Mr. Khater,

21   showed that Mr. Khater was on a 21-second phone call with a

22   number known to be associated with Mr. Tanios.

23       Additional evidence obtained since the affidavit was

24   sworn out includes evidence that was seized from Mr. Tanios

25   and Mr. Khater's residences at the time search warrants were

1    executed in those locations on Sunday, March 14th and Monday,
2    March 15th, as well as information provided by Mr. Khater
3    during a statement given to law enforcement post Miranda
4    warning at the time of his arrest.
5         At Mr. Khater's residence in the dresser of a room that
6    Mr. Khater's father told investigators that Mr. Khater slept
7    in, law enforcement found a hat and gloves that matched
8    Mr. Khater is seen on the video wearing on January 6, 2021, at
9    the U.S. Capitol.  On the bed in another room, which
10   Mr. Khater claimed was his own during statements made to law
11   enforcement, they found the Columbia brand jacket with a UNC
12   logo that Mr. Khater is seen in the video wearing on January
13   6, 2021 at the Capitol.  And in the pocket of a separate green
14   jacket that was under the Columbia brand jacket law
15   enforcement found a spent canister of chemical spray.
16        At Mr. Tanios' residence, investigators found a black
17   backpack that appears to be identical to the one Mr. Tanios
18   wore at the Capitol on January 6th.  Inside that backpack
19   investigators found a Sig Sauer 9mm handgun with Mr. Tanios'
20   wallet and driver's license.
21        Also in the residence, investigators found two canisters
22   of Frontiersman brand bear spray, which appeared to be in
23   tact, except for the safety valves on one of the cans had been
24   removed, and one smaller canister of chemical spray on a shelf
25   in a closet next to ammunition.  The Frontiersman bear spray

1    canisters are consistent in color, shape, and size with the

2    canister that Mr. Khater was depicted holding in his hand in

3    one of the videos or still shots from the videos taken at the

4    U.S. Capitol on January 6, 2021.

5         If we could show Exhibit 13, please.

6         MS. WAGNER:  Could we switch the camera?  Oh, okay.

7    Sorry.

8         (Playing Government's Exhibit 13, a video, in open

9    court.)

10        MS. WAGNER:  And the smaller canister of chemical

11   spray found in Mr. Tanios' residence matched the empty

12   canister found at Mr. Khater's residence.  If we could show

13   Exhibit 14, which is the photo taken at the time of the search

14   warrant from Mr. Khater's house, and if we could put

15   side-by-side with that, Exhibit 15, which is the search

16   warrant photo from Mr. Tanios' residence.

17        With respect to the statement given by Mr. Khater at the

18   time of his arrest last weekend, he told investigators that he

19   drove from New Jersey to Morgantown, West Virginia, to pick up

20   Mr. Tanios; that the two arrived in Washington, D.C., late in

21   the evening on January 5th or early in the morning of January

22   6th where they intended to attend a Trump rally on January 6,

23   2021.

24        Mr. Khater told law enforcement that Mr. Tanios purchased

25   the bear spray and two smaller canisters of pepper spray.

1    Mr. Khater acknowledged that he knew that the bear spray was

2    not intended for use on humans.  Mr. Khater told investigators

3    that the two, he and Mr. Tanios, shared a backpack and that

4    Mr. Tanios carried the backpack for both of them.  Mr. Khater

5    told law enforcement that he and Mr. Tanios stayed in same

6    hotel and took a Lyft to the Capitol together.  Mr. Khater

7    acknowledged that after the spraying --

8         MR. WALKER:  Judge, we object to this.  I would like

9    to see a copy of the statement if it's going to be read

10    essentially into the record.  I know we have summaries of it,

11    but -- we may have summaries of it, but I would like a copy of

12    that statement if it's now being introduced as additional

13    hearsay.

14         THE COURT:  Did you provide them with a copy of the

15    summary, Ms. Wagner?

16         MS. WAGNER:  I did not, Judge.

17         THE COURT:  Do you have a copy?

18         MS. WAGNER:  I don't believe I have a copy of it -- I

19    know I don't have a copy of it with me, but I can try to get

20    one.

21         THE COURT:  Okay.  I am going to overrule the

22    objection.  I will afford the testimony -- or the proffer the

23    way I believe it merits.  Go ahead.

24         MS. WAGNER:  Mr. Khater acknowledged that after the

25    spraying he and Mr. Tanios stayed and that Mr. Khater climbed

1    the scaffolding to take pictures.  And Mr. Khater told law

2    enforcement that he and Mr. Tanios then drove back together

3    and that Mr. Khater dropped Mr. Tanios off in Morgantown, West

4    Virginia.

5        Judge, we have also obtained information from an

6    individual named Scott Biddle.  He is the manager of ATR

7    Performance in Morgantown.  The manager reported that one or

8    two days prior to January 6, 2021, Mr. Tanios walked into ATR

9    while on the telephone.  Mr. Tanios told the manager that he

10   and a friend that Mr. Tanios was on the phone with, were going

11   to the Trump rally in Washington, D.C.  Mr. Tanios asked Mr.

12   Biddle if he could take his firearm to D.C.  He responded no.

13   Mr. Tanios then asked if he could take a pepper ball gun which

14   was located near the cash register at the store to D.C., and

15   the manager, again, responded no, because it shot projectiles.

16   The specific pepper ball gun that Mr. Tanios asked about is

17   the HDP Prepared to Protect .50 caliber pepper ball pistol.

18       Mr. Tanios then walked over to the section of the store

19   where Mace was located and asked the manager if he could carry

20   Mace in D.C.  The manager responded, yes, so long as the Mace

21   was aerosol based.  Mr. Tanios purchased two cans of

22   Frontiersman brand bear spray, which is the only bear spray

23   that ATR carries.  Mr. Tanios also purchased two pepper sprays

24   that were on key chains.  Mr. Tanios told the manager that he

25   and his friend would carry the pepper spray on their person in

1    D.C., and put the bear spray in the car.  The manager provided
2    the receipt he believed to coincide with Mr. Tanios' purchase.
3    It was dated January 5th, 2021, at 5:09 p.m.  The manager told
4    the agent that that was the only combination of bear spray,
5    pepper spray, that he could remember being sold in the store.
6    And phone records belonging to Mr. Khater show a 39-second
7    call between Mr. Khater's number and Mr. Tanios' number at
8    4:58 p.m., on January 5th, 2021.  And again, the receipt was
9    January 5th, 2021, at 5:09 p.m.
10        That is the evidence that we would proffer for the
11   Court's consideration.
12        THE COURT:  Thank you.  Did you -- it seemed to me
13   the proffer had to do with -- primarily with the
14   dangerousness.  What would be the government's position on
15   flight risk?
16        MS. WAGNER:  Judge, our -- and I do have argument to
17   make, but I would proffer that as to flight, a known tipster
18   to the FBI has provided information that Mr. Tanios' mother
19   has indicated if he is released the family will attempt to get
20   him to Lebanon where the family has ties.  And so if you want
21   to hear our argument now, I am happy to provide it, but our
22   position is that Mr. Tanios is a flight risk as well as a
23   danger to the community.
24        THE COURT:  Okay.  I will hear your argument, but
25   nothing else to proffer on it?

1              MS. WAGNER:  That is the entire proffer, Judge.

2              THE COURT:  Okay.  Thank you.

3       Ms. Gross, Mr. Walker, you all may make your proffer or

4  offer witnesses.

5              MR. WALKER:  Judge, I'd like to ask for a copy of the

6  statement from the gentleman who apparently works at the

7  firearms dealership.  And, Judge, this is the first we are

8  hearing about an informant in this case.  We would like to

9  request any documented information relating to that person's

10  statement to the FBI.  And again, we think that given the

11  nature of this case and given the seriousness of it, the

12  nature of the allegations, that live witnesses should be

13  present.

14     I mean, that is a scandalous thing to say about a hard

15  working family, of small business people from New Jersey, and

16  many of whom are here and many of whom are prepared to testify

17  today and surely they will rebut that claim.  We think that if

18  the government would introduce an allegation like that, that

19  the entire family will conspire to obstruct the judicial

20  process before this Court, that a witness should be required.

21              THE COURT:  Okay.  I understand your position.  And

22  certainly I will take that under advisement after I hear what

23  your witnesses have to say.

24     So are you all ready to present your first witness?

25              MS. GROSS:  Judge, we are ready.  If we could just

1    have one second quickly to confer.

2        Thank you, Judge.  While we are on this topic, I think I

3    would like to have my first witness be Mr. Tanios' mother who

4    is available by Zoom.  If the Court could unmute her, her name

5    is -- oh, can you find her on the --

6            THE COURT:  I think Ms. Diamond is the one who is in

7    charge of this.

8            MS. DIAMOND:  Yeah.

9            THE COURT:  So Ms. Diamond -- tell us the name of the

10   individual you are calling, Ms. Gross.

11           MS. GROSS:  Magey Tanios.  Or it could be under his

12   -- I don't know if it's under her name, or it might be under

13   Maria, which is George's sister.  But his mother is with the

14   sister on Zoom.

15           THE COURT:  Sister has the same last name?

16           MS. GROSS:  Yes.  No?  Boutros.

17           THE COURT:  Any of you all able to communicate with

18   Ms. Diamond?  Okay.

19           MS. DIAMOND:  I'm here, Judge.  What were those names

20   again?

21           MS. GROSS:  Maria Boutros, or it could be under Magey

22   Tanios, M-A-G-I-E [sic.].  I do hear somebody.  Who is it?

23           MS. BOUTROS:  This is Maria.  I am next to my mother,

24   Magey.  And my father is here right next to me as well.

25           MS. GROSS:  Perfect.  Thank you so much.

1      THE COURT:  Go ahead and ask her -- at this time, I
2  would ask that the witness -- and again her name is?
3      MS. GROSS:  Magey Tanios.
4      THE COURT:  Ms. Tanios, if you would raise your right
5  hand, please, and be sworn by the clerk.
6                MAGEY TANIOS, DEFENSE WITNESS, SWORN
7      THE COURT:  Okay.  You may proceed.  And again, I
8  have to ask our reporter, hold on a second.  Are you hearing
9  that okay?
10      COURT REPORTER:  Yes, sir.
11      THE WITNESS:  All right, Judge.  This not too good.
12  I have to speak.
13                DIRECT EXAMINATION
14  BY MS. GROSS:
15  Q.  Hi, Ms. Tanios.  This is Beth Gross.  I represent your
16  son, and I am sitting next to him in court.  I don't think you
17  can probably see me, but I am raising my hand for you.  And
18  George is next to me here.  I just want to ask you a few
19  questions for the Court.  Okay?
20  A.  Yes.
21  Q.  Could tell the Court your full name, so they have it for
22  the record?
23  A.  Okay.  My name is Magey Pieria Tanios.
24      COURT REPORTER:  Spelling, please.
25  Q.  Could you please spell it for us?

1  A.  M-A-G-E-Y.  Rest of it too?  T-A-N-I-O-S.

2         COURT REPORTER:  There is another name.

3         MS. GROSS:  Oh, the middle name.

4  Q.  Your middle name, ma'am?

5  A.  P-I-E-R-I-A.  I'm sorry.

6         THE COURT:  I'm sorry, Ms. Gross.  There is someone

7  else appearing on the screen.  I think the witness should be

8  sequestered.  I don't know who that is.

9         MS. GROSS:  If we could just mute that one.

10        THE COURT:  Proceed.

11 BY MS. GROSS:

12 Q.  Okay.  Sorry, ma'am.  We are going to start all over

13 again.  Okay.  So I am just going to ask you a few questions

14 about your relationship with George.  George is your son; is

15 that right?

