**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:21-cr-00222 (TFH)** |
| | : | |
| **GEORGE PIERRE TANIOS,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JULIAN ELIE KHATER,** | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR
RELEASE FROM CUSTODY**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this memorandum in opposition to the defendants'

motions for release from custody. Defendant Tanios's Motion for Review of the Detention Order

(ECF No. 19); Defendant Khater's Memorandum of Law in Support of His Pre-Trial Release (ECF

No. 18-1). Detention in this case is justified because there are no conditions or combinations of

conditions which can effectively ensure the safety of any other person and the community,

pursuant to 18 U.S.C. §§ 3142(e). The government respectfully requests that the following points

and authorities, as well as any other facts, arguments and authorities presented at the detention

hearing, be considered in the Court's determination regarding pre-trial detention.

**Factual Background**

1. **The Attack on the United States Capitol on January 6, 2021**

The defendants, Julian Khater and George Tanios, have been indicted on multiple charges,

as detailed further below, arising from their participation in a riot that occurred at the United States

Capitol Building, located at 1 First Street, NW, Washington, D.C. on January 6, 2021.

The U.S. Capitol is secured 24 hours a day by the United States Capitol Police ("USCP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. On January 6, 2021, only authorized people with appropriate identification were allowed access inside the U.S. Capitol. A joint session of the United States Congress was scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The exterior plaza of the U.S. Capitol was closed to members of the public.

A crowd began to assemble near the Capitol around 12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol. The joint session began at approximately 1:00 p.m. in the House Chamber.

At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber. Also around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby.

As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside. At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or

2

other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As rioters attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured and several were admitted to the hospital. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. Beginning around 8:00 p.m., the Senate resumed work on the Certification, and beginning around 9:00 p.m., the House resumed work on the Certification. Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. on January 7, 2021.

### 2. The Defendants' Assault on Federal Officers

At approximately 1:00 p.m., a crowd of violent rioters had broken through previously barricaded areas and assembled on the Lower West Terrace, which was off limits to the public at that time.  USCP had formed a line of bike racks extending from the North end of the Lower West Terrace to the South end, to act as a barrier against the crowd. Officers were standing watch behind this line and fending off repeated attempts by the rioters to pull on the bike racks, either with their hands or with ropes and straps, and move forward toward the Capitol.

The surveillance footage of this incident shows defendants Khater and Tanios working together to assault law enforcement officers with an unknown chemical substance by spraying multiple officers directly in the face and eyes. As explained in more detail below, the video evidence of this assault shows that the defendants clearly timed the deployment of chemical substances to coincide with other rioters' efforts to forcibly remove the bike rack barriers that were preventing the rioters from moving closer to the Capitol building.

At 2:09:45 p.m., Tanios can be seen on surveillance video walking from the south grassy area toward the Lower West Terrace. See Govt. Exhibit 3 (USCP Surveillance).[1] Khater can be

---

[1] The government's video exhibits have been provided separately to the Court and the parties, and the government intends to refer to these exhibits and play selected portions during the hearing on this motion. Time stamp references followed by "p.m." refer to the actual time stamp marked on the video footage, located in the upper right (surveillance footage) or upper left (body worn camera) of the video frame. Otherwise, the time reference will refer to the time of the video clip itself. Government's Exhibits 1-15 are the same video exhibits that were introduced by the government on March 22, 2021 at the detention hearing of defendant Tanios before the Honorable Judge Michael John Aloi in the

seen walking behind Tanios.  Khater is wearing a beanie with a pom-pom on top, a dark jacket, and has a beard. Tanios is wearing a red hat, black backpack, dark hooded sweatshirt, and has a beard. After separating briefly, Tanios and Khater reunite at 2:14:15 p.m. See Ex. 3. At 2:14:19 p.m., Khater reaches his hand towards Tanios's backpack and then stands behind Tanios, appearing to reach inside the backpack and retrieve something. *Id.*

This same moment in time was captured by open source media video of the incident from January 6, 2021, the relevant portion of which is provided as Government Ex. 5 (Convo Couch Clip). On the video, which bears a stamp entitled "The Convo Couch" on the top right of the frame, Khater is seen making his way towards Tanios. Khater then states, "Give me that bear shit," and reaches into the backpack on Tanios' back. Tanios then states, "Hold on, hold on, not yet, not yet… it's still early." Khater is then seen emphatically telling Tanios, "They just fucking sprayed me." Khater is seen holding a white can with a black top that appears to be a can of chemical spray. His right hand, which is holding the spray, has a black glove on it with the word "Trump" visible on the glove.  See Govt. Exhibit 5.1, below.

