UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------------------X

UNITED STATES OF AMERICA

    – against –

JULIAN ELIE KHATER,

        Defendant.

-------------------------------------------------------X

**Docket No. 21-CR-00222 (TFH)**

## DEFENDANT JULIAN KHATER'S MEMORANDUM
## OF LAW IN SUPPORT OF HIS PRE-TRIAL MOTIONS

Joseph Tacopina, Esq.
Chad Seigel, Esq.
Tacopina Seigel & DeOreo
Attorneys for Defendant *Julian Khater*
275 Madison Avenue, 35th Floor
New York, N.Y. 10016
Tel: (212) 227-8877

Alvin H. Thomas , Jr., Esq.
Law Office of Alvin H. Thomas Jr., PLLC
Attorney for Defendant *Julian Khater*
938 E. Swann Creek Road, #325
Fort Washington, MD. 20744
Tel: (301) 203-0893

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    The Court Should Suppress All Statements Obtained From Mr. Khater In Violation Of Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.    The Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.    The Government Did Not Obtain a Valid Waiver of Defendant's Fifth Amendment Privilege . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    The Court Should Dismiss Count Six, Charging Obstructing Or Impeding An Official Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    The Court Should Transfer Venue Pursuant To Fed.R.Crim.P. 21(a) . . . . . . . . . . . . . . 14

    The Government Should Be Compelled To Immediately Disclose Any And All *Brady* Material In Its Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    The Government Should Be Directed To Provide Notice Of Its Intent To Use Rule 404(b) Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    Defendant Julian Khater Adopts And Incorporates Herein The Arguments Made By His Co-Defendant George Tanios To The Extent They Are Neither Inconsistent With, Nor Antagonistic To, His Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    The Defendant Reserves The Right To Make Additional Motions That May Become Necessary As A Result Of Further Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                    <u>**PAGES**</u>

*Bliss v. United States,* 445 A.2d 625 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Brady v. Maryland,* 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Colorado v. Connelly,* 479 U.S. 157 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dickerson v. U.S.,* 530 U.S. 438 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Edwards v. Arizona,* 451 U.S. 477 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Giglio v. United States,* 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Irvin v. Dowd,* 366 U.S. 717 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Johnson v. Zerbst,* 304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Michigan v. Tucker,* 417 U.S. 433 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Miranda v. Arizona,* 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,7,8,11

*Missouri v. Seibert,* 124 S. Ct. 2601 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Moran v. Burbine,* 475 U.S. 412 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,12

*Murphy v. Fla.,* 421 U.S. 794 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Patton v. Yount,* 467 U.S. 1025 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pennsylvania v. Muniz,* 496 U.S. 589 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7,12

*Rideau v. State of La.,* 373 U.S. 723 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Skilling v. United States,* 561 U.S. 358 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15,16

*United States v. Andries,* 21-cr-93 (RC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Bagley,* 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Blair,* 21- cr-186 (CRC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Bozell,* 21- cr-216 (JDB). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Caldwell and Crowl,* 21-cr-28 (AMP) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Costianes,* 21-cr-180 (RJL). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Cua,* 21-cr-107 (RDM). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Frischer,* 21- cr-234 (CJN) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Gieswein,* 21-cr-24 (EGS). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16

*United States v. Grider,* 21-cr-22 (CKK) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Jensen,* 21-cr-6 (TJK) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Lino,* No. 00 CR. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) . . . . . 17

*United States v. McHugh,* 21- cr-453 (DJB) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Miller,* 21-cr-119 (CJN) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Montgomery and Knowlton,* 21-cr-46 (RDM) . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Mostofsky,* 21- cr-138 (JEB) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Nordean,* 21- cr -175 (TJK) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

*United States v. Poindexter,* 727 F. Supp. 1470 (D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Puma,* 21- cr -454 (PLF) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Reed,* 522 F.3d 354 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

*Unites States v. Roberson,* 2021 WL 5310685 (D.D.C. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Robertson,* 21- cr -34 (CRC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Sandlin,* 21- cr -88 (DLF) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Starusko,* 729 F.2d 256 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------------------X

UNITED STATES OF AMERICA

    – against –

JULIAN ELIE KHATER,

       Defendant.