16 A.  Yes.

17 Q.  And can you tell us a little bit about where George was

18 raised.  Where did you raise your family?

19 A.  I raise my family -- you want me to tell you how I came

20 to United States?

21 Q.  Sure.

22 A.  If you don't want --

23 Q.  Sure.  That's okay.

24 A.  (Indiscernible) --

25        COURT REPORTER:  I'm sorry --

1    A.   -- lost my father.  I lose my mother.  I lost my sister.

2         THE COURT:  Hold on, Ms. Gross.  I apologize, I

3    interrupted at such a moment, but -- (To the court reporter)

4    Did you have trouble understanding?

5         COURT REPORTER:  The first part, yes.

6    A.   I said I want to come to United States.  United States,

7    she is the country for all the world.  I said I need peace.  I

8    came to United States when I am 20 years old.  I start -- I

9    work from beginning, no money, no nothing, with a broken

10   heart.  I raised my kids to work a 12-hour day, 12 hours in a

11   day with a small (indiscernible) in New Brunswick.  If you

12   like to ask about us, where we are, please go ahead.  And

13   (inaudible) --

14        (Zoom audio interference.)

15   A.   -- I raised my kids with the church.  I go every Sunday.

16   I send him to private school.  My son, he is not bad kid.  I

17   raised him with praying every morning, with praying at night.

18   I be honest with you.  I don't like bad kids.  And my son,

19   when he did that, he is wrong place, at wrong time.

20   Q.   I understand.  Can you tell us what did you do -- you

21   mentioned your employment whenever George was a young boy.

22   What did you do in New Brunswick?  That's where you lived; is

23   that correct?

24   A.   Yes.  We lived in small (indiscernible) near the

25   courthouse and city hall (indiscernible).

1    Q.   You ran a luncheon?

2    A.   Yes, more or less.  Lebanese food.

3    Q.   You guys were small business owners in New Brunswick?

4    A.   Yes, about 30 years.

5    Q.   Okay.  And George went to school his whole life and lived

6    his whole life in the same town?

7    A.   Yes, in St. Peter School.  It's Catholic school we send

8    my kids.

9    Q.   Okay.  And does George have any brothers or sisters?

10   A.   Yes.  He have a brother, he (indiscernible) and have one

11   sister (indiscernible).

12          THE COURT:  And I would say, Ms. Gross, I can't

13   imagine how difficult it is for her.  I don't have a problem

14   with you repeating things if the government does not.

15          MS. GROSS:  If I lead a little bit, I apologize.

16   Q.   Okay.  I am going to ask you a few pointed questions,

17   ma'am, and then I will let you end.  Okay?

18   A.   Yes.

19   Q.   Do you keep in touch with George now that he has been in

20   West Virginia?

21   A.   Of course.  He had three beautiful kids (indiscernible).

22   Q.   Have you once lived in Morgantown when George was living

23   here as well?

24   A.   I lived three years only.

25   Q.   You lived here for three years when George was working

1    here?

2    A.   Yes.

3    Q.   And you ran a restaurant in Morgantown with him; isn't

4    that right?

5    A.   Yes.  That's true and (indiscernible).

6    Q.   And now that restaurant is no longer in Morgantown; is

7    that correct?

8    A.   No.

9    Q.   Okay.  And after that, you moved back home to New Jersey?

10   A.   I moved back to New Jersey because all of my

11   (indiscernible).  I want --

12   Q.   Do you talk to George regularly on the phone?

13   A.   Of course.  He is my son.  He have three kids, of course,

14   but we (indiscernible) talk about politics.

15   Q.   And he has -- you have three grandchildren that are

16   George's; is that right?

17   A.   Yes.  Yes.

18   Q.   Okay.  Is there anything else that you think that I

19   should be asking you for the Court to know?  I want you to be

20   able to just calm down a little bit, so I don't want to ask

21   you too many questions to upset you.

22   A.   Don't worry.  Don't worry.

23   Q.   Okay.

24   A.   I am saying the truth.  That's it.

25   Q.   I have one more question that might upset you, okay, but

1    I have to ask.  So today, I don't know if you could hear a few

2    moments ago, but it was alleged that you had told someone that

3    if George were to be released, you would get him out of the

4    country; is that true?

5    A.  (Indiscernible) 40 years in the United States what you

6    talking about?  What you talking about?  I am (indiscernible).

7    This is my country.  That's United States.  God bless United

8    States.

9    Q.  I understand.

10    A.  What you talking about?

11         THE COURT:  Ms. Gross --

12    A.  I raised my kids, here.  We are Americans.

13    Q.  I understand that, ma'am.  If you could just answer yes

14    or no.  I assume your answer is no by the way you are

15    reacting; is that correct?

16    A.  No, of course not.

17    Q.  Okay.  We are good on questions right now for you, ma'am.

18    I appreciate your testimony, and I just -- you know, I very

19    much appreciate your time here.  And I understand you are

20    upset, and that is okay.  But we are going to move on to a

21    different witness for George at this time.  Okay?

22         THE COURT:  Don't leave.

23    A.  Thank you so much.

24    Q.  You stay here on the Zoom here for a second.  The

25    government has the opportunity to ask you some questions.

1   Okay?

2   A.   Exactly.   Thank you.

3   Q.   You're welcome.

4           THE COURT:  Did you have any questions, Ms. Wagner?

5           MS. WAGNER:  No.  I don't have any questions for

6   Ms. Tanios.

7           THE COURT:  Ms. Tanios, while your testimony is done,

8   we will mute you, but you are welcome to continue to watch the

9   proceedings.  Thank you --

10          THE WITNESS:  Thank you so much, Judge.  Thank you,

11  Judge.

12          THE COURT:  -- for being here.

13      Ms. Gross, you may call your next witness.

14          MS. GROSS:  Thank you.  The rest of our witnesses

15  will be in person, Judge.  So I think we can alleviate some of

16  the Zoom issues.

17      I would next like to call Amanda Plumley, which is

18  Mr. Tanios' fiancée.

19          THE COURT:  Thank you.

20          MS. GROSS:  And (inaudible) will go get her for me.

21          THE COURT:  If you would come in, please, and walk to

22  the front of the courtroom.  Yes, please, just right where the

23  clerk is.

24          AMANDA PLUMLEY, DEFENSE WITNESS, SWORN

25          THE COURT:  Ma'am, it's okay for you while you are

1   enclosed to pull your mask down --

2          THE WITNESS:  Thank you.

3          THE COURT:  -- so you can be better understood, and

4   there is also water if you would like.

5          THE WITNESS:  Thank you.

6                    DIRECT EXAMINATION

7   BY MS. GROSS:

8   Q.  Hi, Amanda.  If you could please just say your full name

9   and spell it out for the court reporter.

10  A.  Amanda Lynn Plumley.  A-M-A-N-D-A, L-Y-N-N,

11  P-L-U-M-L-E-Y.

12  Q.  Okay.  Thank you.  Amanda, if you could just give us kind

13  of a little bit of background about your relationship with

14  George.  Who is George to you?

15  A.  George is my partner of ten -- almost ten years, the

16  father of our three children.  We have two dogs.  We have

17  worked together throughout the years, and -- I'm sorry.

18  Q.  It's okay.  I can ask you more specific questions.

19  A.  Yeah, please.

20  Q.  That's okay.  You mentioned that you guys have been

21  together for ten years.  Where did you meet?

22  A.  We meet at -- through my old roommate.  She worked for

23  him at his bar, and we met at a bar.

24  Q.  That's okay.  Where is the bar located?

25  A.  Morgantown, West Virginia.

1    Q.    Okay.  And when you met George, you guys just started
2    dating in Morgantown through your friend; is that right?
3    A.    Yes.
4    Q.    Okay.  And eventually, your relationship got more
5    serious.  Did you guys move in together?
6    A.    Yeah.
7    Q.    And do you have -- you mentioned you have three children
8    together.  How young are your children?
9    A.    Our older son is four.  And this past summer we had
10   identical twin boys, and they are seven, almost eight months
11   now.
12   Q.    Okay.  What's George like as a father?
13   A.    Fun.
14   Q.    That's okay.  I know George currently runs a business.
15   Can you tell us about the business?  You run it together?
16   A.    Yes.  It's a, you know, like a late night sandwich shop,
17   and, you know, we have been changing through the Covid and
18   rebranded it a little bit.  We have a lot of like virtual
19   restaurants.  It's more delivery, take out focused.  We used
20   to be downtown and we had to move, but -- so he works a lot;
21   late night hours, and...
22   Q.    Sure.  And those restaurant businesses, are they all
23   based out of Morgantown as well?
24   A.    Yeah.  It's all from one building, like, we would have,
25   like -- kind of, like, ghost kitchens, virtual restaurants.

1    Q.   Okay.  And you guys own the main business.  What is it
2    called?
3    A.   Sandwich University.
4    Q.   Okay.  And how long have you guys been running that
5    together?
6    A.   Almost six years --
7    Q.   Okay.
8    A.   -- I think, yeah.
9    Q.   Okay.  And you described it as kind of like a -- is it
10   mostly college students eat at the Sandwich University?
11   A.   When it was downtown, it was more focused on the
12   late-night crowd.  We have rebranded it, so it's more of just
13   anybody, take out delivery.
14   Q.   Okay.  And up until Covid, that business was pretty
15   lucrative for you guys?
16   A.   Yeah.
17   Q.   Can you tell me about your home in Morgantown?  Have you
18   worked -- have you guys lived there long?
19   A.   We have always lived in Morgantown, but the residence
20   that we are at right now, we just moved there this past summer
21   because we are a growing family.
22   Q.   You moved into a bigger place?
23   A.   In June, yeah.
24   Q.   But you have been living in Morgantown together the
25   entire time you have been together?

54

1    A.   Not the entire time, like, within the first year of

2    dating we moved in together, yeah.

3    Q.   Okay.  Have you ever lived outside of Morgantown with

4    George?

5    A.   No.

6    Q.   Okay.  Can you tell me a little bit about George's

7    personality?  Is he a calm person?

8    A.   Yeah, for the most part.  I mean, he works hard and hangs

9    out with his family.

10   Q.   Okay.  So that's what he does whenever he is not working,

11   he is at home?

12   A.   Yes.  Yes.

13   Q.   Okay.  Whenever -- I know that George has a passport.  Do

14   you have that at your house?

15   A.   Yes.  I already sent it -- well, I didn't send it, but I

16   sent a photo to the probation officer who contacted me.

17   Q.   Okay.  If we needed the passport to be handed over, could

18   you bring it?

19   A.   Yes.  Yes.  Absolutely.

20   Q.   Okay.  And I know whenever George got arrested, it was a

21   stressful time, but you were very cooperative with law

22   enforcement; is that right?

23   A.   Yes, extremely.  And they were very kind as well.

24   Q.   Okay.  Let me just check with my co-counsel here.  You

25   also have a few firearms in the home; is that correct?

1    A.   Yes.

2    Q.   Do you have access to those?

3    A.   I have already had a registered gun owner come and take

4    them, and everything is gone.

5    Q.   Okay.  So they are no longer in your home?

6    A.   No.  I let the probation officer know that as well.

7    Q.   Okay.  Great.  Is there any -- any other weapons or

8    anything like that in the home?

9    A.   No.

10   Q.   Okay.  As far as George, whenever things were -- before

11   this happened, George worked a lot of hours per week; is that

12   correct?

13   A.   Uh-huh.

14   Q.   How many hours do you think he worked a week?

15   A.   Eighty to 100.

16   Q.   Hard worker?

17   A.   Yeah.  Well, I -- we have children, so I could no longer

18   be in the store as much.