---

Northern District of West Virginia.



*Exhibit 5.1 (Still shot from Govt. Exhibit 5 at timestamp 00:36)*

On Govt. Exhibit 3, for the next few minutes, Tanios and Khater can be seen engaging each other in animated conversation while they are standing together. This verbal exchange between Khater and Tanios, together with Khater's retrieval of the spray can from Tanios, reveals that the two were working in concert and had a plan to use the toxic spray against law enforcement.

At approximately 2:20 p.m., surveillance footage shows that Khater leaves Tanios and walks through the crowd to within a few steps of the bike rack barrier. Govt. Exhibit 4 (USCP Surveillance). In Exhibit 4, Khater can be seen standing directly across from a line of law enforcement officers to include USCP Officers Brian Sicknick and Caroline Edwards, and Metropolitan Police Department ("MPD") Officer Damion Chapman, who was equipped with a functioning body worn camera ("BWC") device.

Officer Chapman's BWC shows that at approximately 2:23:00 p.m., unidentified rioters begin pulling on a bike rack to Chapman's left, using ropes and their hands to pull the rack away. Govt. Exhibit 7 (Chapman BWC). Seconds later, Khater began his attack. He is observed with his

right arm up high in the air, holding a canister in his right hand and aiming it in the officers' direction while moving his right arm from side to side. See Govt. Exhibit 7. Officer Chapman's BWC confirms that Khater was standing only five to eight feet away from the officers. *See* Govt. Exhibit 7.1, below.



*Govt. Exhibit 7.1 (Still shot of Govt. Exhibit 7 at 2:23:10 p.m.)*

Collectively viewed, the surveillance footage and BWC video exhibits demonstrate that Officers Sicknick, Edwards and Chapman, who are standing within a few feet of Khater, all react, one by one, to being sprayed in the face by Khater. The officers immediately retreat from the line, bring their hands to their faces and rush to find water to wash out their eyes. Officer Sicknick can be seen bending over and washing his eyes out away from the line. See Govt. Exhibit 4.1, below.



*Govt. Exhibit 4.1 (Still shot of Govt. Exhibit 4 at 2:23:25 p.m.)*

Officer Chapman's reaction to the spray is evident in his own BWC footage, and as captured in additional video footage.  See Govt. Exhibit 7. Officer Edwards can be seen bent over in distress from the spray and requiring assistance to walk away. See Govt. Exhibit 4.2, below.



*Govt. Exhibit 4.2 (Still shot of Govt. Exhibit 4 at 02:23:15 p.m.)*

At 2:23:23 p.m., on the surveillance footage, Khater is again observed raising his arm and continues to spray in the direction of additional law enforcement officers. See Govt. Exhibit 4.

MPD Lt. Bagshaw notices these actions and approaches Khater. *Id.* At 2:23:26 p.m., Lt. Bagshaw then sprays Khater, as observed on both Govt. Exhibit 4 and Government Exhibit 16, below.



*Govt. Exhibit 16*

After being sprayed by Lt. Bagshaw, Khater disappears from view of the surveillance cameras, as has Tanios. Khater reappears at approximately 2:42 p.m. at the same location on the Lower West Terrace, after the police line has been breached and rioters have advanced to the Upper Terrace. He is seen holding his phone to his ear and appears to be speaking. See Govt. Exhibit 17, below.



*Govt. Exhibit 17*

Law enforcement obtained phone records for Khater's known cellular phone number, and the records show that on January 6, 20201, at 2:42 p.m., Khater's phone was on a 21 second call with a number associated with Tanios.