-------------------------------------------------------X

**Docket No. 21-CR-00222 (TFH)**

### DEFENDANT JULIAN KHATER'S MEMORANDUM
### OF LAW IN SUPPORT OF HIS PRE-TRIAL MOTIONS

### PRELIMINARY STATEMENT

Defendant Julian Khater stands accused in a ten-count Indictment [Exhibit A], charging him as follows: (1) Count One with Conspiracy to Impede or Injure an Officer (18 U.S.C. § 372); (2) Counts Two through Four with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting (18 U.S.C. §§ 111(a)(1) and(b), and (2)); (3) Count Five with Civil Disorder (18 U.S.C. § 231(a)(3)); (4) Count Six with Obstructing or Impeding an Official Proceeding (18 U.S.C. § 1512(c)(2)); (5) Count Seven with Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon and Causing Significant Bodily Injury (18 U.S.C. § 1752(a)(1), (b)(1)(A) and (b)(1)(B)); (6) Count Eight with Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon and Causing Significant Bodily Injury (18 U.S.C. § 1752(a)(2), (b)(1)(A) and (b)(1)(B)); (7) Count Nine with Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon and Causing Significant Bodily Injury (18 U.S.C. § 1752(a)(4),

(b)(1)(A) and (b)(1)(B)); and (8) Count Ten with an Act of Physical Violence in the Capitol Grounds or Building (40 U.S.C. § 5104(e)(2)(F)).

This memorandum is submitted to provide legal support for defendant Julian Khater's pretrial motions seeking an Order: (1) suppressing statements unlawfully obtained from him; (2) dismissing Count Six; (3) transferring venue of this matter; (4) compelling the Government to immediately disclose *Brady* material in its possession; (5) directing the Government to provide reasonable Rule 404(b) notice; (6) permitting the defendant to join in the motions of his co-defendant; and, (7) allowing the defendant to make additional motions that may become necessary as a result of further discovery.

## **STATEMENT OF FACTS**

As and for his statement of facts, defendant Julian Khater adopts and incorporates herein by reference the averments made by his attorney, Chad D. Seigel, Esq, in his accompanying declaration, sworn to on February 24, 2022 ("Seigel decl."), all as is more fully set forth herein at length.

On March 14, 2021, Mr. Khater was arrested at Newark International Airport, while still aboard a plane that had just arrived from Florida. Despite repeatedly asking why he was being arrested, no explanation was forthcoming. Instead, Mr. Khater, confused and frightened, was transported to the FBI's New Jersey Field Office, located at 11 Centre Place in Newark. While there, two federal agents proceeded to interrogate him for nearly 2¼ hours straight, between approximately 4:55 pm and 7:09 pm. During that entire period, Mr. Khater was handcuffed to a metal bar attached to a wall, while wearing shorts, in an extremely cold room. In fact, the room was so cold that Mr. Khater voiced that he was

2

"freezing." Worse still, during the first 21 minutes of his interrogation, before ultimately being afforded a long-sleeve sweatshirt, Mr. Khater was donned from the waist up solely in a tee-shirt.

Notably, during that initial period, agents extracted an invalid waiver of Mr. Khater's *Miranda* rights, through means of coercion and deception. Specifically, as detailed below, Special Agent Riley Palmertree (1) repeatedly and oppressively told Mr. Khater that he needed to waive his Fifth Amendment privilege as prerequisite to being informed why he was shackled to a wall in a freezing room; (2) misled Mr. Khater into devaluing his rights as a mere technicality by minimizing the legal significance of his waiver; and (3) explicitly instructed Mr. Khater that he "ha[d]" to read a wavier form out loud while disingenuously accepting Mr. Khater's compliance with that demand as a waiver of his rights. The foregoing was captured on a video and audio recording [Exhibit B], which reflected the following exchange at its immediate start:

Palmertree:   I'm Special Agent Riley Palmertree. I'm with the FBI.