19   Q.   So George works more and you are home more?

20   A.   Yeah.

21   Q.   Okay.

22        MS. GROSS:  I think that's pretty much it that I have

23   for you for now, Amanda.  Thank you so much.

24        THE WITNESS:  Thank you.

25        THE COURT:  Do you have any questions, Ms. Wagner?

1          MS. WAGNER:  No, I do not.

2          THE COURT:  Okay.  You may be excused.

3      And do you see any reason that you would want her to

4  remain in the courtroom, Ms. Wagner?

5          MS. WAGNER:  I don't, Your Honor.

6          THE COURT:  Okay.  You are welcome -- you just need

7  to distance yourself.  You are welcome to stay in the

8  courtroom.  You just need to distance yourself, but you are

9  welcome to stay in the courtroom if you would like.

10          MS. GROSS:  Thank you, Judge.  I do have another

11  witness.  Her name is Shadoe Lowers.

12          THE COURT:  Ma'am, if you would stop right where you

13  are, and the clerk is going to administer an oath, and then

14  you may have a seat.

15              SHADOE LOWERS, DEFENSE WITNESS, SWORN

16          THE COURT:  You may have a seat here, and once you

17  are seated, you may remove your mask so we can hear you more

18  clearly.  There is also water if you would like.

19          THE WITNESS:  Thank you.

20                      DIRECT EXAMINATION

21  BY MS. GROSS:

22  Q.   Hi Shadoe.  Can you see me pretty good?

23  A.   Yes, I can.

24  Q.   Okay.  If you could please just say your full name and

25  spell it for the court reporter.

1    A.    My name is Shadoe Lowers.  S-H-A-D-O-E, L-O-W-E-R-S.

2    Q.    Thank you, so much.  Shadoe, if you could just tell the

3    Court just the background of your relationship with George.

4    How do you know him?

5    A.    I am a friend and former employee of George.

6    Q.    Okay.  And when you say "former employee," of what --

7    what place were you his employee and when was that?

8    A.    I worked for a business that he previously owned as a

9    bartender at Fourth and Goal.

10   Q.    Okay.  And was that in Morgantown?

11   A.    Yes.

12   Q.    And when was that again, sorry?  Do you remember the

13   date, the year?

14   A.    About 2011, 2012.

15   Q.    Okay.  Was that in downtown?

16   A.    Yes.

17   Q.    Okay.  And I know that you -- Amanda had previously

18   mentioned that she was introduced to George by her roommate.

19   Were you her roommate?

20   A.    Yes.

21   Q.    So you introduced George and Amanda?

22   A.    Yes, I did.

23   Q.    How long ago was that?

24   A.    2011, 2012.

25   Q.    Okay.  And have you guys remained close ever since?

1    A.   Yes.

2    Q.   How often would you say you see Amanda or George?

3    A.   Every several months.

4    Q.   Okay.

5    A.   Talk to them pretty often, though.

6    Q.   Okay.  You guys communicate on the phone?

7    A.   Yes.

8    Q.   Did you move somewhere else?  You are not in Morgantown

9    anymore?

10   A.   No.  I live two hours away.

11   Q.   Okay.  And whenever you introduced Amanda and George,

12   was -- she was your roommate, right?

13   A.   Yes.

14   Q.   Were you guys WVU students together?

15   A.   Yes.

16   Q.   Okay.  Was she -- was Amanda also working at the bar or

17   no?

18   A.   She -- we worked together at another bar, but she did not

19   work at Fourth and Goal.

20   Q.   Okay.  Whenever George was basically your boss at Fourth

21   and Goal, kind of what was he like as an employer?

22   A.   You know, he is a tough boss.  No nonsense.  But he

23   always worked around my schedules.  Like I said, I worked at

24   another bar and I was a student, so -- he knew that being a

25   student was my priority, so he was tough, but he was

1   reasonable.

2   Q.   Okay.  Would you say -- was there ever any instances at

3   the bar that George had to, you know, have a problem within a

4   bar, college students fighting or any violence in the bar?

5   A.   As a college bar, especially downtown, I mean, there is a

6   lot of fights and violence, yes.

7   Q.   How was George -- how did George react to incidents like

8   that?

9   A.   He always handled it without resorting to violence

10  himself.  With the help of the bouncers and himself he would

11  take care of the situation without resorting to violence

12  himself.

13  Q.   So you have not known George to be a violent person?

14  A.   I cannot remember a time he has ever been violent.

15  Q.   Okay.  As far as your relationship with George now, I

16  know you know George as a friend, what is George like as a

17  friend and father?

18  A.   George is a great father, and he is a great to my friend

19  Amanda.  His oldest soon adores him.  He is very encouraging.

20  As a friend, you know, as I have made different career choices

21  and have grown, I mean he has witnessed me be a college

22  student to a young adult and he has always encouraged me, and

23  supported my decisions.  He is an entrepreneur himself, so he

24  has always encouraged that of us.

25  Q.   That's really great.  Thank you so much.  I don't have

1    anything else, Shadoe.  I appreciate your testimony.

2    A.    Thank you.

3          THE COURT:  Do you have any questions for the

4    witness, Ms. Wagner?

5          MS. WAGNER:  I do not, Judge.

6          THE COURT:  Okay.  Any objection to her remaining in

7    the courtroom if she so desires?

8          MS. WAGNER:  No, Judge.

9          THE COURT:  Okay.  Ma'am, you are welcome to stay in

10   the courtroom if you would like, just distance yourself.  If

11   you need to leave, I understand that too, and we will excuse

12   you.

13         THE WITNESS:  Thank you.

14         THE COURT:  Thank you.

15         MS. GROSS:  I have another witness, Judge.  He goes

16   by Michael, but his full name is --

17         THE COURT:  Well, just bring him in and he will --

18         MS. GROSS:  It's a name that's hard for me to

19   pronounce.

20         THE COURT:  -- introduce himself, and spell it on the

21   record.  If you would call your next witness, please.

22         MS. GROSS:  Michael Scottodiluzio.

23         MR. WALKER:  Your Honor, that witness is coming in.

24   We offer Mr. Tanios' passport to the Court or to the US

25   probation office during the pendency of this case if that is

1    agreeable to the Court.

2         THE COURT:  Thank you.  Thank you, Mr. Walker.  I

3    think it is appropriate to present it to the probation

4    officer.  Who --

5         MS. GROSS:  It's Ms. Grilli.

6         THE COURT:  Oh, there she is in the front row.  Thank

7    you.

8         Sir, if you would come forward, please.  Walk all the

9    way forward, stand -- if you would state your name, please,

10   and then spell it for the record.

11        THE WITNESS:  Yes.  It's Michela Scottodiluzio.

12   M-I-C-H-E-L-A, S-C-O-T-T-O-D-I-L-U-Z-I-O.

13        MICHELA SCOTTODILUZIO, DEFENSE WITNESS, SWORN

14        MS. GROSS:  Can I call you Michael?

15        THE WITNESS:  Yes.

16        MS. GROSS:  That would be a lot easier for me.  I

17   appreciate it.

18        THE COURT:  And, sir, you are welcome to remove your

19   mask, so you can be heard more clearly.

20        MS. GROSS:  And we have his name for the record; is

21   that correct?

22        COURT REPORTER:  Yes, ma'am.

23                         DIRECT EXAMINATION

24   BY MS. GROSS:

25   Q.  Hi Michael.  I am just going to ask you a few questions,

1    pretty open-ended.  If you could just start by telling us how

2    you know George.

3    A.   So I met George when I moved to Morgantown a few years

4    back.  I also own a restaurant.  And we made acquaintances by,

5    you know, through work.

6    Q.   Sure.  What restaurant do you -- or did you own or do you

7    own?

8    A.   It's called The Pizza Place.

9    Q.   Okay.  And is that in Morgantown as well?

10   A.   Yes.

11   Q.   Okay.  So did you start your business in Morgantown just

12   a few years ago; is that right?

13   A.   Correct.  October of 2018.

14   Q.   Okay.  And when you say you met George through business,

15   just describe that to me, your meeting through the business.

16   A.   So being new in town, I was just kind of reaching out to

17   other locally-owned businesses trying to collaborate and help

18   build a brand and kind of outreach, build a new customer base

19   and stuff.

20   Q.   How did George, you know, communicate with you, or how

21   did he help you in that manner?

22   A.   So we worked together previously, kind of collaborating

23   with our two different menus, and making -- you know, selling

24   items with menu items from both of our stores.

25   Q.   So you actually collaborated with your products

1    themselves, the food?

2    A.  Yes, uh-huh.

3    Q.  Okay.  And what was that like with George?  Was that a

4    good relationship?

5    A.  Yes.

6    Q.  Okay.  And whenever -- you said you own a restaurant now.

7    Do you also -- you don't live in Morgantown anymore; is that

8    correct?

9    A.  No.  I do.

10    Q.  Oh, you still do.  Okay.  So you still have a

11    relationship with George in Morgantown?

12    A.  Yes.

13    Q.  Okay.  Do you hang out with him just for business or also

14    friendly?

15    A.  We have hung out a few times outside of -- outside of

16    business as well.

17    Q.  Okay.  And what is his demeanor like?  What is his

18    character?

19    A.  He seems like a very -- to me, like, he is a trustworthy

20    person.  I have never had any issues.  He has always been

21    honest, and, you know, we have never had a bad relationship.

22    I was -- actually prior to Covid, I was looking to host an

23    event for kids with special needs, and he was one of the first

24    people that I reached out to and got a commitment with to --

25    he was going to donate food for the event.

1    Q.   Okay.  Have you ever known George to have a violent

2    demeanor or be violent?

3    A.   No.

4    Q.   Okay.  I don't have any other questions for you.  Thank

5    you so much.

6    A.   Thank you.

7              THE COURT:  Do you have any questions, Ms. Wagner?

8              MS. WAGNER:  I do not, Judge.

9              THE COURT:  May he also remain in the courtroom if he

10   so desires?

11             MS. WAGNER:  Yes.

12             THE COURT:  Okay.  Sir, you need to put your mask

13   back on.  Your testimony is finished.  You are welcome to stay

14   in the courtroom if you would like, just distance yourself

15   with your mask.  However, if you need to leave, you're a

16   business man, you are welcome to leave and you are excused.

17   Thank you.

18             Ms. Gross.

19             MS. GROSS:  Thank you, Judge.  I think (inaudible) is

20   going to get -- I have another witness that is in person.  His

21   name is James Keller.

22             THE COURT:  Okay.  Ms. Gross, how many other

23   witnesses do you anticipate?

24             MS. GROSS:  I have one more that is via Zoom, and

25   that's it.

1      THE COURT:  Okay.  I was just going to -- I started
2  to hesitate to keep people in chambers, but we are good in the
3  courtroom.
4      MS. GROSS:  Never mind, Judge.  I just have -- I
5  don't have James available.  I just would like to call his
6  sister, who is already on our line.  And she is there with his
7  mother.  Her name is Maria, but she is with Magey which is on
8  the Zoom.
9      THE COURT:  Ms. Diamond, if you can locate the
10  witness with that information and go ahead and unmute her, so
11  she may testify.
12      MS. GROSS:  There she is.  Maria, can you hear me?
13      THE WITNESS:  Yes.  Good morning.
14      MS. GROSS:  Okay.  Great.
15                    DIRECT EXAMINATION
16  BY MS. GROSS:
17  Q.  If you could state your full name and spell it out for
18  the court reporter that would be great.  Thank you.
19  A.  Sure.  It's Maria, M-A-R-I-A, Boutros, B-O-U-T-R-O-S.
20  Q.  Thank you so much.  Maria, I'm going to do a little
21  almost substitution --
22      THE COURT:  Hold on.  I don't think she is sworn.  We
23  have to swear you in Maria.
24              MARIA BOUTROS, DEFENSE WITNESS, SWORN
25  BY MS. GROSS:

1    Q.   Maria, I'm going to get you to do a little bit of

2    background for me just because it was a little bit more

3    difficult with your mom to kind of get through a few things.