On March 19, 2021, law enforcement spoke with W-3, who stated that one or two days prior to January 6, 2021, Tanios walked into a store in Morgantown, West Virginia, and stated that he was going to the rally in Washington, D.C. He asked W-3 if Tanios could take a firearm Tanios owned to D.C., and W-3 responded no. Tanios then inquired about a pepper ball gun, and was again told by W-3 that he could not take a pepper ball gun to D.C. because it shot projectiles. Tanios then inquired about carrying mace in D.C., and W-3 stated that it was allowed as long as it was aerosol based. Tanios purchased two cannisters of Frontiersman brand bear spray, and two additional pepper spray cannisters. Law enforcement also obtained copies of the receipts for this purchase, which showed the chemical sprays were purchased on January 5, 2021, at 5:09 p.m. Furthermore, W-3 stated that Tanios was on the phone when he entered the store, and Tanios told

W-3 that Tanios was speaking to the friend who was accompanying him to D.C. for the rally. Phone records obtained pursuant to subpoena show that at 4:58 p.m. on January 5, 2021, eleven minutes before the purchase, Khater's known cell phone number connected with Tanios' known cell phone number for a 39 second call.

### 3.  Injuries to Officers

Officers Sicknick, Edwards, and Chapman suffered injuries as a result of being sprayed in the face by Khater. The officers were temporarily blinded by the substance, were disabled from performing their duties, and needed medical attention and assistance from fellow officers. They were initially treated with water in an effort to wash out the unknown substance from their eyes and on their face. All three officers were incapacitated and unable to perform their duties for at least 20 minutes or longer while they recovered from the spray. Officer Edwards reported lasting injuries underneath her eyes, including scabbing that remained on her face for weeks.  Officers Edwards and Chapman also described the spray to their face as a substance as strong as, if not stronger than, any version of pepper spray they had been exposed to during their training as law enforcement officers. Officer Sicknick reported to his supervisors and colleagues that he had been sprayed in the face with a substance.

### 4.  Evidence Recovered During Arrests of the Defendants

On March 14, 2021, law enforcement officers arrested the defendants and searched their respective residences pursuant to search warrants. At Tanios' residence, investigators found a black backpack identical to the one Tanios used to carry chemical spray at the Capitol, as seen in the surveillance footage. Investigators also recovered a Sig Sauer 9millimeter handgun with Tanios' wallet and driver's license from the same backpack. Additionally, investigators recovered two canisters of Frontiersman brand bear spray, which appeared to be unused, and one smaller

canister of chemical spray, which is depicted in Govt. Exhibit 14. The Frontiersman canisters are consistent in color, shape and size with the canister that Khater is seen holding at the Capitol. See Govt. Exhibit 13.

During the search of Khater's residence, investigators recovered a hat, gloves, and a Columbia jacket matching those Khater is seen wearing on the video footage from January 6. In a pocket of a separate green jacket that was found underneath the Columbia jacket, investigators recovered a spent canister of chemical spray. See Govt. Exhibit 15. This canister appears to be identical to the canister recovered from Tanios' residence. See Govt. Exhibit 14.

Additionally, following his arrest, Khater spoke to investigators and admitted that he drove from New Jersey to pick up Tanios in West Virginia, and that the two drove together to Washington, D.C., the night before the January 6 riot. Khater told investigators that the two defendants shared a backpack which Tanios carried that day, containing the chemical spray that Tanios had purchased. He also identified himself and Tanios in photographs and video taken from the incident. He stated that after the spraying incident, he and Tanios stayed at the Capitol grounds and that he (Khater) climbed the scaffolding to take pictures.

## **Procedural History**

On March 6, 2021, United States Magistrate Judge Zia M. Faruqui issued warrants for the arrests of the defendants. *See* Criminal Complaint and Arrest Warrant (ECF No. 1). The defendants were arrested on March 14, 2021, Tanios in Morgantown, West Virginia and Khater in Newark, New Jersey. At his initial appearance, defendant Khater waived his right to a preliminary hearing and did not contest detention pending his transfer to the District of Columbia.