Khater:   Okay.

Palmertree:   And you probably figured out here, this is an FBI Field Office, right. Some folks have talked to you so far.

Khater:   Yeah, not that they've given me a lot of information, but I wanna know what the hell is going on.

Palmertree:   I wanna talk to you more. I can tell you about that and then, well, we have to go over your rights. And when we go over those, it's important to consider like, hey, um, I'm gonna get to some lines in here and then during those lines, I'm uh iterate a couple of things first, okay. So, I'm gonna go over this with you first. Alright, this is an advice of rights form, alright. Before you ask any questions, wait til I get to the end of it to give me your response, okay. *Before you're asked any questions, you must understand your rights. Um, you have the*

*right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.*[1] This is an important time. Just because you agree to talk to me without a lawyer present, doesn't mean you can't stop at any time you get uncomfortable.

Khater:        Uh-hmm.

Palmertree:    Alright, and again, if you decide that, if you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. I've read this statement – if, if you understand this, just read this. That's not agreeing to anything. Um, just read this statement if you wanna talk to me. Read it out loud if you would.

Khater:        Do I have to?

Palmertree:    Yeah, could you read it out loud?

Khater:        *I have read this statement about my rights and I understand what my rights are. At this time, I am willing to answer questions.*[2] Um, well I need to know what's going on before I....

Palmertree:    Well, that's part of that. Like I said, as soon as we start going and you don't wanna talk to me anymore...

Khater:        Uh-hmm.

Palmertree:    ...you could stop at any time.

Khater:        Okay.

---

[1] Agent Palmertree recited the italicized language while reading from an "Advice of Rights" form. [Exhibit C],

[2] Mr. Khater began reading the italicized language from the "Advice of Rights" form. [Exhibit C].

Palmertree:  But even, even for me to give you any more information....

Khater:      Okay. *I am willing to answer questions without a lawyer present.*[3]

Palmertree:  Okay. And then, could you just sign right there. Yeah, it's a little. Is it okay I'm not wearing a mask?

Khater:      That's fine. I don't care.

Palmertree:  Alright, so, um, first how are you doing today with all this?

Khater:      I'm freezing.

Palmertree:  Okay. Um, so today I wanna talk to you about January 6th, 2021. And, uh, I need some clarity....

Following the above exchange, the agents proceeded to question, and extract statements from, Mr. Khater about the allegations giving rise to the instant Indictment.

## ARGUMENT

### I.   THE COURT SHOULD SUPPRESS ALL STATEMENTS OBTAINED FROM MR. KHATER IN VIOLATION OF DUE PROCESS

#### A.   The Applicable Law

The Self-Incrimination clause of the Fifth Amendment provides that no "person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As stated in *Miranda v. Arizona*, 384 U.S. 436, 460 (1966),

> the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens.  To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice

---

[3] Mr. Khater finished reading the italicized language from the "Advice of Rights" form.

> demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. *Chambers v. State of Florida*, 309 U.S. 227, 235—238, 60 S.Ct. 472, 476—477, 84 L.Ed. 716 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

In addition to a suspect's privilege against self-incrimination, *Miranda* recognized the right to counsel as part of a "series of recommended 'procedural safeguards' ... [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Michigan v. Tucker*, 417 U.S. 433, 443–444, (1974). "*Miranda* thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).

In order to protect an individual's privilege against self-incrimination and right to counsel, the Supreme Court has required the application of "special procedural safeguards" in the context of custodial interrogations. *Pennsylvania v. Muniz*, 496 U.S. 582 at 589 (1990) (internal quotations and citation omitted). In particular, such safeguards are necessary due to the inherent compulsion and compelling pressures exerted upon individuals subject to custodial interrogation:

> We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak.  As a practical

6

> matter, the compulsion to speak in the isolated setting of the
> police station may well be greater than in courts or other
> official investigations, where there are often impartial observers
> to guard against intimidation or trickery.