4    Okay?

5    A.   Okay.

6    Q.   If you could kind of give me the family background that

7    your mom was trying to tell the Court, basically, you know,

8    your family history, why are you in New Jersey, how did you

9    guys get there, and then we will move on to the next question.

10   Okay?

11   A.   Sure.  So my parents came to the states to give us a

12   better life, with everything going on in Lebanon during the

13   civil war.  So they moved here just to start fresh.  They

14   started from nothing.  They put us in great schools.  We grew

15   up around the church, always being around family.  We are very

16   family oriented.  Majority of my family, both mom and dad's

17   side are all in New Jersey.

18       George was actually the first one baptized in our church,

19   which has been like a growing community.  But he unfortunately

20   moved away to Morgantown.  And it's been upsetting.  We have,

21   you know, he has a family.  We have always wanted them to be

22   closer.

23   Q.   Sure.  Sure.  I understand.

24   A.   Sorry.

25   Q.   Go ahead.  And I don't want to interrupt you, but I just

1    wanted to ask you, you mentioned about your church, your local

2    church.  What is that church's name?

3    A.  St. Sharbel.

4    Q.  Okay.  And your whole family goes there; is that right?

5    A.  Every Sunday.

6    Q.  Okay.  And are you George's older sister or younger?

7    A.  No.  I am his baby sister.

8    Q.  Okay.  How far in age are you guys separate?

9    A.  Between seven and eight years apart.

10   Q.  Okay.  So George has been a part of your whole life; is

11   that right?

12   A.  Yes.  I -- actually growing up, I always call him dad.

13   He was just always very protective, wanted the best for me.

14   My dad is more laid back and calm, so George was always there

15   to push me to do better.

16   Q.  Okay.  And can you just describe George's -- you know,

17   whenever George was in school, you were a good bit younger

18   than him, but what was George like in school?

19   A.  Very outgoing, passionate, driven, honest.  He always

20   pushed himself to be the best.  If he wanted something, he had

21   to work for it, and -- may I have a tissue?  Sorry.

22   Q.  That's okay.

23   A.  Just honest, motivated, hard working.  Always working.  I

24   always would tell him, stop working, stop working, you have to

25   spend time with the family.  He always wanted the best for

1    everyone around him.

2    Q.   And you don't know George to have a violent character, do

3    you?

4    A.   No.

5    Q.   Can you describe his demeanor normally to you and

6    everyone you know?

7    A.   He is a jokester, funny, and just always -- he just

8    wanted the best for everyone around him.

9    Q.   You don't know George to have a violent criminal past, do

10   you?

11   A.   No.

12   Q.   Have you ever seen George be violent?

13   A.   No.

14   Q.   Whenever George moved to Morgantown, how often would you

15   say you guys have communicated?

16   A.   All the time actually.  If he was working, I was always

17   speaking to his fiance, every single day.

18   Q.   So you have a very close relationship still?

19   A.   Yes.  Yes.  Of course.  We try to see each other as much

20   as possible.  Mostly at least holidays so that we can have the

21   whole family together.

22   Q.   Sure.  Have you ever been to Morgantown to visit George

23   and his family?

24   A.   Yes.  Of course.

25   Q.   Okay.

1    A.   I used to live there years ago, but I moved back to start
2    my own family.  I was there about three and a half years.
3    Q.   Okay.  Were you here when your mom was also here?
4    A.   Of course, for a short period of time, about one year.
5    Q.   Okay.  And have you ever been in any business with George
6    at all?
7    A.   Yeah.
8    Q.   So you were one of his employees as well?
9    A.   Yeah.
10   Q.   Okay.  And how is George as a boss compared to a brother?
11   A.   Tough too.  He opened up a small convenient store.  I
12   didn't know what I was doing.  I had just gotten out of
13   college.  He threw me into the store and said, "You have to
14   figure out everything by yourself," and I did the best I
15   could.
16   Q.   And was that store in Morgantown?
17   A.   Yes.
18   Q.   Okay.  Was that one of the first businesses he opened up?
19   A.   One of the first.
20   Q.   Okay.  I don't think I have any other questions about
21   your relationship with George.  I just wanted to say thank you
22   to you and your family for participating.  Thank you so much.
23        THE COURT:  Did you have any questions for the
24   witness, Ms. Wagner?
25        MS. WAGNER:  No, Your Honor.  Thank you.

1              THE COURT:  Okay.  Ma'am, you may continue to watch

2       the proceedings, although we are going to mute you now.  Thank

3       you for being here today.

4              THE WITNESS:  Thank you.

5              MS. GROSS:  Judge, that concludes our witnesses, live

6       and on Zoom.

7              THE COURT:  Okay.

8              MS. GROSS:  Hold on.  I have to confer with

9       Mr. Walker about that actually.

10             THE COURT:  You may do so.

11         (Defense counsel confer off the record.)

12             MS. GROSS:  Judge, actually we would like to call

13      another witness and I assume it's via Zoom, Agent Palmertree.

14             THE COURT:  Is he available?

15             MS. WAGNER:  Judge, I believe he is on Zoom.

16             THE COURT:  What would be --

17             MS. WAGNER:  Our position is, Your Honor, he is not

18      subject to cross-examination because we did not present his

19      testimony.  And we believe that the Court can take into

20      consideration his affidavit, and weigh the government's

21      proffer and we don't believe the defense is entitled to

22      cross-examine him.

23             MR. WALKER:  Judge, we don't want to cross-examine

24      him.  We want to call him as a witness in our case and we want

25      to conduct a direct examination, it's our intention.

```
1          THE COURT:  What do you expect from that -- because I
2    have to tell you, Mr. Walker, it doesn't -- it just seems like
3    it's an opportunity to discover information in a stage that is
4    early in the process, that typically would not be available.
5          MR. WALKER:  Judge, we want to find out -- we think
6    that the Court needs to know and we need to establish the
7    nature of the investigation.  We want to ask about the
8    particular observations and the interviews that the agent
9    conducted to make the determinations that our client is guilty
10   of a federal crime.  We want to test and explore the weight of
11   the evidence as it relates to all of the charged offenses.
12   This Court has to consider -- I mean, this just goes back to
13   the Hammond case.  This Court has to consider the weight of
14   the evidence.  And the only way at this point in time for our
15   office to explore that and develop that aspect of the case,
16   which is a critical factor, is to call the agent as a witness.
17        Now, obviously, we don't have this witness under subpoena
18   because it was our understanding and we, in fact, agreed that
19   the agent could appear today by Zoom.  He is available.  And
20   we are asking for an opportunity to ask him all about the
21   investigation and what his findings were.  Thank you.
22         THE COURT:  Where do you think the government's
23   evidence is inadequate as to the events that happened, and
24   that your client was there when it occurred?
25         MR. WALKER:  Judge, I don't think that I have a
```

1    burden to establish --

2         THE COURT:  No, no.  I understand that.

3         MR. WALKER:  -- that there are certain problems with

4    the government's case before I call the witness.  We want to

5    ask questions.  We want to find out what he knows.

6         The government gave a summary.  The government gave a

7    proffer.  We want to hear what the actual evidence is.  I

8    think it is irresponsible and not the best course to present

9    the information in support of detention in this case without

10   calling a single witness.

11        THE COURT:  Okay.  Let's go ahead -- I am going to

12   make the agent available.  So if you would, please -- if the

13   agent will appear, please, and then I will place him under

14   oath.  You may ask questions, Mr. Walker.

15        Okay.  Agent, if you would identify yourself for the

16   record, please.

17        THE WITNESS:  Can you hear me, Judge?

18        THE COURT:  Yes, sir, I can.  Thank you.

19        THE WITNESS:  My name is Special Agent Riley

20   Palmertree with the FBI.  My first name is spelled R-I-L-E-Y.

21   My last name is spelled P-A-L-M-E-R-T-R-E-E.

22        THE COURT:  Okay.  If you would raise your right

23   hand, please, to be sworn by the clerk.

24        RILEY PALMERTREE, GOVERNMENT'S WITNESS, SWORN

25

1          THE COURT:  You may proceed.

2                    DIRECT-EXAMINATION

3    BY MR. WALKER:

4    Q.   Agent Palmertree, good afternoon.  This is Richard

5    Walker.  Can you see and hear me?

6    A.   I can.

7    Q.   Okay.  I'm an assistant federal public defender here in

8    West Virginia, and I am one of the attorneys representing

9    Mr. Tanios.  You are probably aware of that.

10         Have you listened to the hearing so far today?

11   A.   Yes, I have.

12   Q.   All right.  So I want to ask some questions about your

13   investigation.  When did you become involved in the

14   investigation of Mr. Tanios?

15   A.   I became involved in an overall investigation around

16   January 7, 2021, regarding the incidence that occurred on the

17   Capitol January 6, 2021.

18   Q.   Is your duty station in Washington, D.C.?

19   A.   It is.

20   Q.   Can you explain when you became aware of Mr. Tanios and

21   tell us how you began the investigation of him specifically?

22   A.   I can't remember the exact date that I became aware of

23   Mr. Tanios.  Probably some time around late January and early

24   February, I, in doing my own investigation on the incidence

25   that happened on the Capitol on January 6, 2021, I became

1    aware of an incident wherein law enforcement officers were

2    sprayed with a chemical.

3    Q.   Who brought that to your attention?  What was it that

4    cause you to learn about that?

5    A.   Capitol surveillance video that was recorded on the

6    Capitol on January 6, 2021, and MPD body cam video recorded by

7    an officer's body cam on January 6, 2021.

8    Q.   When did you receive the identity of Mr. Tanios?  How was

9    it that you identified him or became aware that he was, in

10   fact, present?

11   A.   I can't give you the exact date it was provided via

12   tipster information to the FBI.

13   Q.   So was it through social media?

14   A.   One was through social media, I believe, the other was

15   direct information from a tipster.

16   Q.   Okay.  So you had video, and you had a tip, what did you

17   do next to pursue the investigation against Mr. Tanios?

18   A.   I investigated further via the tipster to ask if the

19   tipster was able to get me the identity of the individual whom

20   I associated with Mr. Tanios, who at that time was marked by

21   a -- simply a number, just as Mr. Tanios was.

22   Q.   Okay.  What did you learn?

23   A.   The identity of the other number was Mr. Khater.

24   Q.   Now, when you say a number that means you had assigned a

25   number or someone assigned a number to all of the individuals

1    involved in the incident that you were investigating?

2    A.   That's generally correct, yes.

3    Q.   Okay.  And you're referring to the incident where there

4    was pepper spray presented and allegedly directed towards

5    three officers on Capitol grounds.

6         Is that the incident that you were investigating?

7    A.   Correct, that's an offshoot of my broader investigation.

8    Q.   Right.  What did you do next after you identified the

9    identity of Mr. Tanios and Mr. Khater, what did you do next in

10   your investigation?

11   A.   I sought information from individuals who could

12   corroborate that identification.

13   Q.   And what did you learn?

14   A.   I learned -- I corroborated those identifications through

15   interviews with people who would be able to potentially

16   identify those individuals.