On March 17, 2021, a federal grand jury indicted Khater and Tanios for conspiracy to impede or injure an officer, in violation of 18 U.S.C. § 372; three counts of assaulting, resisting,

or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and

(b), and 2; civil disorder, in violation of 18 U.S.C. § 231(a)(3); obstructing or impeding an official

proceeding, in violation of 18 U.S.C. § 1512(c)(2); entering and remaining in a restricted building

or grounds with a deadly or dangerous weapon and causing significant bodily injury, in violation

of 18 U.S.C. §§ 1752(a)(1), (b)(1)(A) and (b)(1)(B); disorderly and disruptive conducing in a

restricted building or grounds with a deadly or dangerous weapon and causing significant bodily

injury, in violation of 18 U.S.C. §§ 1752(a)(2), (b)(1)(A) and (b)(1)(B); engaging in physical

violence in a restricted building or grounds with a deadly or dangerous weapon and causing

significant bodily injury, in violation of 18 U.S.C. §§ 1752(a)(4), (b)(1)(A) and (b)(1)(B); and

engaging in an act of physical violence in the Capitol Grounds or Buildings, in violation of 40

U.S.C. § 5104(e)(2)(F). *See* Indictment (ECF No. 8).

On March 22, 2021, United States Magistrate Judge Michael John Aloi in the Northern

District of West Virginia conducted a detention hearing for defendant Tanios, after which he

concluded no conditions or combinations of conditions could assure the safety of the community

and ordered Tanios to be transferred to this District and detained pending trial. *See* Defendant

Tanios Motion (ECF No. 19), Exhibit 1, Transcript of March 22, 2021 detention hearing, *United

States v. Tanios*, 1:21-mj-27 (N.D.W.V. March 22, 2021). In concluding that Tanios was a danger

to the community, Magistrate Aloi pointed out that, "I don't think I have ever seen anything play

out in a way that was more dangerous to our community. And I have no question in your own way,

Mr. Tanios, you chose to be part of that." *Id*. at 112. "And so I don't know what would draw

someone to that and it worries me deeply." *Id*. at 108.  Magistrate Aloi reasoned:

> But what causes you, causes your friend to talk beforehand to go to a weapons store
> to talk about getting dangerous sprays? This isn't a weekend visit to see bosses
> [sic][2] in D.C. And then so you talk beforehand to buy these things, you want to

---

[2] The government recalls Magistrate Aloi stating, "This isn't a weekend visit to see monuments in D.C."

know whether it is legal to go to D.C., what is planned for that trip. They stayed together. They went on their way. And then you see this conversation and why do you have this spray in your backpack in the first place? It didn't get there by accident . . . And then there is this conversation and it's removed and I'm very satisfied with the evidence.

*Id*.  Magistrate Aloi continued:

Why would you just not turn the other way and go home? . . . [T]he was a choice. The choices all along the way. [Tanios] didn't spray it. He handed the horrible spray to [Khater] and indirectly (the government recalls Magistrate Aloi saying (in directly) into a law enforcement's eyes without provocation. Men and women just trying to do their job from having individuals attack our Capitol.

*Id*. at 109.  *See* Commitment to Another District and Detention Order (ECF No. 26), *United States v. Tanios*, No. 21-mj-27-MJA (N.D.W.V.); Detention Order (ECF No. 28), *United States v. Tanios*, No. 21-mj-27-MJA (N.D.W.V.). In Magistrate Aloi's Detention Order he again points out why he determined that Tanios "poses a danger to other and the community."  Aloi Detention Order, ECF No. 28 at 8.

On April 13, 2021, the Court set a briefing schedule for the defendants' to file motions to address pre-trial detention. On April 20, defendant Khater filed a memorandum of law in support of pre-trial release (ECF No. 18). On the same date, defendant Tanios filed a motion for review of Judge Aloi's detention order (ECF No. 19). This motion is set for a hearing on April 27, 2021, before this honorable Court.

## **Applicable Law and Analysis**

When the basis for pretrial detention is the defendant's danger to the community, the government is required to demonstrate the appropriateness of detention by clear and convincing evidence. *See* 18 U.S.C. §3142(f). When the basis for pretrial detention is the defendant's risk of flight, the government is required to demonstrate the appropriateness of detention by a preponderance of the evidence. See *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). When a magistrate's detention order is reviewed by the trial court, courts in this district have held, in line with courts across

the country, that such detention decisions are reviewed *de novo*. *See United States v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017); *see also United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662 (D.D.C. Feb. 26, 2021) at 5-6. The defendants do not contest that they are eligible for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), having been indicted with a crime of violence - Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b).