*Miranda*, 384 U.S. at 461.

As for the procedural safeguards required to protect an accused during custodial interrogation, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. "These rights represent our system's promise of equal justice under law, and their accompanying procedural protections are 'bulwark[s] against the coercive power of being taken into police custody and interrogated.'" *United States v. Roberson*, 2021 WL 5310685, at *1 (D.D.C. 2021) (*quoting United States v. Burden*, 934 F.3d 675, 693 (D.C. Cir. 2019)).

Only if a person "voluntarily, knowingly and intelligently" waives these rights, may the Government introduce into evidence in its case in chief in a subsequent criminal proceeding any incriminating responses to questioning. *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (*quoting Miranda*, 384 U.S. at 444); *Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("*Miranda* holds that the defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly and intelligently") (internal quotations, brackets, and citation omitted).

Indeed, "[a] confession is inadmissible as a matter of due process if under the totality of the circumstances it was involuntarily obtained." *United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008) (*quoting United States v. Bradshaw*, 935 F.2d 295, 299 (D.C.

Cir. 1991)). As the Supreme Court has articulated, the inquiry regarding whether a *Miranda* waiver has been made voluntarily, knowingly and intelligently "has two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.[4] Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. at 421 (*quoting Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Among the factors the Court should consider in determining the validity of a waiver are "the defendant's prior experience with the legal system, the circumstances of the questioning, [and] evidence of coercion or trickery resulting in a confession." *Bliss v. United States*, 445 A.2d 625, 630–31 (D.C. Cir. 1982).

On a motion to suppress, the Government retains the burden of "establish[ing] the voluntariness of confession by a preponderance of the evidence." *United States v. Reed*, 522 F.3d at 359 (citing *Colorado v. Connelly,* 479 U.S. 157 at 168). Notably, in assessing whether the Government has carried its burden, the Court should "indulge every reasonable presumption against waiver' of fundamental constitutional rights" and should "not presume acquiescence in the loss of fundamental rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (U.S. 1938) (internal quotations and citation omitted).

---

[4]With regard to this consideration, "[t]he voluntariness of a waiver of this [*Miranda*] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly,* 479 U.S. 157, 170 (1986).

8

## B.     The Government Did Not Obtain a Valid Waiver of Defendant's Fifth Amendment Privilege

Under the particular facts and circumstances of this case, Defendant Julian Khater did not voluntarily, knowingly and intelligently waive his Fifth Amendment privilege. And, accordingly, the Government will not be able to carry its burden of establishing the admissibility of his statements.

As the recording of his custodial interrogation makes clear, while handcuffed to a wall in an extremely cold room, Mr. Khater – who had absolutely no prior contact with the criminal justice system – expressed his desire to know what was "going on." However, as a prerequisite to even telling Mr. Khater why he was shackled to a wall in shorts and a tee-shirt while "freezing," Agent Palmertree repeatedly told him he needed to first waive his Fifth Amendment privilege – (1) "I wanna talk to you more. I can tell you about that...."; (2) "Like I said, as soon as we start going...."; and (3) "But even, even for me to give you any more information...."

18 U.S.C. § 3501(b) provides that "[t]he trial judge in determining the issue of voluntariness shall take into consideration ... whether [a] defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession." Where lack of knowledge regarding the offense under investigation undercuts the voluntariness of a defendant's statements, law enforcement's requirement that a defendant abandon his Fifth Amendment privilege as a prerequisite to obtaining such knowledge can only serve to render the resulting waiver involuntary. That is precisely what occurred here.

Moreover, Agent Palmertree was obviously aware it was improper to tell Mr. Khater

9

he would be advised about the nature of his charges only if he waived his rights, as Agent Palmertree subsequently lied about that circumstance.  Specifically, in an FBI-302 report, Agent Palmertree falsely documented that "[a]fter being advised of the identities of the interviewing Agents *and the nature of the interview*, KHATER was advised of his rights under Miranda ... [and] waived his Miranda rights verbally and in writing." [Exhibit D] (emphasis added). Despite that contention, the recording makes clear that Mr. Khater was only told about the nature of the interview after Agent Palmertree extracted an invalid waiver from him.