17   Q.   Okay.  So you reviewed video, you had a tip, you learned

18   about Mr. Tanios's identity, and you confirmed his identity.

19        What did you do next?

20   A.   Probably I continued the investigation to find out where

21   these individuals were.

22   Q.   Did you find out?

23   A.   Yes.

24   Q.   How did you --

25   A.   I found out where they were.

1    Q.   Okay.  And did you learn that Mr. Tanios was in

2    Morgantown, West Virginia?

3    A.   I did.

4    Q.   Right.  So what else did you do?  Did you -- did you talk

5    to any witnesses who were on the Capitol grounds?  Did you

6    interview the police officers?  Tell us what you did.  I mean,

7    you tell us what you did.

8    A.   I conducted an investigation, just like I usually do and

9    interviewed victims, of course, that was part of it.

10   Q.   Okay.  So you interviewed the three police officers who

11   were present?

12   A.   Are you talking about the three police officers in the

13   affidavit?  The one is deceased so I only interviewed two.

14   Q.   Edwards?  Did you interview Edwards?

15   A.   I did.

16   Q.   Did you interview Chapman?

17   A.   I did.

18   Q.   Okay.  Did they identify Mr. Tanios or Mr. Khater?

19   A.   No.

20   Q.   All right.  Did you interview any other individuals who

21   were present, eyewitnesses other than those two?

22   A.   I interviewed Lieutenant Bagshaw among others.  I have to

23   look at my case notes to see just how many individuals I

24   talked to that were in that vicinity at that particular time.

25   Q.   Well, did you talk to any eyewitnesses who had relevant

1    information about Mr. Tanios who were at the Capitol grounds?

2    A.   About Mr. Tanios?

3    Q.   Right.

4    A.   Yes.

5    Q.   What did witnesses tell you about Tanios?

6    A.   The witness told me that he and Tanios were together at

7    the Capitol on January 6, 2021.

8    Q.   Okay.  And now are you referring to Mr. Khater?

9    A.   I am referring to Mr. Khater.

10   Q.   All right.  Now, did Mr. Khater tell you about the

11   conspiracy that is alleged in Count 1 of the indictment, the

12   conspiracy to injure members of the Capitol Police Department

13   and members of the Metropolitan Police Department?

14   A.   Mr. Khater said that Mr. Tanios carried a backpack for

15   the both of them that had pepper spray and water in it.

16   Q.   All right.  And was there an agreement that Khater and

17   Tanios made prior to coming to Washington, D.C.?

18   A.   What kind of agreement?

19   Q.   Was there -- right.  Well, as alleged in Count 1 was

20   there an agreement to do anything with the backpack or the

21   items in the backpack?  Did Khater tell you that they had

22   agreed?

23   A.   Khater, from my memory, made no such descriptive comments

24   about their -- that type of corroboration.

25   Q.   Okay.  Well, obviously in Count 1 we are talking about a

1    conspiracy charge.  What was the agreement between Tanios and

2    Khater as it relates to Count 1?

3    A.   I don't know what the conspiracy was, I can only tell you

4    what I see in the video regarding the two working together.

5    Q.   Did you not testify in front of the grand jury?

6    A.   What is your specific question?

7    Q.   Did you testify in front of the grand jury about Count 1?

8    A.   About that corroboration?

9    Q.   About -- did you testify about Count 1 of the indictment

10   in front of a federal grand jury?  I am looking at the

11   indictment, have you seen it?

12   A.   Yes.

13   Q.   Did you provide testimony in support of that indictment?

14   A.   Yes.

15   Q.   Okay.  In Count 1 of the indictment, the third line

16   indicates that Khater and Tanios agreed to injure a U.S.

17   Capitol police officer and to injure a Metropolitan police

18   officer.

19        What is the evidence in support of that agreement based

20   on your investigation?

21   A.   In that I am referring to the video of the two working

22   together.  That's what I can say on that.

23             COURT REPORTER:  Can you repeat that, please?

24   Q.   Can you please repeat that?

25   A.   Yeah.  Could you do me a favor and just ask the question

1    one more time so can I make sure I understand what you are

2    asking me.

3    Q.   What is the evidence that Khater and Tanios conspired and

4    agreed together to injure a U.S. Capitol police officer and a

5    Metropolitan police officer?

6    A.   The video of them working together is what I am referring

7    to.

8    Q.   Okay.  So the evidence of the conspiracy is limited to

9    the video evidence that you have provided to the federal

10   prosecutor?

11   A.   As far as can I remember at this moment in time that's

12   what I am referring to.

13   Q.   Okay.  So Khater never told you that he had talked about

14   injuring a police officer with Tanios?

15   A.   Khater, his name is Khater.  And no, Khater never said

16   that they had made such a plan together.

17   Q.   Okay.  Tanios never told you that he and Khater had

18   discussed going to Washington, D.C. or going to the Capitol

19   grounds to injure a police officer from the Capitol Police

20   Department or from the Metropolitan Police Department?

21   A.   I have not spoken to Mr. Tanios, so no.

22   Q.   Have you observed any other communication between -- or

23   are you aware of any other communication between Khater and

24   Tanios where there was some text message, Facebook message,

25   message on WhatsApp relating to their agreement to allegedly

1    conspire and agree to injure a police officer?

2            MS. WAGNER:  Judge, if I could just reiterate our

3    objection to this.  Your Honor, this whole line of questioning

4    is a backdoor around the government's right to put on a

5    proffer as opposed to present the agent --

6            THE COURT:  I understand your objection.

7        Mr. Walker, the purpose of -- I understand part of the

8    consideration the Court is with respect to the government's

9    case, I have heard those proffers.  I think if you have

10   anything in regard to his flight risk or dangerousness that

11   you want to talk to the agent, I think you can address that.

12   I will give you some more leeway with the investigation, but I

13   am going to cut it off pretty quick.

14       So if you want to talk to him about the evidence about

15   dangerousness or flight risk, those are my considerations

16   today.  So go ahead.

17           MR. WALKER:  Judge, again, we were exploring the

18   weight of the evidence.

19           THE COURT:  I understand.

20           MR. WALKER:  I'm going to need you to tell me when I

21   am prohibited from asking further questions, because I fully

22   intend to go through every count in the indictment and ask

23   this agent what the evidence is that supports the critical

24   elements of the most serious charges.

25       So you'll have to tell -- I'm going to ask questions --

1    you'll have to tell me to stop, because I am not going to stop

2    until we have a full record as it relates -- I'm not going to

3    voluntarily stop until we have a full record as it relates to

4    the weight of the evidence, Judge, for all the reasons that

5    I've discussed today.

6            THE COURT:  Okay.

7            MS. WAGNER:  Judge, if I could just respond to that.

8    We have proffered evidence as to every element of each of

9    these offenses, including that there was evidence that

10   Mr. Tanios and Mr. Khater, were communicating about purchasing

11   the bear spray, as Mr. Tanios was purchasing it, their travels

12   together, Mr. Tanios' role as the person carrying the pepper

13   spray and Mr. Tanios' role as seen in the video where

14   Mr. Khater asked him for the bear spray and he says, "Not yet,

15   it's not time."

16           And this was not a, no, don't use the spray, this was a,

17   it's not time yet to use the spray.  And so we have proffered

18   evidence on each of these elements and we are prepared to draw

19   for the Court how we think those line up in our arguments.

20   But we believe that what Mr. Walker is doing here is forcing

21   the government to put on a witness when we have put on a

22   perfectly appropriate proffer with video evidence that

23   Mr. Tanios and Mr. Khater coordinated their activities and

24   that Mr. Khater assaulted these police officers with pepper

25   spray that Mr. Tanios purchased and carried and gave to

1    Mr. Khater when he asked for it.

2         THE COURT:  Okay.  Thank you.  Go ahead, Mr. Walker.

3    But I will listen to your next question.  But if you are going

4    to ask him about danger of flight risk you should do that now

5    because I don't know how much further I'm going to let you go

6    with the other questioning.

7         MR. WALKER:  That's fine, Judge.  Thank you.

8    BY MR. WALKER:

9    Q.   Agent Palmtree, *[sic]* --

10        MS. WAGNER:  Judge, it's Palmertree.

11        THE COURT:  His name is there, Mr. Walker.

12   BY MR. WALKER:

13   Q.   Agent Palmertree, is there any other evidence that you

14   are aware of, other than video, that is evidence of Tanios and

15   Khater's agreement to injure police officers as alleged in

16   Count 1?

17   A.   Nothing off the top of my head outside of the video that

18   had audio and video.

19   Q.   And we have that.  Thank you.

20        Now, as it relates to Count 2, you're aware that

21   Mr. Tanios is charged in aiding and abetting Khater's alleged

22   assault on Officer Sicknick with pepper spray.  Can we agree

23   on that?

24   A.   Yes.

25   Q.   All right.

1   A.   Yes.

2   Q.   Now, can you tell me, is there any evidence that

3   Mr. Tanios knew the codefendant would approach Officer

4   Sicknick with OC spray or pepper spray?

5          MS. WAGNER:  Judge, same objection.

6          THE COURT:  Sustained.  Mr. Walker, if you want to

7   ask him anything about dangerousness or flight risk, you may.

8   But, and I'll preserve your objection on the record, I'll note

9   it, but this is not a trial for them to prove their case.

10  It's not discovery for you to find out more.  And I think it's

11  past the point as to the weight of the evidence.

12    It's rare that we have video and audio that helps the

13  Court and others see what is occurring, so --

14         MR. WALKER:  Can I tell you the questions that I

15  intended to ask?

16         THE COURT:  Yeah, you can tell me.

17         MR. WALKER:  Judge --

18         THE COURT:  Were they about each count?

19         MR. WALKER:  It's very simple.  My approach is very

20  simple.  I was able to get my hands on the actual model jury

21  instructions for all of the counts of conviction, and

22  particularly as it relates to Count 2, I was able to obtain

23  model jury instructions for the offense of aiding and

24  abetting.  And one element of aiding and abetting is that the

25  defendant participated in something that he wished to bring

84

1    about, and I fully intended to ask the officer several

2    questions -- the agent -- about the evidence that Mr. Tanios

3    wished to bring about an assault of the alleged victim

4    identified in Count 2.

5        I would ask the same question as it relates to Count 3,

6    and to Count 4.  I also would have asked the agent what

7    evidence there is that Mr. Tanios knew -- just another element

8    of aiding and abetting -- that the codefendant intended and,

9    in fact, assaulted with pepper spray the three officers named

10   as victims in Counts 2, 3, and 4.

11       And I would ask other questions along those lines.  I

12   think it's really important, Judge, rather than him just to

13   have a story line, which is essentially what the government

14   has provided through his proffer to go through and understand

15   what the evidence is that supports every element of all of the

16   offenses that are identified in the indictment.

17       So that would be my plan.  I think that it's entirely

18   appropriate.  Obviously, Judge, I'm not here to try to obtain

19   discovery.  We'll get plenty of discovery in this case.  We're

20   not preparing for trial.  I am upset by that insinuation from

21   the government and frankly from the Court, because that's not

22   what we are here to do today.  We have someone that we

23   represent who has been charged with many serious offenses.

24   He's a family man.  He lives in Morgantown.  He owns a

25   business.  And one of the factors -- we have already presented

85

1    evidence that he is not a flight risk.  We've already

2    presented evidence that he's not a danger to the community.

3         What we need to do is we need to explore the weight of

4    the evidence.  And this witness in particular is the only

5    person available who can do that because he's the case agent

6    and he testified before the grand jury.