In determining dangerousness, the Court must "identify an articulable threat posed by the defendant to an individual or the community," though "[t]he threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union." *United States v. Sabol*, No. 21-cr-35-EGS (D.D.C. April 14, 2021), Memorandum Opinion (ECF No. 56), *citing United States v. Munchel,* No. 21-3010, 2021 WL 1149196 at 4 (D.C. Cir. March 26, 2021). In determining whether the defendants pose a flight risk and/or danger to the community, the Court should consider four factors under § 3142(g): (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. §3142(g); *Munchel,* 2021 WL 1149196 at 7. A review of these factors as applied to both defendants weighs overwhelmingly in favor of their continued pre-trial detention.

### <u>Nature and Circumstances of the Offenses Charged</u>

The gravity of the conduct that occurred at the U.S. Capitol on January 6, 2021, cannot be understated. *Sabol,* Memorandum Opinion at 27. "This was a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *Id., citing United States v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021). During the course of the January 6, 2021, siege of the U.S. Capitol, multiple law enforcement officers were assaulted by an enormous mob, which included numerous individuals armed with baseball bats, stun guns, fireworks, and pepper spray, among other dangerous weapons. Specific

15

members of the mob targeted the individual officers assigned to protect the Capitol as part of a coordinated effort to breach the police lines, break through the doors of the Capitol, and achieve their goal of interfering with the certification of the Presidential election. Simply put, without the violent efforts of these specific individuals to injure and/or incapacitate law enforcement officers who were executing their duties and protecting our democracy, the barrier lines would never have been breached, and rioters would likely not have gained entry into the Capitol Building.

The defendants' conduct on January 6 must be analyzed against this backdrop. Without their premeditated actions to break down the police line and directly attack officers in concert with likeminded rioters, a breach of the Capitol could not have occurred. While the government understands that not all participants in the riot are deserving of pretrial detention, those, like the defendants, who, without provocation, directly assaulted multiple law enforcement officers with dangerous weapons certainly belong in the most serious category of culpability. *See Chrestman*, 2021 WL 765662 at 8. ("The conduct of a defendant who injured, attempted to injure, or threatened to injure others, or who damaged or attempted to damage federal property, is more troubling than the conduct of a defendant who, though unlawfully present in a restricted area, merely wandered the premises.") The assault on uniformed law enforcement officers gives rise to "grave concerns" regarding the dangerousness of the defendants. *Id.* ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement," because such conduct demonstrates "disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.")

The court in *Chrestman* articulated six "guideposts" for assessing "the comparative culpability of a given defendant in relation to fellow rioters." *Id.* The guideposts are as follows: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent

of the defendant's prior planning, "for example, by obtaining weapons or tactical gear"; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's "words and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure others." *Id.* at 7-8. These factors, "[t]aken together, as applied to a given defendant, . . . are probative of 'the nature and circumstances of the offense charged,' 18 U.S.C. § 3142(g)(1), and, in turn, of the danger posed by the defendant." *Sabol,* Memorandum Opinion at 28-29.

In this case, five of the six guideposts as applied to both defendants weigh overwhelmingly towards a finding of dangerousness. Both defendants are charged with felonies as opposed to misdemeanors. The defendants obtained multiple cannisters of chemical weapons specifically in anticipation of travelling to Washington, D.C. for the January 6 event. The defendants both used (Khater) and carried (Tanios) a dangerous weapon, that is, a chemical spray. There is evidence of coordination, as described more fully below, before, during and after the riot. Finally, the defendants injured or attempted to injure others by attacking multiple unsuspecting officers. The defendants attempt to place themselves in the same category as other Capitol Riot defendants who have been released, *see* Khater Motion (ECF No. 18-1) at 21-23; [3] Tanios Motion (ECF No. 19) at 15-16. However, an application of the *Chrestman* guideposts to the facts before this Court make it clear which category incorporates the conduct of these defendants. *Munchel*, 2021 WL 1149196

---

[3] The distinguishing factor between the instant matter and the cases referenced by defendant Khater, where Capitol Riot defendants were not detained is that, with the exception of two cases, none of the referenced cases involved a charge of Assault on a Federal Law Enforcement Officer while using a dangerous weapon. 18 U.S.C. § 111(b). In the two cases which did charge 111(b), the government did not seek detention of the defendant for various reasons, including the lack of injuries.

at 8 ("those who actually assaulted police officers and broke through windows, doors and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id.*)