To aggravate matters, in order to wrest such an involuntary waiver from Mr. Khater, Agent Palmertree misled him into believing that his waiver was " not agreeing to anything." In so doing, the agent deceptively minimized the legal significance of Mr. Khater's waiver, thereby devaluing his rights as a mere technicality.

But, most egregiously, Agent Palmertree explicitly instructed Mr. Khater that he (Mr. Khater) was actually required to read the preprinted wavier form "out loud" and then disingenuously deemed Mr. Khater's compliance with that demand as a waiver of his rights.  Specifically, after Agent Palmetree instructed him to "[r]ead [the waiver] out loud," Mr. Khater inquired, "Do I have to?"  Agent Palmertree then responded, "Yeah," prompting Mr. Khater to do so.  And immediately after Mr. Khater finished reading the form ("I am willing to answer questions without a lawyer present."), Agent Palmertree presented him with the form to sign as a trivial formality ("Okay.  And then, could you just sign right there. Yeah, it's a little.").  Then, with that simple exchange, Agent Palmertree proceeded with his interrogation of Mr. Khater, stating, "Um, so today I wanna talk to you about January 6[th], 2021.  And, uh, I need some clarity...."

10

Despite seeking such "clarity" regarding the events of January 6th, Agent Palmertree never once sought to make clear to Mr. Khater the fundamental rights he possessed, their importance, or the significance of waiving them. Instead, he continued to exert pressure upon Mr. Khater to forgo such rights by repeatedly impressing upon him that he could stop speaking once he started – (1) "This is an important time. Just because you agree to talk to me without a lawyer present, doesn't mean you can't stop at any time you get uncomfortable"; (2) "Alright, and again, if you decide that, if you decide to answer questions now without a lawyer present, you have the right to stop answering at any time."; and (3) "Like I said, as soon as we start going and you don't wanna talk to me anymore...." While stressing Mr. Khater's ability to stop talking at a later stage in the interrogation, Agent Palmertree never ensured that he adequately and effectively understood his right not to speak in the first place. Nor did Agent Palmertee cavalierly having Mr. Khater "just sign" the form under these circumstances offset that serious deficiency. This is particularly true where Mr. Khater, who was freezing and fettered to a wall at the time, had absolutely no prior experience with the criminal justice system.

*Miranda* is concerned with a defendant's ability to make an informed choice which is free from the informal compulsion of custodial questioning, not with whether a suspect can merely recite rote words on a piece of paper. The Supreme Court has held that a suspect must be "*adequately and effectively* apprised of his rights." *Miranda*, 384 U.S. at 467 (emphasis added); *see also*, *Missouri v. Seibert*, 124 S.Ct. 2601, 2604 (2004) (Kennedy, J., concurring in the judgment) ("The *Miranda* rule would be frustrated were we to allow police to undermine its meaning and *effect*.") (emphasis added). To that end, the Supreme Court has required "procedures that will warn a suspect in custody of his right to

11

remain silent and assure him that the exercise of that right will be honored." *Dickerson v.*
*U.S.*, 120 S.Ct. 2326, 2329, 530 U.S. 428, 429 (2000). It is thus not enough that Agent
Palmertree made Mr. Khater aware of his rights in the abstract. Rather, procedural
safeguards were necessary to guarantee that Mr. Khater truly understood those rights and
nevertheless elected to forego them voluntarily, knowingly, and intelligently.