7         So that is what we want to do because we want Mr. Tanios

8    to be released back to his family.  Now, you mentioned the

9    trial.  I called the attorneys that I know personally in

10   Washington, D.C. and they told me we would be lucky to get a

11   trial in a year because of the pandemic, because of the number

12   of cases that are coming out of the incident on the Capitol

13   grounds.  So we won't have a trial probably for a year, Judge.

14   And that's why we are going to go fight, and we are going to

15   leave no stone unturned when it comes to having Mr. Tanios

16   released because he has never been in a situation like this

17   before.  He has never been incarcerated.  He's not spent any

18   time in the West Virginia Regional Jail and he certainly

19   hasn't spent time in the D.C. jail.  This is going to be hard

20   time for him if he is not released and we need to make a

21   record, because obviously this will be reviewed one way or the

22   other.

23        And, Judge, we also can go to the Court of Appeals in

24   Washington, D.C. as well.  And we fully intend to do that if

25   he is detained.  That's my purpose.  That's my only purpose.

1    It's very reasonable.  As matter of fact, I think that I would

2    be ineffective not to do that in this particular case.

3         Thank you, Judge.

4         THE COURT:  Do you have anything else you want to

5    add, Ms. Wagner?

6         MS. WAGNER:  Judge, I don't think that the Court is

7    being deprived of the ability to weigh the evidence unless we

8    draw it line for line to Mr. Walker's jury instructions.  We

9    have provided the Court with a sworn affidavit, the Court was

10   already familiar with, ten pieces of video footage,

11   photographs that show exactly what the government has alleged,

12   and exactly the basis for those allegations, the basis for the

13   government's charge against Mr. Tanios, his connection to

14   Mr. Khater, his role in these offenses, and we believe that

15   the Court has sufficient evidence to make the detention

16   determination to weigh the evidence as it is.  And as the

17   Court said, it's rare that we have so much video footage of

18   two people engaged in coordinated action.

19        We have witness statements that corroborate that.  We

20   have Mr. Khater's statements that corroborate that.  And so I

21   think the Court has what it needs to make a determination as

22   to the weight of the evidence.

23        MR. WALKER:  Judge, I would just like to say the

24   video doesn't tell the whole story in this case.  And that's

25   what we want to get to.  We want to develop evidence in detail

87

1    fully for the Court.  And I object to the Court's decision
2    precluding me from asking additional questions to this agent
3    relating to the weight of the evidence.  Thank you.
4        And it also relates to dangerous too, Judge.  Because I
5    think that the government's primary argument will be, you
6    know, this is not a dangerous person, there's not anything
7    otherwise have anything dangerous --
8        THE COURT:  Mr. Walker, go ahead and go through your
9    questioning with him.  Go ahead, agent, you can respond to
10   him.
11       MR. WALKER:  Thank you.
12       THE COURT:  You are not going through all the
13   elements.  You can ask him what other evidence he has, if he
14   has it he can tell you that, if he doesn't, then he doesn't.
15   BY MR. WALKER:
16   Q.  I want to talk to you about Count 2 of the indictment,
17   Agent Palmertree, are you familiar with that?  I was asking
18   you some questions about that.
19       What is the evidence --
20       MR. WALKER:  Judge, I am going to read from the jury
21   instructions.  I want to ask him, what is the evidence that
22   the assault --
23       THE COURT:  Mr. Walker, no.  Just ask him in general,
24   and --
25       MR. WALKER:  Judge, now we are back to the story line

1    that the government has crafted.  I want to ask him specific

2    questions, and I'm going to ask the questions the way I want

3    to ask the questions until you instruct me not to.  And I

4    think that is where we are, Judge.  So I will just bring this

5    up with the -- if necessary, with the District Court in

6    Washington, D.C. and I will ask to supplement the record in

7    this case with the testimony of Officer Palmertree because I

8    am not being permitted to ask the questions the way I want

9    to -- I'm sorry, Judge.  I have the utmost respect for you,

10   but I want to ask the questions the way we think they need to

11   be asked not the way the Court thinks they should be asked.

12        THE COURT:  Well, I am the decision-maker and I

13   understand the evidence that I need.  But go ahead,

14   Mr. Walker, you may proceed.

15   BY MR. WALKER:

16   Q.   Agent Palmertree, what is the evidence that the assault

17   on Officer Sicknick was something that Mr. Tanios wished to

18   bring about?

19        MS. WAGNER:  Judge, I would just add a further

20   objection here.  Mr. Walker is asking Mr. -- or Agent

21   Palmertree to essentially make legal conclusions here and we

22   have presented -- we have made the proffer.  Him parsing it

23   out, was asking Agent Palmertree to state for the Court which

24   piece of evidence goes with which element, and that is not

25   something he is -- he is trained to give testimony about his

1    investigation which he has now done.  We have also done

2    through the proffer.

3         At this point he is asking Agent Palmertree to basically

4    make legal arguments about --

5         THE COURT:  I understand the argument, Ms. Wagner,

6    it's overruled.

7         I do want him to talk about what facts that will assist

8    me in regard to what weight I should accord the proffer in the

9    video.  And so, I mean, to the extent that you can keep it to

10   the facts, Mr. Walker, and not legal conclusions that would be

11   helpful, because I think that is what you are looking for.  So

12   go ahead.

13   BY MR. WALKER:

14   Q.   You want to answer the question?

15   A.   Can you just ask it one more time?  I need to be clear on

16   what I am answering.

17   Q.   What is the evidence that the assault on Officer Sicknick

18   is something that Mr. Tanios knew about?

19   A.   There is no way to know if Mr. Tanios knew Officer

20   Sicknick.

21   Q.   What is the evidence then that Mr. Tanios wished to bring

22   about the assault on Sicknick?

23   A.   Again, there is no evidence that Mr. Tanios had even seen

24   Mr. Sicknick or knew Mr. Sicknick existed.

25   Q.   Is your answer the same for Officer Chapman?  Is there no

1  evidence, based on your investigation, that Mr. Tanios knew

2  his codefendant would go with OC spray and assault Officer

3  Chapman?

4  A.   Yeah.  There is no evidence that I know of that suggests

5  that Mr. Tanios knew Officer Chapman.

6  Q.   Yeah, right.  I'm not asking if he knew him personally,

7  but is there any evidence that Tanios knew these specific

8  officers were in an area and that his codefendant would go

9  over there and assault those three, is that something they

10  discussed?  Is that something that a witness told you they

11  talked about, or something that the codefendant told you

12  about?

13  A.   That's what the video shows, that's what I see in the

14  video.

15  Q.   Okay.  There is video.  Other than the video, no other

16  evidence?

17  A.   That they -- for that specific moment?

18  Q.   Yeah.

19  A.   Yeah, that's what we are going off of for that specific

20  moment is the audio and video, the close-up audio and video

21  that we were able to obtain that shows collaboration.

22  Q.   Right.  So --

23  A.   Coupled with an understanding from the interview with one

24  of the individuals in the video was that Mr. Tanios carried

25  the backpack for both of them.  Mr. Tanios bought the sprays

1    for both of them.  Two of the sprays being sprays that were

2    clearly not sprays that were to be used on human beings.

3    Q.   Those two sprays that are not to be used on human beings

4    are you referring to the quote unquote, bear spray?

5    A.   That's correct.

6    Q.   And did Khater use the bear spray that day?

7    A.   Not that I know of, but that's for further

8    investigation -- the investigation is still going on regarding

9    the bear sprays.

10   Q.   Okay.  So it's your understanding that Khater used the

11   smaller canister of OC spray with the black handle that was

12   sort of like on a key chain or could be a key chain?

13   A.   That's according to my investigation which is still going

14   on.

15   Q.   Is that what you told the grand jury?

16           MS. WAGNER:  Objection, Your Honor.  He is asking for

17   grand jury --

18           THE COURT:  Sustained.  Ask him about the evidence.

19   BY MR. WALKER:

20   Q.   That's all the evidence that you know right now, right?

21   A.   Could you just ask your specific question again?

22   Q.   You don't have any reason to believe that the bear spray

23   was deployed that day at all, do you?

24   A.   I have the bear spray cans myself and I haven't submitted

25   them for analysis, so that's what I would need to do.  That's

1    a very serious thing that I have to be sure on in a scientific

2    way the best I can.

3    Q.   Okay.  Now, you're aware that at some point a search

4    warrant was executed and firearms were located at Mr. Tanios's

5    home?

6    A.   Correct.

7    Q.   Are you in possession of any of those firearms or are

8    they still with the family?

9    A.   We are not.

10   Q.   Okay.  Do you have --

11   A.   I don't know where the firearms are.

12   Q.   Right.  Is there any evidence in this case that

13   Mr. Tanios has ever misused a firearm?

14   A.   In this case?  I haven't researched anything to that

15   capacity in this case.

16   Q.   Is he a prohibited person?

17   A.   Not that I know of.

18   Q.   Were the guns stolen?

19   A.   No.

20   Q.   Were they otherwise unlawful?

21   A.   Did you say, were they otherwise unlawful?

22   Q.   That's my question.

23   A.   Not that I know of.

24         MR. WALKER:  I have no further questions.  Thank you,

25   Judge.

1          THE COURT:  Did you have any questions, Ms. Wagner?

2          MS. WAGNER:  No, Your Honor.

3          THE COURT:  Okay.  May he be excused?

4          MR. WALKER:  As far as we are concerned, yes, sir.

5     Thank you, Agent Palmertree.

6          THE COURT:  Agent Palmertree, you're excused from

7     testifying further from this proceeding; however, you are

8     welcome to continue to observe it by Zoom.  Thank you.

9          THE WITNESS:  Thank you, Your Honor.

10         THE COURT:  Okay.  Did you have anything else,

11    Mr. Walker?

12         MR. WALKER:  We are requesting a five-minute recess,

13    Judge.  Thank you.

14         THE COURT:  Okay.  You may have a five-minute recess.

15    Let's be back at just a minute or two past 12:45.  Thank you.

16         (Recess taken from 12:40 p.m. until 12:48 p.m.)

17         THE COURT:  After a brief recess we are back on the

18    record in the matter of United States of America vs. George

19    Pierre Tanios.  I think we are done with the presentation of

20    evidence, counsel, Ms. Wagner?

21         MS. WAGNER:  Yes, Judge, we are prepared to make

22    argument when the Court is.

23         THE COURT:  Okay.  Mr. Walker?

24         MR. WALKER:  No further evidence from Mr. Tanios.

25         THE COURT:  Okay.  You may go ahead and make your

1    argument, Ms. Wagner.

2          MS. WAGNER:  Thank you, Judge.  Our position is that

3    Mr. Tanios should be detained because there are no conditions

4    of release that will reasonably assure his appearance as

5    required and the safety of the community.

6          And just going through the 3142(g) factors, the nature

7    and circumstances of the offenses charged against Mr. Tanios

8    weigh in favor of detention.  First and foremost is that

9    Mr. Tanios has been charged with three crimes of violence.

10    18 U.S.C., Section 111(b) has been determined to categorically

11    be a crime of violence.  And so that in and of itself does, we

12    believe, weigh in favor of detention.

13          And at its essence, Mr. Tanios' crime was to coordinate

14    with another individual a premeditated physical assault

15    against three people, and would have been more except for

16    Lieutenant -- his name is escaping me, but the intervention of

17    law enforcement.

18          Stripping away the context that the location that this

19    attack took place, the fact that it took place at the United

20    States Capitol on January 6th, at its core, if this were any

21    other defendant who had engaged in a conspiracy in a

22    premeditated fashion to assault law enforcement, there would

23    be no question that they are a danger to the community and

24    should be detained.