The evidence of coordination is worth extra mention because it took two sinister forms: First, there was coordination between the two defendants themselves. They prepared together, travelled together, planned together, and executed their attack, giving rise to a separate charge of conspiracy to attack law enforcement officers. Second, there was coordination between the defendants' actions and the actions of their fellow rioters, as the defendants carefully timed their assault on the officers to occur in tandem with an attack on the police barrier. This allowed the defendants to assault the officers while they were distracted, maximizing their chances of landing chemical spray in their eyes and thus incapacitating them to the point where the police line would break. This brazen, and ultimately cowardly act of spraying unprotected officers in the face while they were looking elsewhere, speaks to the dangerousness of the defendants. Theirs was not an impulsive, isolated attack on law enforcement officers, brought on by the energy of the mob. Rather, the mob obtained its energy from people like the defendants, who prepared for a confrontation, armed themselves with weapons, waited for the right moment, and attacked.

The degree of planning and "intentionality" suggests the defendants came to Washington, D.C. "with the intention of causing mayhem and disrupting the democratic process, mandated under the U.S. Constitution, of counting and certifying Electoral College votes." *Sabol,* Memorandum Opinion at 30*; Chrestman,* 2021 WL 765662 at 8. This was a premeditated assault on the U.S. Capitol, the Presidential election, and the integrity of our democratic process. The nature of this conduct could not be more serious and certainly warrants detention for its violent

participants.

The defendants' actions played a part in the ultimate breach of the police line protecting the Capitol, and in allowing rioters to advance towards the entrance and illegally enter the Capitol. As is apparent from the government's exhibits, the strategic timing of the defendants' attack on police caused officers to be injured and incapacitated and enabled the advancement of the rioters, which was the defendants goal.

In Defendant Tanios' Motion for Review of the Detention Order, ECF No. 19, the defendant baldly and incorrectly argues that he did not take "the lead or personally cause harm to any individual or destroyed property." *Id.* at 11. Additionally, the defendant postures that he "did not conspire to or assist with an assault on law enforcement officers. Most certainly, Mr. Tanios did not spray any officer with O.C. spray, 'bear spray' or any other chemicals." *Id.* What the defendant conveniently overlooks is that he is liable as both a co-conspirator and as an aider and abettor. Defendant Tanios purchased the harmful chemicals 24 hours before using them on January 6, he consulted with co-defendant Khater while purchasing the chemical spray, and they traveled together to Washington, D.C. Defendant Tanios secured the chemical spray in his backpack for safekeeping, and shortly before the attack on three unsuspecting police officers told co-defendant Khater "Hold on, hold on, not yet, not yet… it's still early." Defendant Tanios knew full well the plan was to assault law enforcement officers with the chemical spray. The premeditation and coordination of this plan to attack police is evident. Additionally, after the attack, the defendants left together. As Magistrate Aloi stated, the defendants were not in Washington, D.C. to visit monuments, but to participate in an attack on law enforcement and the Capitol, which makes them an overwhelming danger to the community.

Defendant Khater similarly minimizes the gravity of his own conduct, claiming that he

"never intended to forcibly interfere with the peaceful transfer of power" Defendant Khater's Motion for Release, ECF No. 18-1 at 1. But the planning, preparation, timing, and execution of these attacks as detailed above clearly prove otherwise. Similarly, the argument that neither defendant actually entered the Capitol building is meaningless, considering the throngs of rioters who did enter the building would not have been able to do so absent attacks like the one carried out by these defendants.

For all these reasons, the nature and circumstances of this offense are of the utmost gravity, and overwhelmingly weigh in favor of a finding of dangerousness.

### Weight of the Evidence Against the Defendants

The second factor to be considered, the weight of the evidence, also clearly weighs in favor of detention. A grand jury sitting in Washington, D.C., returned a 10-count indictment against the defendants. ECF 8. The evidence against the defendants is very strong, convincing, and compelling. As noted above, there is credible and detailed evidence that the defendants planned the attack on law enforcement officers. W-3 provided proof of defendant Tanios purchasing bear and pepper spray 24 hours before the defendants ambushed unsuspecting law enforcement officers. There is powerful video evidence of the defendants' actions on January 6, including the defendants overheard on video discussing their plan to attack law enforcement, and defendant Khater aggressively spraying three police officers in the face with chemical spray. The injuries to these officers are clearly documented. Defendant Khater's post-*Miranda* statements of their actions leading up to and on January 6 confirm the defendants' culpability in this offense. The instruments of the crime, including cannisters of chemical spray and the clothing worn by the defendants on January 6, were recovered from both defendants' respective residence. The evidence against both defendants is overwhelmingly strong, and accordingly, the weight of the evidence weighs heavily in favor of detention.