Despite this requirement, Agent Palmertree never even asked Mr. Khater, *at a bare*
*minimum*, if he understood his rights. Rather, referring to the waiver form, Agent
Palmertree merely told Mr. Khater "if you understand this, just read this" immediately
before directing him to "[r]ead it out loud" (*i.e.*, "Do I have to?" and "Yeah."). Logically, it
would have been impossible for Mr. Khater to "understand" what he was reading until he
read it. Thus, requiring him to read it as an expression of his understanding was
nonsensical. Nevertheless, Agent Palmertree absurdly considered Mr. Khater's
compliance with his demand to read the waiver form out loud as Mr. Khater having "waived
his Miranda rights verbally," as he later documented in an FBI-302 report. [Exhibit D].

**C.    Summary**

As the irrefutable evidence makes plain, Mr. Khater, while subject to custodial
interrogation, did not voluntarily, knowingly and intelligently waive his Fifth Amendment
privilege. Consequently, the Government cannot carry its burden of establishing a valid
waiver, and all statements made by Mr. Khater during that interrogation must be
suppressed. *See Pennsylvania v. Muniz, supra, Moran v. Burbine, supra.*

II.   **THE COURT SHOULD DISMISS COUNT SIX, CHARGING OBSTRUCTING OR IMPEDING AN OFFICIAL PROCEEDING UNDER 18 U.S.C. § 1512(c)(2)**

The defense submits that Count Six, charging Mr. Khater with Obstructing or Impeding an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), should be dismissed for failure to state an offense pursuant to Fed.R.Crim.P. 12(b)(3)(B)(v), as (1) the certification of electoral votes does not constitute an "official proceeding" as a matter of law; and (2) the statutory phrase "corruptly" is unconstitutionally vague in this case.

For the sake of brevity, the defense adopts and incorporates herein by reference the arguments for dismissal of this charge, which have been made by other defendants similarly prosecuted for conduct allegedly committed within and/or near the Capitol Building on January 6, 2021, to the extent such arguments are neither antagonistic to, nor inconsistent with, his position herein.

Specifically, such defendants include those charged in the following cases: *United States v. Jensen*, 21-cr-6 (TJK) [Doc. No. 42]; *United States v. Grider*, 21-cr-22 (CKK) [Doc. Nos. 21, 69]; *United States v. Gieswein*, 21-cr-24 (EGS) [Doc. Nos. 60, 90]; *United States v. Caldwell and Crowl*, 21-cr-28 (APM) [Doc. Nos. 240, 250, 288, 400]; *United States v. Reffitt*, 21-cr-32 (DLF) [Doc. Nos. 38, 43]; *United States v. Robertson*, 21-cr-34 (CRC) [Doc. No. 52]; *United States v. Montgomery and Knowlton*, 21-cr-46 (RDM) [Doc. Nos. 39, 48]; *United States v. Sandlin*, 21-cr-88 (DLF) [Doc. Nos. 45, 54]; *United States v. Andries*, 21-cr-93 (RC) [Doc. Nos. 20, 23]; *United States v. Cua*, 21-cr-107 (RDM) [Doc. Nos. 84, 103]; *United States v. Miller*, 21-cr-119 (CJN) [Doc. Nos. 34, 38]; *United States v. Mostofsky*, 21-cr-138 (JEB) [Doc. Nos. 47, 61]; *United States v. Nordean*, 21-cr-175

13

(TJK) [Doc. Nos. 94, 113, 135]; *United States v. Costianes*, 21-cr-180 (RJL) [Doc. No. 32]; *United States v. Blair*, 21-cr-186 (CRC) [Doc. No. 54]; *United States v. Bozell*, 21-cr-216 (JDB) [Doc. No. 33]; *United States v. Fischer*, 21-cr-234 (CJN) [Doc. No. 54]; *United States v. McHugh*, 21-cr-453 (DJB) [Doc. Nos. 41, 45]; *United States v. Puma*, 21-cr-454 (PLF) [Doc. Nos. 20, 25]; and *United States v. Williams*, 21-cr-618 (ABJ) [Doc. Nos. 33, 41].

While certain of the above-referenced dismissal motions have already been denied, the defense recognizes that this Court may reasonably draw a varying conclusion. And, in any event, the instant motion is necessary for preservation purposes.