25          To the extent Mr. Tanios argues that it was Mr. Khater

95

1    and not he who actually assaulted these police officers with

2    the pepper spray, the evidence that we proffered showed that

3    the two were very much working in concert on January 5th,

4    2021, Mr. Tanios, walks into the ATR store in Morgantown on

5    the phone with Mr. Khater.  He purchases two canisters of

6    Frontiersman bear spray and two other chemical sprays.  He

7    tells the store owner, or the store manager that he is on the

8    phone with a person who he is going to D.C. with.

9        They then do drive to D.C. together.  Mr. Khater picks up

10   Mr. Tanios in Morgantown.  They stay together at the same

11   hotel.  They take a list together to the Capitol.

12       And the evidence that they were working in concert is

13   also contained in the video surveillance.  Mr. Khater and

14   Mr. Tanios are seen and heard talking together.  Mr. Khater

15   asks Mr. Tanios for the bear spray that Mr. Tanios is carrying

16   for both of them.  Mr. Tanios tells him, "not yet."  Doesn't

17   tell him, no, don't do that, he says to, "Wait, it's too

18   early."

19       And this is evidence that he was not merely taking a

20   minor role in Mr. Khater's offenses as the defense suggested

21   in -- or not suggested, stated in their response to the

22   detention motion that was filed on Friday afternoon.

23       When Mr. Khater does spray shortly thereafter, there is a

24   push to breach the line, and that appears to be coordinated

25   with the time that the crowd breaches the line.  And

96

1    Mr. Khater sprays the officers, he falls back into the crowd
2    and Mr. Tanios is not directly with him, but -- and Mr. Tanios
3    has an ear piece in, but Mr. Khater calls him on his cell
4    phone.  That's on video, it's corroborated and connected
5    Mr. Tanios by the phone records.
6         And, of course, Mr. Khater's statement to the police,
7    basically laying out how they got there, how they stayed
8    together, how they rode together, who bought the bear spray
9    and the pepper spray, that Mr. Tanios was carrying it for both
10   of them and the backpack, that corroborates what the video
11   surveillance shows and the information provided by Mr. Biddle
12   at ATR shows that this was a coordinated effort and that it
13   was planned out in advance.
14        Judge, one other thing in relation to the nature and
15   circumstances that we believe the Court should take into
16   consideration here is the injuries to the victims.  This was
17   not one victim.  Three law enforcement officers and would have
18   been more but for Lieutenant Bagshaw's intervention.
19        And so we would ask that the Court consider that in the
20   nature and circumstances of the offense which we believe is
21   based in favor of detention.
22        And, Judge, the weight of the evidence here we believe
23   our proffer, the video surveillance, weighs in favor of
24   detention.  The Court has for its consideration video footage
25   from various sources, various angles that captured Mr. Tanios

1     and Mr. Khater's conduct, their concerted action and before
2     the attack, and then obviously Mr. Khater's spraying of the
3     pepper spray.
4           We have the victim witness statements from Officers
5     Chapman and Officer Edwards.  And we know that Officer
6     Sicknick told his supervisor that he had also been sprayed.
7     And that corroborates, again, is corroborated by the video
8     evidence.
9           We have cell phone records of Mr. Tanios and Mr. Khater
10    showing that they were acting in concert, both the day before,
11    and the just after the assault on the officers.
12          We now have Mr. Khater's admissions that this was -- that
13    this was planned and coordinated action.  Mr. Tanios purchased
14    and carried for both of the men chemical spray, they rode
15    together, stayed together.  Shared a Lyft to the Capitol, rode
16    home together.  We also have the materials obtained from the
17    search of the two residences that tie both Mr. Khater and
18    Mr. Tanios to what we know happened at the Capitol from the
19    video surveillance and the other individual footage.
20          At Mr. Tanios' residence they found the backpack that he
21    was carrying that day for both men.  Three unused canisters --
22    two unused canisters of bear spray and one pepper spray.  The
23    clothes that Mr. -- the Sandwich U clothes were which were
24    similar to what Mr. Tanios wore at the January 6th incident.
25    And have information from ATR obviously that those -- that

98

1    this was planned in advance.

2        Judge, with respect to the history and characteristics of

3    Mr. Tanios, we have no doubt that Mr. Tanios' family loves him

4    very much.  But what we would just ask the Court to consider

5    that these ties to the community, Mr. Tanios' three small

6    children, we would just point out that these family and

7    community ties were all in place before he committed these

8    crimes that he is accused of.  So we would ask you to consider

9    that when weighing the history and characteristics of the

10   defendant.

11       And with respect to the nature and seriousness of the

12   danger to any person or the community, we believe this very

13   strongly weighs in favor of detention.  Again, Mr. Tanios,

14   coordinated a premeditated assault on these officers, and it

15   would have been more had there not been an intervention.

16       And, Judge, again, stripped down to its essence, this was

17   an assault, a coordinated premeditated assault on individuals

18   and I would also just point out in the discussions with

19   Mr. Biddle at ATR, the implication of Mr. Tanios' questions

20   about being allowed to take a gun and being allowed to take a

21   pepper ball projectile gun, I would just raise those because I

22   think those do have implications about what Mr. Tanios was

23   thinking that day.

24       And although Mr. Tanios did not do the actual spraying,

25   he did assist Mr. Khater in purchasing the chemical spray and

1    planning.  He, although, he was not at the front line himself,

2    we believe that he was and we believe evidence shows that he

3    was assisting Mr. Khater in every other step of the

4    coordinated attack.

5         And, Judge, with respect to any suggestion that home

6    detention or electronic monitoring might be appropriate here,

7    I would just note to the Court that this -- that Mr. Tanios

8    and Mr. Khater planned and carried out what was an unprovoked

9    attack on three police officers.  And I believe that that

10   should give this Court extreme pause in releasing Mr. Tanios

11   under a court order, because we believe that if he would

12   engage in an unprovoked attack on three police officers, he is

13   not going to abide by court order.  And we think a major

14   question, at least in our minds, is whether Mr. Tanios would

15   be a danger to our probation officers, under supervision he

16   would be, or other law enforcement in this community who might

17   find themselves in the same position as Officer Sicknick,

18   Edwards, and Chapman.

19        And, of course, Judge, we already articulated our

20   position on flight risk, and we meant no disrespect to

21   Mrs. Tanios, about her being -- I understand that this is her

22   country and that this is Mr. Tanios' country, but we believe

23   that there is a potential for and a network for Mr. Tanios to

24   elude facing these charges, and that's our concern.  And so we

25   believe that he is a danger to the community and a flight risk

1    and he should be detained until trial.

2              THE COURT:  Okay.  Thank you, Ms. Wagner.

3         Ms. Gross or Mr. Walker.

4              MS. GROSS:  Thank you, Judge.  Well, Judge, I just

5    want to go over the Bail Reform Act.  The Bail Reform Act

6    favors the release of Mr. Tanios.  The government has the

7    burden here today.  I know the Court is aware of that, but

8    it's our assessment that the government definitely did not

9    prove by a preponderance that there is no combinations of

10   conditions that could assure his appearance.

11        Basically, Judge, when you look through the Bail Reform

12   Act we have to look at the nature and circumstances of the

13   offense.  There is no doubt that this is a serious offense

14   allegation.  No doubt.  We are not questioning that, we take

15   this very seriously.  But that's what it is, Judge.  These are

16   allegations.

17        That doesn't make Mr. Tanios any less innocent until

18   proven guilty.  We have to think about that when we are

19   talking about the nature and circumstance of the offense, we

20   are talking about the government's version of the nature and

21   circumstances of the offense.  That's all you're hearing.

22   You're hearing their story line, their interpretation of what

23   the facts of the case are.  And when we are talking about the

24   circumstances of the offense, when you are talking about these

25   exhibits that the government put on today, these are puzzle

1    pieces, small snippets, tiny limited seconds of evidence that
2    they are providing to us where we don't have the right to see
3    the rest.

4         We don't know what else happened.  We have no idea.  We
5    see their limited interpretation of videos, and their view of
6    those videos because they are tiny little pieces of them, hand
7    picked by the government to show to the Court today, and to
8    show the public today, in a part of their proffer.  Their
9    proffer was just so limited.

10        So the nature and the circumstances are just that.  They
11   are the government's version, and still as of today,
12   Mr. Tanios is innocent until proven guilty.  The Bail Reform
13   Act doesn't change that.  We don't automatically assume that
14   the nature and circumstances of every offense in a complaint
15   or indictment are automatically true, and that Mr. Tanios or
16   any other defendant is guilty based on those allegations.
17   That's what they are.  They are allegations.

18        So nature and circumstances of the offense, you know,
19   that was not proven by a preponderance of the evidence.  That
20   doesn't -- that shouldn't weigh in favor of keeping Mr. Tanios
21   detained.

22        Let's go to the weight of evidence.  Well, we heard the
23   weight of the evidence.  The weight of the evidence are these
24   videos that I am talking about.  The weight of the evidence
25   any snippets, tiny little pieces of videos taken of

1   Mr. Tanios, allegedly, and the codefendant that day at the
2   Capitol.  Those are, again, interpretations of what really
3   happened.  We don't know what really happened.
4       And the weight of the evidence, like we said, is limited.
5   It's so limited.  They purposefully limited it to the Court
6   today by doing their proffer.
7       We know hardly nothing about the weight of evidence.
8   It's minimal.  It's limited.  So is it serious?  Yes.  But
9   what do we know?  Not much.  We know that that is George
10  Tanios.  That's all we know.  He was there.  We know that the
11  communication that we are talking about, I'm very unhappy to
12  hear, you know, "in concert," "in coordination," there was no
13  evidence of any of that today.  Those videos, the
14  coordination, the concert, in acting in concert together,
15  premeditated, those are all interpretations of what we saw in
16  this video.  It's just interpretation.
17      We know there were calls.  We know that -- well,
18  allegedly, we don't have the calls.  We know that there is a
19  video of them talking to each other.  But we have no idea the
20  full circumstances.  We know nothing.  We know the smallest
21  amount of evidence.  And still, that tiny amount of the weight
22  of the evidence is not substantial.
23      It's not enough, they didn't meet their burden on number
24  two.  History and characteristics.  We have multiple witnesses
25  today, Judge, that have known Mr. Tanios for a very long time.

103

1    We had his mother, we had his sister, we had his fiancée, we
2    had his long-term business -- people that own a business in
3    Morgantown that know Mr. Tanios.  We had an employee of
4    Mr. Tanios.
5        We know that he is a local person to Morgantown.  He's
6    lived there for over 15 years.  We know he owns property in
7    Morgantown.  We know he has a home in Morgantown.  We know he
8    has three children, four and under, that live in Morgantown.
9        We also know that his character, all of these people
10   testified to, that his character is nonviolent.  There is no
11   evidence that Mr. Tanios has ever been violent.  There is no
12   evidence that Mr. Tanios has a background in violence or that
13   has prior convictions in violent crimes.  None.
14       So, therefore, his -- I know the government wants to
15   minimize his character, and his family ties, employment,
16   community ties, they want to minimize that, of course, but
17   that is strong.  His family ties and ties to the community of
18   Morgantown are strong.  We showed that he has an abundance of
19   ties to the community.
20       As far as him -- also, you know, being a flight risk,
21   Judge, we had his mom tell you, front and center, that she has
22   no idea what that unsubstantiated claim is that we just heard
23   about today that someone says that his mom said he's got to
24   get out of here.  We just signed paperwork over for his
25   passport.  He's not going anywhere.  Ms. Grilli has it right

1    now.  His passport is -- might as well be hers, that is gone.