## History and Characteristics of the Defendant

Defendant Khater has no prior adult convictions on his record, and defendant Tanios has a 2011 conviction for False Pretenses and a 2016 conviction for Making/Issuing a Worthless Check. The government recognizes that both defendants have family and community ties. However, that should not end the Court's analysis.  The defendants had these characteristics in place when they chose to commit their attack on uniformed police officers. The defendants had family and community ties on January 6 when they chose to commit their attack on uniformed police officers. The defendants knew what they were risking by committing these criminal acts. They chose to gamble that either they would not get caught, or a court would release them because of these family and community ties.

As Magistrate Aloi stated at Tanios' detention hearing, "I understand this is a one-time event, but you know there are people serving life sentences for one-time events. It's not representative of their character but it happens. And there are mothers and sisters, fiancés and children who will suffer every day because of their conduct.  Why you weren't thinking about that beforehand.  I don't know, because it wasn't hard to understand."  Tanios Motion (ECF No. 19), Exhibit 1 at 110-11. Despite these deep family and community ties, these defendants were comfortable risking those ties to attack uniformed police officers. While their previous non-criminal behavior must be considered, it is negated by the defendants' willingness to engage in assaultive behavior on law enforcement officers as part of a violent mob, all while armed with a dangerous weapon. Despite their lack of a criminal history, these actions should give this Court great concern about the danger they would pose to the community, if released.

## The Nature and Seriousness of the Danger to any Person or the Community that would be Posed by Release

The fourth factor, the nature and seriousness of the danger to any person or the community

posed by a defendant's release, also weighs in favor of the defendants' detention. The charged offenses involve unprovoked, assaultive conduct on three uniformed police officers who were trying to hold back a violent mob of thousands of people and protect the Capitol. The defendants timed the attack on the officers to accompany the nearby breach of the bike racks, so as to catch the officers when they were in the midst of a stressful event and were unsuspecting. The defendants failed to respect law enforcement officers in full uniform doing their job. Thus, the government believes that if the defendants would disregard the authority of law enforcement, they will not abide by this Court's release conditions. Magistrate Aloi stated that, "I can't accept anyone who will not respond to law enforcement under these circumstances other than in a peaceful way. And to not have just simply turned around and go home . . . But my obligation is to the safety of our community. And I don't think I have ever seen anything play out in a way that was more dangerous to our community." Tanios Motion (ECF No. 19), Exhibit 1 at 109-10, 111-12. The danger the defendants caused by assisting the violent mob cannot be understated. The defendants were spokes in the wheel that caused the historic events of January 6, 2021, and they are thus a danger to our society and a threat to the peaceful functioning of our community.

Both defendants are also a flight risk. Defendants have deep family ties to the country of Lebanon. The risk in a case where the defendants face potentially long periods of incarceration cannot be ignored. Defendant Khater's pledge to provide a surety of 15 million dollars indicates a degree of family wealth that would make it possible to flee the country and escape prosecution.

## Conclusion

In consideration of all these factors, the government respectfully submits that no conditions or combinations of conditions can effectively ensure the safety of any other person and the community and that the defendants are flight risks. The United States therefore respectfully requests that the Court deny defendant Khater's and defendant Tanios' motions for release, and continue to detain both defendants pending trial.

Respectfully Submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793


By:   */s/ Gilead Light*
Gilead Light
D.C. Bar Number 980839
Gilead.light@usdoj.gov
Anthony Scarpelli
D.C. Bar No. 474711
Anthony.Scarpelli@usdoj.gov
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6880 (Light)
(202) 252-7707 (Scarpelli)

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2021, I caused a copy of the foregoing motion to be

served on counsel of record via electronic filing.

By:     */s/ Gilead Light*
        GILEAD LIGHT
        Assistant United States Attorney