## III.   THE COURT SHOULD TRANSFER VENUE PURSUANT TO FED.R.CRIM.P. 21(a)

The Fifth and Sixth Amendments guarantee a defendant the right to trial by an impartial jury. Const. amends. V, VI; *see also, Skilling v. United States*, 561 U.S. 358, 378 (2010). In fact, that right is so fundamental to Due Process that the Constitution's place-of-trial prescriptions "do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial." *Skilling*, 561 U.S. at 378. Indeed, when such prejudice exists, the district court must transfer the proceedings upon a defendant's motion. Fed. R. Crim. P. 21(a).

Notably, at times, the hostility of the community in a venue may be so severe that it creates a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984). Indeed, reaffirming that view, the Supreme Court in *Skilling* set forth various considerations in determining whether to change venue based on presumed prejudice. They include: (1) the size and characteristics of the jury pool; (2) the nature and extent of

14

pretrial publicity; and (3) the time period between such publicity and the trial.[5] *Skilling*, 561 U.S. at 378.

Where presumed prejudice exists, jurors' indicia of fairness may be disregarded, because assertions of impartiality may not safeguard a defendant's rights in "sufficiently inflammatory" cases. *Murphy v. Fla.*, 421 U.S. 794, 802 (1975). As explained in *Irvin v. Dowd*, 366 U.S. 717, 728 (1961), with regard to jury selection in that matter:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, 'You can't forget what you hear and see.' With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.

In accord with the foregoing, where a case is so emotionally charged that jury prejudice may be presumed, an appellate court can find transfer to have been necessary "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury [based] on due process of law." *Rideau v. State of La.*, 373 U.S. 723, 727 (1963). In other words, *voir dire* is not sufficient to protect a defendant's Constitutional rights where presumptive prejudice in a community exists. That is precisely the scenario which exists here.

Based on the arguments advanced for a change of venue in *United States v. Gieswein*, 12-cr-24 (EGS) [doc. nos. 64 and 101], and evidence filed in support thereof

---

[5]While not relevant to the instant motion, the *Skilling* Court also identified evidence of juror partiality as a consideration as it pertains to post-trial appellate review.

[Doc. No. 101-1], all of which are adopted and incorporated herein by reference, Mr. Khater respectfully submits that a change of venue is necessary in this case.

Indeed, data presented in *United States v. Gieswein, ibid,* evinces that: (1) 84% of potential jurors have unfavorable opinions of those arrested for participating in the January 6th demonstrations; (2) 62% would characterize these individuals as criminals; (3) 71% have already formed the opinion that these individuals are guilty; and (4) 85% have already concluded that those who entered the Capitol had the specific intent to overturn the election. [Exhibit E].[6]

Prejudice must be presumed here given these sentiments.  And, to protect Mr. Khater's Constitutional rights, the Court should thus transfer his case to a different venue. In fact, even where "the circumstances may not constitutionally compel a change of venue," Fed.R.Crim.P. 21 nonetheless authorizes this Court to grant such relief in the prudent exercise of its discretion. *See Skilling,* 561 U.S. at 446 n.9 (Sotomayor, J., concurring in part and dissenting in part) (finding it would not have been imprudent for the district court to transfer the *Skilling* case in its discretion given "the widely felt sense of victimhood among Houstonians and the community's deep-seated animus toward Skilling").

In sum, Mr. Khater's trial is presently scheduled to begin in early June.  Between now and then, other January 6th defendants will have proceeded to trial, the small pool of potentially eligible jurors will diminish, and pretrial publicity will clearly continue.  Given

---

[6] Specifically, such data stems from an assessment of the federal jury pool in the District of Columbia conducted by Select Litigation, LLC, of Washington, D.C., at the behest of the Federal Public Defenders' Office for the District of Columbia. [Exhibit E].

16

these circumstances, presumptive prejudice will only increase over time.  Therefore, in order to protect Mr. Khater's Constitutional right to trial by an impartial jury, this Court should transfer his case to an appropriate venue.