2        You know, his family has worked tirelessly to help try to

3    secure a plan for his release, by being cooperative, by

4    helping probation get everything they could need.

5        His fiancée is in here, I'm sure she would give anything

6    under the sun to probation if they wanted to search anything

7    in their house she would be happy to do.  They want him on

8    location monitoring?  Happy to do it.

9        They have been super cooperative this entire time because

10    Mr. Tanios believes he has nothing to hide.  He is

11    cooperative.  He wants to participate in his own defense.  So

12    we are asking for his release for that very reason.

13        Is he a danger to the community?  Certainly, certainly

14    the government does not believe they proved by clear and

15    convincing evidence that Mr. Tanios is a danger to the

16    community by those videos.  That is absurd.  Those videos,

17    again, show nothing.  They don't show anything but

18    interpretation of the government's thoughts on what they think

19    it shows.  It doesn't show dangerousness.  There is no proof

20    of dangerousness.  We've had no testimony, zero evidence, to

21    prove that Mr. Tanios has ever been dangerous or was dangerous

22    that day.  I don't have anything further.

23        THE COURT:  Okay.  Thank you.  Anything in response?

24        MS. WAGNER:  Just briefly, Judge.  I don't believe

25    that Ms. Grilli has the passport for whatever it's worth at

1    that point.

2            MR. WALKER:  I just signed the paper giving it to

3    her, so --

4            PROBATION OFFICER:  I asked his fiancée and she said

5    that it's at home.

6            THE COURT:  Okay.  That's not --

7            MS. WAGNER:  Right, I just wanted to --

8            THE COURT:  No, that's fine, thank you, Ms. Wagner.

9            MS. WAGNER:  And, Judge, as far as, I just want to

10   point out two things, Judge.  The grand jury has returned an

11   indictment on, again for Mr. Tanios and Mr. Khater for the

12   events on January 6th.  So I disagree with the

13   characterization that this is a story line or that these are

14   just any snippets of evidence that we want the Court to see to

15   grant our motion.

16       Judge, we have provided video footage and proffered

17   evidence that the video footage -- what took place in the

18   video foot was coordinated between Mr. Tanios and Mr. Khater.

19   We've corroborated that by cell phone records, witness

20   statements, and receipts of Mr. Tanios' purchase of the

21   chemical spray, and Mr. Khater's statements to the police

22   about his activities with Mr. Tanios.  And Mr. Tanios'

23   statements to the manager of the gun store.  He was on the

24   phone at the time he purchased the chemical spray.  He told

25   the manager that he was purchasing -- that he and the person

1   on the phone were going to D.C., to the Capitol, and so the

2   notion that we have just selected snippets of video, is -- I

3   think it's an unfair characterization.  And, Judge, you know,

4   we didn't play every moment of the video footage, but it's

5   been provided to the Court.

6        And on the video, you can see that Mr. Tanios and

7   Mr. Khater are acting in concert and that is corroborated by

8   other evidence.

9        And, Judge, we would ask that you do detain Mr. Tanios

10  given the nature and circumstances of the offense.  We believe

11  he poses a danger to the community and particularly to anyone

12  who is going to be responsible for supervising him, and we

13  would ask for his detention.

14        THE COURT:  Okay.  Thank you, Ms. Wagner.

15        Well, I always say to my law clerk before I walk into a

16  room on detention, is a solemn moment.  I am very aware that

17  my rulings affect certainly the person in front of me and

18  everyone who loves them and cares deeply about them.

19        I also understand that it affects the people who perhaps

20  have been harmed by his actions and other's actions.  I have

21  had the opportunity to review your brief, Ms. Gross, also the

22  opportunity to review the bond report prepared by Ms. Grilli,

23  and both of those tell a similar story which is that his

24  criminal history is, if any, is very minor and minimal and of

25  no concern to the Court, his criminal history.

1        Certainly he is blessed with a mother and sister and

2    family who support him very deeply.  It's a story I'm familiar

3    with.  He has a fiancée who cares very deeply for him, that is

4    obvious to the Court and I hope you are thankful for that,

5    Mr. Tanios.

6        I am not unmindful that he has a four year old and two

7    twins who are seven or eight months old.  And so I understand

8    that, and I take that into consideration.

9        But I think the context of everything that happened on

10   that day and before are what inform me in my decision-making

11   and I think it needs to.  We all know what happened on January

12   6th.  Everyone in our country knows what happened on January

13   6th.  We also generally know -- although, I don't know why

14   Mr. Tanios was there and Mr. Khater was there -- but we know,

15   looking at it now, that they were supporting the president who

16   would not accept that he was defeated in an election.  And it

17   was on that day when Congress, under their oath, the

18   Constitution was to certify the electoral college.  That's not

19   happenstance that they picked January 6th.  It was the day.

20       And so we have created this just culture, radicalized by

21   hate, and just refusal to really accept the result of a

22   democratic process.  And so given that, two college friends

23   decide, let's go.  Why?  So many other things they could have

24   done.  Stay at work, stay at home with your children that you

25   love.  Visit your mother.

1    There were no songs of joy and peace.  We've all seen it,

2    nothing but hate and anger.  And so I don't know what would

3    draw someone to that and it worries me deeply.  And it draws

4    good people who otherwise would not be indicative of their

5    character.  But what causes you, cause your friend to talk

6    beforehand to go to a weapons store to talk about getting

7    dangerous sprays?  This isn't a weekend visit to see the

8    bosses in D.C.

9    And then so you talk beforehand to buy these things, you

10   want to know whether it's legal to go to D.C., what is planned

11   for this trip.  They stayed together.  They went on their way.

12   And then you see this conversation and why do you have

13   this spray in your backpack in the first place?  It didn't get

14   there by accident.  It's not really typical what people would

15   take to a gathering in our nation's Capitol.  But it's there.

16   And then there is this conversation and it's removed and I'm

17   very satisfied with the evidence.  There is no question

18   Mr. Tanios was there, Mr. Khater was there, and they were

19   there together.

20   Now, did he know that what the spray was going to be used

21   for?  I can think of no good reason what it was going to be

22   used for.  Especially in light of the fact that you go a mile

23   or two to walk up to our nation's Capitol on the day of a

24   peaceful transition of power, and we all witnessed it.

25   Forcing yourself against law enforcement officials that had

1    nothing but bike racks.

2         Why would you just not turn the other way and go home?

3    The fact that all of them weren't thinking of that is just

4    frightening to me.  And that was the choice.  The choices all

5    along the way.  He didn't spray it.  He handed the horrible

6    spray to the sprayer, and indirectly into a law enforcement's

7    eyes without any provocation.  Men and women just trying to do

8    their job from having individuals attack our Capitol.

9         I have taken an oath to the Constitution, not to the

10   President, not to the Governor, not to the Chief Justice, not

11   to the Speaker of the House, not to the President of the

12   Senate, but to the Constitution.  And those were the people

13   who were meant to protect the building where the work of the

14   Constitution was taking place.  The peaceful transfer of

15   power.  And why anyone thought they could be there to

16   interrupt -- excuse me, in any small way, is just not healthy

17   thinking for our society.  And to the extent that we are

18   casual about that, accept that as normal, it needs to stop.

19        But the lawyers before me are familiar with how I make

20   rulings and when I make rulings, but one of first things I

21   always take into consideration is our interaction with law

22   enforcement.  When you get stopped, do you run in your car?

23   Do you run away from them?  Do you pull a gun?

24        I can't accept anyone who will not respond to law

25   enforcement under these circumstances other than a peaceful

1   way.  And to not have just simply turned around and go home,

2   we don't need to camp, let's go home.  It's not what was said.

3        And there are two compelling things in my mind, seeing

4   just that stream of spray going into their eyes.  And then the

5   woman officer just with her head rubbing her eyes, turning

6   away.  What did she do that day, other than show up to do her

7   job, staring down thousands of angry people?

8        And then the officer who is now no longer with us, it's

9   almost surreal, sort of locking in solitude rubbing his eyes

10  on the Capitol steps.

11       It's hard for me not to look at this as anything other

12  than an assault on our nation's home, and everything that is

13  important to us as a people.  And I struggle because I don't

14  know if that represents who you are, Mr. Tanios, I don't think

15  it represented who a lot of people were on that day.  But what

16  is it that causes that behavior?  And all I can think of is

17  that there is something that causes such hate, such irrational

18  behavior, such desire to show up and attack our country and

19  officers in such ways that gives me little confidence as to

20  whether it will stop.

21       I'm very satisfied with the government's evidence.  I

22  understand this is a one-time event, but you know there are

23  people serving life sentences for one-time events.  It is not

24  representative of their character, but it happens.  And there

25  are mothers and sisters, and fiancés and children who will

1    suffer every day because of their conduct.  Why you weren't
2    thinking about that beforehand, I don't know, because it
3    wasn't hard to understand.
4          And so you talk about danger, and believe me, I have been
5    thinking about almost nothing other than this for a week.
6    It's what I go to sleep with, it's what I wake up with.  And I
7    am reminded and when I talk about the anger, and the danger, I
8    think of a quote that I read often from Martin Luther King
9    when he was giving a sermon in 1956 at Ebenezer Baptist in
10   Atlanta.  So he was saying that there are great things facing
11   us today, there is not so much that an atomic bomb that you
12   can put in airplanes and drop on the heads of hundreds and
13   thousands of people.  As dangerous as that is, the real danger
14   confronting civilization today is the atomic bomb which lies
15   in the hearts and the souls of men, capable of exploding into
16   the violence of hate and into the most damaging selfishness,
17   that's the atomic bomb that we have got to fear today.
18         The problem is with men, with their hearts and souls of
19   men, that is a real basis of our problem.  Yeah, it shook me
20   when I saw those things happen.  And so in many ways it's not
21   going away, and I think it's the biggest fear we should still
22   have.
23         And so this won't mean anything to the family, I will
24   ache for the absence of someone that you love.  But my
25   obligation is to the safety of our community.  And I don't

1    think I have ever seen anything play out in a way that was

2    more dangerous to our community.  And I have no question in

3    your own way, Mr. Tanios, you chose to be part of that.

4        So for those reasons I am going to remand you to the

5    custody of the marshal and you shall be detained pending

6    further proceedings, and we shall be adjourned.  Thank you.

7        MR. WALKER:  Will you issue a written order, please?

8    We are obligated to ask you to reduce --

9        THE COURT:  Yes, I'm going to --

10       MR. WALKER:  -- your findings to writing and if you

11   do that then we would more quickly be able to appeal, because

12   obviously it could take longer to get the transcript.  Thank

13   you.

14       THE COURT:  I will issue a written order.  I expect

15   to issue it today.  And I know that we were fortunate to have

16   a court reporter here to expedite that transcript.  And again,

17   my decision is subject to review by the District Judge.

18   Nothing further, we will be adjourned.  Thank you.

19       (Proceedings concluded at 1:23 p.m.)

20                              - - -

21                    C E R T I F I C A T E

22       I, Jill M. Cutter, Registered Professional Reporter and

23   Official Reporter for the United States District Court for the

24   Northern District of West Virginia, so hereby certify that the

25   foregoing is a correct transcript to the best of my ability of

1   the proceedings in the above-styled action on March 22, 2021,

2   as reported by me in stenotypy.

3       I certify that the transcript fees and format comply with

4   those prescribed by the Court and Judicial conference of the

5   United States.

6

7                    Given under by hand this day, March 24, 2021.

8

9                        /s/ Jill M. Cutter, RPR

10                       Official Reporter, United States
                         US District Court for the Northern
11                       US District of West Virginia

12

13

14

15

16

17

18

19

20

21

22

23

24

25