## IV.    THE GOVERNMENT SHOULD BE COMPELLED TO IMMEDIATELY DISCLOSE ANY AND ALL *BRADY* MATERIAL IN ITS POSSESSION

The defense seeks the *immediate* disclosure of all exculpatory or impeachment material, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *United States v. Bagley*, 473 U.S. 667 (1985).

Significantly, various Courts have held that *Brady* supersedes Jencks (18 U.S.C. § 3500), requiring prosecutors to disclose exculpatory or impeachment evidence which is in the form of prior statements by witnesses at a defendant's request.  For instance, in *United States v. Snell*, the Court held that "Brady obligations are not modified merely because they happen to arise in the context of witness statements. The government therefore has the obligation to produce to defendant *immediately* any exculpatory evidence contained in its Jencks materials, including exculpatory impeachment material, and it is so ordered." 899 F.Supp. 17, 21 (D. Mass. 1995) (*quoting United States v. Poindexter*, 727 F. Supp. 1470, 1485 (D.D.C. 1989)) (emphasis added); *see also, United States v. Starusko*, 729 F.2d 256 (3d Cir. 1984) (holding that impeachment material is covered by *Brady* and must be turned over in advance of trial); *Poindexter*, 727 F. Supp. at 1485 ("*Brady* imposes duties on the prosecution in addition to those created by the Jencks Act, and ... in some cases the same evidence may be subject to both obligations."); *United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *14 (S.D.N.Y. Jan. 2, 2001) ("impeachment material is Brady

17

material and must be produced by the Government in advance of trial.").[7]

Accordingly, the defense requests that any *Brady* material, including impeachment material, in the possession, custody or control of the Government be disclosed at this time, to allow for full exploration and use by the defense.

## V.      THE GOVERNMENT SHOULD BE DIRECTED TO PROVIDE NOTICE OF ITS INTENT TO USE RULE 404(b) EVIDENCE

The Government has yet to inform defendant Julian Khater whether it intends to utilize Rule 404(b) evidence against him – *i.e.,* evidence of a defendant's other crimes, wrongs or acts that are relevant to "prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed.R.Evid., Rule 404(b). Thus, the defense requests that the Court require the Government to provide notice, reasonably in advance of trial, of its intent to introduce such evidence so that the defendant may have an adequate opportunity to respond meaningfully.

## VI.     DEFENDANT JULIAN KHATER ADOPTS AND INCORPORATES HEREIN THE ARGUMENTS MADE BY HIS CO-DEFENDANT GEORGE TANIOS TO THE EXTENT THEY ARE NEITHER INCONSISTENT WITH, NOR ANTAGONISTIC TO, HIS DEFENSE

## VII.    THE DEFENDANT RESERVES THE RIGHT TO MAKE ADDITIONAL MOTIONS THAT MAY BECOME NECESSARY AS A RESULT OF FURTHER DISCOVERY

---

[7]The Government's typically cited argument against pre-trial non-disclosure (*i.e.*, witness tampering) is minimized when a defendant is subject to pretrial detention, such as Mr. Khater.

**CONCLUSION**

For the reasons set forth herein, the defense respectfully submits that the Court should grant the relief sought in the annexed Notice of Motion, as well as such other and further relief as this Court deems just and proper.

DATED this 24th day of February, 2022.

Joseph Tacopina, Esq.
Chad Seigel, Esq.
Tacopina Seigel & DeOreo
Attorneys for Defendant *Julian Khater*
275 Madison Avenue, 35th Floor
New York, N.Y. 10016
Tel: (212) 227-8877


/s/ Alvin H. Thomas, Jr.
Alvin H. Thomas , Jr., Esq.
Law Office of Alvin H. Thomas Jr., PLLC
Attorney for Defendant *Julian Khater*
938 E. Swann Creek Road, #325
Fort Washington, MD. 20744
Tel: (301) 203-0893