# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**CHAD D. SEIGEL**
EMAIL: cseigel@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

January 23, 2023

Hon. Thomas F. Hogan
United States District Court
District of Columbia
333 Constitution Ave. NW
Washington, D.C. 20001

> **Re:    United States v. Julian Khater**
> <u>**Docket No. 21-cr-00222 (TFH)**</u>

Your Honor:

## I.    <u>Introduction</u>

The defense respectfully submits this letter in anticipation of defendant Julian Khater's upcoming sentencing, presently scheduled for January 27, 2023.  By way of background, on September 1, 2022, Mr. Khater pled guilty, pursuant to a plea agreement, to Counts Two and Three of the Indictment, each charging him with assaulting an officer using pepper spray during the January 6th U.S. Capitol riot, in violation of 18 U.S.C. §§ 111(a)(1) and (b).  A copy of the plea agreement is annexed hereto as Exhibit A.  As set forth therein, and as confirmed in the Presentence Investigation Report ("PSR"), Mr. Khater's Guidelines range is 78 to 97 months.  However, for reasons set forth below, the defense respectfully submits that mitigating circumstances surrounding this unfortunate incident warrant leniency and compassion.

Notably, Mr. Khater has been in custody since his arrest on March 14, 2021, under the most onerous of pretrial conditions at the Correctional Treatment Facility ("CTF").  Over the course of the past 680 days (22½ months) of his detention, Mr. Khater has been subjected to inhumane conditions, causing him to suffer physically and emotionally.  In addition to the psychological scars he still carries from being warehoused in solitary confinement for the better part of a year, Mr. Khater has been denied the ability to seek comfort from his faith and his family.  In fact, since his detention, the CTF has not permitted Mr. Khater to partake in religious services.  Nor did the facility permit Mr. Khater to receive a single family visit until just a week and a-half ago.  Thus, he has been forced to endure his extensive and harsh captivity largely in insolation and without any reprieve.  Yet, even under these trying circumstances, Mr. Khater has proven himself to be the paradigm of rehabilitation.

TACOPINA SEIGEL & DEOREO

Indeed, Mr. Khater's conduct on January 6th was not part of some orchestrated plan to attack democracy but rather constituted a fleeting and impulsive response to a moment of hysteria fueled by his preexisting diagnosed anxiety coupled with the potent influence of a mob mentality. Notwithstanding that circumstance, as a testament to his rehabilitative outlook, he feels genuine remorse for his conduct. In fact, from the very moment of his arrest, Mr. Khater honestly admitted his wrongdoing to the Government, acknowledging to federal agents that he discharged a small handheld cannister of mace at officers outside the Capitol building and identifying his co-defendant, George Tanios, as the individual who purchased it. For that matter, Mr. Khater, endeavoring to be cooperative, also gave consent to the agents to search his vehicle. Moreover, even during his subsequent bail hearing before this Court on April 27, 2021, Mr. Khater did not take a contrary self-serving position, instead readily admitting, through counsel, that he deployed the pepper spray. As counsel described and as depicted on video footage, Mr. Khater did so instinctively in reaction to an officer deploying a white cannister of pepper spray into the crowd in which he was standing. Further, as proof of Mr. Khater's lack of desire to engage in some anti-democratic movement, after deploying the spray, he not only refrained from entering the Capitol building but left the grounds.

Despite the foregoing, Mr. Khater recognizes that his conduct, however impulsive and transitory, was wrong and merits punishment. We simply ask that such punishment reflect the mitigating circumstances surrounding the offense, consider the aberrational nature of such conduct, account for Mr. Khater's exemplary background and character, and recognize that Mr. Khater has already been sufficiently penalized by means of detention during his extraordinarily harsh pretrial incarceration.

Based on all of these factors, which are addressed in detail below, the defense respectfully requests that the Court impose upon Mr. Khater a non-Guidelines sentence of time-served, pursuant to 18 U.S.C. § 3553. As the Court will be able to discern for itself from the outpouring of letters submitted on his behalf, which are annexed hereto as Exhibits B through P, Mr. Khater's offense does not define him. To the contrary, he is a gentle and kind man who has already been severely punished and meaningfully chastened in the wake of his conduct. Accordingly, the sentence of time-served, coupled with supervised release that requires mental health treatment to redress his underlying anxiety, would be sufficient, but not greater than necessary, to achieve the objectives of sentencing in this case. Significantly, as detailed below, one of the objectives achieved by such a disposition would be the avoidance of an unwarranted sentencing disparity between the punishment imposed in this case and that of other defendants charged for their conduct on January 6th.

## II.      Julian Khater's Background and Character

The defense asks that Part C of the PSR, entitled, "Offender Characteristics," be incorporated herein by reference. In addition, we wish to emphasize certain salient facts about Julian Khater's life, so that this Court may have a better understanding of the man who stands before it for sentencing.

TACOPINA SEIGEL & DEOREO

It only takes a brief look at Julian's life to see that it has been marked by a profound commitment to hard work, family, and the betterment of others. By way of background, Julian, now age 32, was born on February 15, 1989, in New Brunswick, New Jersey, to the marital union of Elie Khater, a landlord, and Eleanor nee Fox, a homemaker. Julian, alongside his older brother, Michael, and two younger brothers, John and Christopher, was reared within a very close-knit family. Indeed, in 1994, when Julian was only 5 years old, his father moved the family back to his childhood home of Bekaa, Lebanon in order to raise his children amidst their extended family, comprising no less than 32 cousins. Characterized as rural and mountainous, the region lacked a steady source of electricity, a readily available telephone system, and a continuous supply of hot water. Nonetheless, what Julian's surroundings did offer to him was a sense of belonging, as he developed a very strong sense of family and community values. As his mother, Eleanor Fox, explains in her letter annexed hereto as Exhibit B:

> What meant something to Julian, and what has always meant something to him, is to give back to the community. Lebanon fostered that in him, being a very tight knit society and very family and community oriented....

In her letter annexed hereto as Exhibit C, Julian's cousin, Josephine Khater, shares a similar view, expressing:

> He is an amazing uncle to his nephews and nieces playing hide and seek and making funny faces to keep them entertained for hours. He never misses an opportunity to hang out with his family, whether it be on the average day or on any special trips and holidays since some of his brothers live out of state, because family is so important to him. And he comes from a very loving tight knit family that is well respected in the community.

Because family has always been so important to Julian, as described by his mother, while in Lebanon, "[h]is brothers would be off exploring the mountains and he would be playing with his younger cousins who couldn't go off by themselves." Exhibit B.

As Julian himself explained to the Probation Department, growing up in Bekaa, Lebanon was a "different, interesting and unique" experience. PSR, ¶ 73. Being raised in that rural area, amidst a close-knit community, shaped Julian's values and perspective on life, as it instilled in him an appreciation for the natural environment and a slower pace of life. At the same time, it also provided him with a strong sense of belonging and support. Describing their shared hamlet, Julian's childhood friend, Johnny Hadded, explains in his letter annexed hereto as Exhibit D:

> It is a typical Lebanese village, where everyone knows each other well, and by name. Everyone is there for each other, always lending

TACOPINA SEIGEL & DEOREO

a helping hand or listening ear.  Julian by all means lived up to that standard.

Unfortunately, Julian's world was suddenly ripped away from him in July of 2006, at the start of the Israel-Hezbollah War.  At that time, Julian, only age 17, was impelled to flee Lebanon overnight with relatives as bombing hailed down upon his surroundings.  The experience, both frightening and chaotic, left Julian and his family with no time to prepare, as they left their home and possessions behind.  To ground these circumstances in their horrific reality, while en route from Bakaa to Beirut, a bomb struck the road in the path of Julian's vehicle, casting a cloud of smoke and debris into the air, which created a temporary impasse.  As it did so, Julian, his mother, and his siblings screamed out in terror, pleading to turn back.  But, desperate to escape with his family, Julian's father refused.  The sheer terror of that event is indelibly etched in Julian's memory.  Ultimately, the Khater family reached the U.S. embassy in Beirut and secured passage with American troops aboard the battleship USS Trenton bound for Cyprus.  There, Julian and his family then boarded a military cargo plane which transported them safely out of the region.  Understandably, leaving his home, community and way of life, particularly under such harrowing circumstances, was a traumatic and difficult ordeal that has had a lasting impact on Julian's psychological well-being.

In fact, as set forth in paragraph 81 of PSR, Julian to date "suffers from anxiety," for which he takes prescribed medication.  Julian's anxiety affliction is corroborated by his medical records at the CTF, the relevant pages of which are annexed hereto as Exhibit Q.  As well-documented therein, Julian suffers from an "anxiety disorder" [Exhibit Q, pp.2, 6, 7], which has caused him, while in pretrial detention, to experience "overwhelming feelings of apprehension and tightness in his chest" *Id.* at p.11, a "recent panic attack" *Id.* at p.13, and "ongoing feelings of anxiety" *Id.* at p.6, for which his "medication [was] not helping." *Id.* at p.2.  Moreover, in conjunction with his anxiety, Julian has felt "very depressed and down." *Id.* at p.14.

Notably, Julian's escape from Lebanon and history of anxiety are confirmed by his father, Elie Khater, who writes in his letter annexed hereto as Exhibit E:

> Julian himself was the victim of war trauma during the horrible events of July 2006 in Lebanon.
>
> *          *          *          *
>
> [T]he war erupted between Hezbollah and Israel.  Due to our hometown's geographical position, planes were hitting targets all around our area.  While we were sleeping, bombing and shelling would wake us up every night.  It was horrible and the children were terrified.  Then, we began to get calls from our family in the US to get out of Lebanon and come back home.  Moreover, it got so bad that the US State Department put a statement out to all US citizens to evacuate Lebanon or remain in the country at their own risk.

4

TACOPINA SEIGEL & DEOREO

One week into the July 2006 war, we decided to leave the town with two other families to Beirut. The trip would take us an hour and a half from our home to our destination. There were literally no other vehicles on the road at the time because any moving vehicle in the area was in danger of being targeted by air bombing. Thirty minutes into our drive, the planes had hit a target less than half a mile ahead of us based on our route. The plumes of smoke and debris from the bombing obstructed our view and destroyed our side of the road. My wife and kids, including Julian, were screaming "go back, go back!" because they feared for their lives. However, we communicated with the other two families, and when the smoke cleared, we came to the conclusion that going back was just as dangerous as finishing the trip. So, we crossed over to the opposite side of the road, got around the rubble, and we continued on our journey. Some minutes later, we encountered three or four tarped trucks on the side of the road. They had been hit by the same wave of air bombing and were still smoldering. Halfway into our trip, we reached a 'safe area' with no bombardment and knew we could finish the journey. We stopped to talk, and all three families were shaking and traumatized by the events that had recently occurred.

*       *       *       *

While in Beirut, we witnessed the nonstop bombardment of West Beirut, mostly at night, which left a lasting and traumatic effect on Julian and other family members. The moment we boarded the USS Trenton marked the first time that day that we had anything to drink or eat for over twelve hours.

It took the ship another eight hours to embark on its journey to Cyprus.... We then were transported to Fort Dix in New Jersey, a perilous journey totaling over three days of hell. Nobody got any sleep, and the children left everything behind, including their friends, family, lives, and most sentimental belongings.

The reason I mention this in detail is because these events had a deep, meaningful effect on Julian in particular, and it was so traumatic for him. These events left a lasting, damaging impact on Julian.

The trauma of the war has affected Julian ever since. Any time Julian goes through a stressful event or is confronted with a difficult situation, he suffers from panic attacks. Over the years since the 2006 evacuation, Julian had numerous panic attacks, some passing without hospitalization. These attacks would vary in duration and intensity. From 2012 to 2014, Julian was hospitalized due to these anxiety

5

attacks on numerous occasions. His anxiety was crippling in some cases, to the extent that he would scream to his mom, "please come sit next to me, I feel like I can't breathe and feel like I'm going to die." His heart would race, and he would suffer from shortness of breath. In some of these occasions, we would have to call the ambulance to take him to the hospital. On two occasions, even after being discharged from the hospital, Julian would get home and almost immediately begin demanding to be taken back for additional treatment due to the persistence of the panic attacks.

Despite having successfully escaped Lebanon under siege in 2006, upon returning to the United States, Julian continued to face challenges separate and apart from his anxiety. After leaving behind people and places that had been familiar to him for 12 years, Julian abruptly found himself having to adapt to a new and very different environment. To that end, upon returning to this country at 17 years old, Julian entered his senior of high school in New Jersey, where he experienced significant culture shock. In addition to adjusting to a new educational system, Julian had to learn to navigate unfamiliar societal norms while shouldering the added stress of applying to college and planning for his future. And, having just relocated to this country, he did so without the benefit of friends, causing him to feel alienated and isolated.

Worse still, Julian had great difficulty forging new relationships here, as he has always been inherently "shy" and "introvert[ed]," as aptly described by his mother, Eleanor Fox. Exhibit B. In fact, Julian's quiet and sheepish nature is a central theme running through the letters submitted on his behalf. *See* Exhibits B through P. By way of additional example, a family friend, Alissa Latner, notes that Julian was always "quiet" and "more reserved." Exhibit F. Likewise, Julian's older brother, Michael, recounts that he "was always the quiet, sweet, gentle [and] shy ... child in the family." Exhibit G.

Despite his adversities, or perhaps to some degree in an effort to overcome them, Julian embraced the altruistic values and sense of community instilled in him as a child within his small Lebanese village. Accordingly, during his senior year in high school, Julian engaged in charitable acts, volunteering his time to help others in need. As explained by his father, Elie Khater:

> While in high school, Julian volunteered to serve the poor and the needy. He used to spend most weekends at the soup kitchen in New Brunswick to help serve a hot meal to those in need. Whenever we had guests and served food, Julian used to always say, "save the leftovers so I can take them to the soup kitchen for the needy." In his teens, he joined the Maronite Youth Organization (MYO) at our Catholic Church, where he helped organize events, raise money, and provide for those in need. He was always available when there was a need to set up for those events.

Exhibit E.

TACOPINA SEIGEL & DEOREO

While donating his time to Church activities, Julian further espoused his faith as he inspired younger children, through his humility and genuine concern, to follow their religious beliefs and similarly engage in volunteer work. As his aunt, Leila Khater, writes in her letter annexed hereto as Exhibit H:

> He was also involved in the Church of Saint Sharbel in the YMA group where he was loved and made lots of friends and a lot of the younger generation looked up to him as he was so humble, caring and tender. So [a]ll knew Julian as the big loving heart and helping hand.

Julian's faith is very important to him, as confirmed by his cousin, Jennifer Bozovic, who writes, in her letter annexed hereto as Exhibit I, that "[h]e frequently attended church and is loved by the members of our community." The preceding sentiment is echoed by Julian's mother, Eleanor Fox, who states:

> When we had to move back to the U.S. in 2006, Julian entered a whole new environment in High School in Franklin, New Jersey. He didn't know anyone, and my heart would break as he would sit alone during lunch. He eventually joined the youth group at the Catholic Maronite church and was very active in the church community. We always joked that Julian would become a priest. His faith hasn't wavered throughout this ordeal.

Exhibit B.

True to his mother's words, even while presently detained, Julian continues to counsel his younger nephews to maintain their religious values. As described by his younger brother, John Khater, in his letter annexed hereto as Exhibit J:

> My nephews love him and to this day ask where Uncle Julian is. He's their Godfather and best friend. Whenever he calls from jail, they run to the phone and ask when he's coming home. He always tells them to pray and go to church. He is a person of great faith and family values....

Julian's values are not only the product of his time growing up in a tight-knit community but also the lessons imparted by his father, Elie Khater. As he explains in his annexed letter:

> I take pride in working hard and have raised a good family – a family of good values and great ethics. We are a family that cares and respects others. My four boys are all upstanding citizens who work hard and are productive members of society. I instilled in my kids the love of God, family, and the love and service of the country.

7

TACOPINA SEIGEL & DEOREO

> &ast;   &ast;   &ast;   &ast;
>
> I always instilled in my children to help the poor and the needy among us. Our family is hospitable, caring, generous, very giving, and welcoming. We housed many people who have immigrated from Lebanon over the years, fleeing war and a destabilized environment, until they were able to take care of themselves and lead successful and productive lives in the US. Julian grew up on these values and lived them every day.

Exhibit E.

As set forth in paragraph 83 of the PSR, in an effort to lead his own successful and productive life here, Julian, after securing his Associates degree in business administration from Raritan Valley Community College in 2009, went on to earn his Bachelor of Science degree in that same discipline from Fairleigh Dickinson University in 2011. As his mother, Eleanor Fox, recalls, Julian's "college days were difficult as he had a 45 minute commute to Fairleigh Dickinson University, but he never missed a day and graduated with honors." Exhibit B.

Notably, Julian's strong work ethic endured as he transitioned from school to the workforce. In fact, since returning to the United States more than 16 years ago, and up until the time of his arrest in this matter, Julian remained continuously and gainfully employed. As explained by his father:

> Since his high school and through college, Julian always maintained a job. He worked at Peter's Liquors in New Brunswick, New Jersey from 2007 until 2012. He then worked as a bar manager at Panico's Restaurant in the same town from 2011 until 2016. From 2014 to 2016, he also maintained a job as a financial sales consultant at PNC Bank in Somerset, New Jersey. From December 2016 to January 2018, he worked as an event ambassador and bar manager at Top Golf in Edison, New Jersey. From January 2018 to January 2019, he managed and co-owned a Frutta Bowls health food restaurant in Chapel Hill, North Carolina. Then, from January 2019 to May 2020, he started up and managed another Frutta Bowls location in State College, Pennsylvania, where he had 30 employees. Julian was always a hard worker as a student, as an employee, and as a business owner.

Exhibit E.

As reflected in paragraphs 90 and 91 of the PSR, Julian's business, Frutta Bowls, closed due to the pandemic, prompting Julian to work as a Lyft driver from September 2020 until his arrest in March 2021. Although Julian's business was forced to shutter its doors, what remains from that

TACOPINA SEIGEL & DEOREO

venture is the respect and admiration Julian garnered while tending to the needs of his family. As his cousin, Joanna Khater, recounts:

> Julian is the kind of person always putting his family first. He is very involved in all family businesses and takes on many responsibilities to ensure the happiness of his family and the success of their investments. When his father became interested in the "Frutta bowls" chain, Julian was by his side, no questions asked. He even uprooted himself and moved to the location of the chain to aid his father in managing the new business. Though he moved away from the family he continuously would travel to see us all, especially his niece and nephews. Julian continues to be a role model to our whole family, always hard working, kind and devoted to the people and things he loves. He is an honorable man, with good morals and a pure heart. He always puts others' needs before his own regardless of the cost.

Exhibit K.

Consistent with the above account, Julian's cousin, Josephine Khater, states:

> In his work life he was the utmost professional employee and coworker. He was an exceptionally good team player and loved by many of the customers he served whether it was at PNC Bank, Top Golf, or even Panico's Restaurant. In short, he operates with integrity and is well liked by everyone. Julian is a person of high moral character, he never hesitates if someone needs a helping hand, and always one to ask if you need something before you even get a chance to ask. As a whole Julian is a reliable, trustworthy and loving person.

Exhibit C.

## III.   The Instant Offense

Given Julian's gentle, kind, and altruistic nature, it may be hard to reconcile how he possibly could have engaged in the instant offense. Nonetheless, a more than cursory review of the surrounding circumstances, while by no means excusing his conduct, does shed some light on it. Indeed, Julian's involvement, unlike so many others caught up in the events of January 6th, was not motivated by a desire to undermine democracy. To the contrary, Julian loves this country, its principles, and members of law enforcement who uphold and defend them. In fact, as noted by his mother, Eleanor, "Julian wanted to join the Sherrif's department" and [b]ut for a DUI, which he massively regretted, he would have been there instead of at the Capitol on January 6th." Exhibit B.

TACOPINA SEIGEL & DEOREO

So the question remains: Why did Julian discharge a small canister of pepper spray at officers during the Capitol riot? In order to answer that question, it is important to initially recognize why he was even there in the first place. Within the days preceding January 6, 2021, Julian's friend and co-defendant, George Tanios, invited Julian to accompany him to Washington D.C. in order to watch the former president speak at the "Stop the Steal" rally, which was scheduled to occur at the White House on that date. Because Julian did not immediately commit to going, Mr. Tanios contacted him again on January 5th, once more asking Julian to attend the event with him. Although Julian ultimately agreed, it cannot be sufficiently underscored that their only intention was to attend a political rally, and not storm the Capitol building or seek to undermine the election results.

Notably, evidence presented to this Court at a bail hearing, held on April 27th and May 11th of 2021, corroborates the foregoing. Specifically, with regard to intent, Mr. Tanios called as a witness his friend, Sean Ruth, who testified that, despite ultimately being unable to do so because of work, he discussed with Mr. Tanios attending the rally with him and Julian "to just support Donald Trump," and "[t]here was no plan of going to the Capitol Building afterwards or anything like that." M.68:9-12; 69:1-9[1].

Likewise, although Mr. Tanios, on his own, purchased two cans of bear spray and two canisters of mace the day before the rally, William Biddle, the manager of the firearms and accessory store from which he purchased them, explained that he did so for self-protection "from violent things that were happening at other Trump rallies." T.5:22 – 6:2; 11:12-17; 25:17-20. In particular, Mr. Tanios "let [Mr. Biddle] know that he was going to go down to the rally in D.C., the Trump rally, and he was concerned about being protected while he was there." T:18:21 – 19:1. Further, as evidence of his intention to comply with the law, Mr. Tanios explicitly asked Mr. Biddle what items he could bring with him to the District of Columbia legally. In fact, after Mr. Tanios "asked if there was anything that he could take," Mr. Biddle told him "aerosols are okay." T.7:8-9. In short, Mr. Biddle made clear that Mr. Tanios was "was concerned about his safety." T.7:17-19. Accordingly, there was never a coordinated plan by Julian and Mr. Tanios to bring weapons to the District of Columbia in order to attack the Capitol building. To the contrary, as explained by Mr. Tanios's counsel during the bail hearing, the items were legitimately purchased for self-defense: "If the Court were to just Google 'Trump rally turns violent,' there are many rallies that ended up turning violent against the Trump supporters, and that's well known. So it's not ... some far off or outlandish fear.... It was legitimate." T.11:18-22.

Against the preceding backdrop, it is also important to note that, as stated in paragraph 77 of the PSR, aside from membership in his Church organization, Julian "is not a member of any other organizations, groups, associations, or clubs." The fact is that Julian, while accompanying Mr. Tanios, truly traveled to Washington D.C. on January 6th with the mindset of being a passive

---

[1] Citations in the form "M.__" refer to the minutes of the April 27, 2021 bail hearing, and in the form "T.__" to the transcript of the continued May 11, 2021 bail hearing.

TACOPINA SEIGEL & DEOREO

spectator, and having no expectation of the tragic events that would unfold that day at the Capitol. Indeed, even when the former president during his speech stated, "we're going to walk down to the Capitol," Julian had no idea that a riot would erupt. Rather, thinking that perhaps another speech was forthcoming at that location, Julian followed the crowd heading towards the Capitol.

Upon arriving at the grounds of the Capitol, Julian, while walking behind Mr. Tanios as noted in paragraph 21 of the PSR, encountered something very different than that which he anticipated. Protestors bellowing into megaphones incited others with rhetoric about a putative stolen election, as emotions reached a feverish pitch. A climate of mass hysteria fueled by the dissemination of misinformation about the 2020 election, originating at the highest level, gave rise to a visceral powder keg waiting to ignite. And that is precisely what occurred.

After separating briefly from Mr. Tanios during the ensuing chaos, Julian stood in a crowd of people as plumes of chemical irritant permeated the air. Thus, upon reuniting with Mr. Tanios, Julian, in an agitated state, referenced wanting the bear spray Mr. Tanios was carrying in a backpack. However, despite having access to such a potent item, Julian retained sufficient clarity of thought so as to avoid taking it. Instead, he solely possessed a small cannister of pepper spray, which he received from Mr. Tanios. Although pepper spray, by design, is a non-lethal self-defense tool meant to avoid permanent harm to another, Julian, to his lasting regret, used it offensively in a moment of clouded judgment. Specifically, as law enforcement safeguarding the Capitol doused the crowd in which Julian was standing with chemicals, the cacophony of collected bodies united in purpose and pulse powerfully overcame Julian's reasoning and resolve. Standing amidst a wave of bellicose protestors, as competing factions engaged one another in a dangerous and chaotic atmosphere, Julian's mindfulness momentarily gave way to his anxiety. Whether it was simply the heat of that moment or the addition of some trauma which still lingered from having fled Lebanon while under bombardment, something in Julian was triggered. And it was in that instant that Julian instinctively reacted by deploying his cannister of pepper spray at law enforcement. Although Julian did so over the course of mere seconds, it was long enough to temporarily incapacitate multiple officers. Nevertheless, the barricades these officers were defending were reformed within approximately a half-minute, without any rioters traversing the area during that momentary window. And that is very fortunate, as it was never Julian's intent to facilitate a breach of the Capitol building. As proof of that fact, after Julian deployed the pepper spray, he not only forewent entering the building but left the area altogether. In other words, Julian's offense conduct during the events of January 6th were indeed isolated and not part of some coordinated effort. Still, for his part, Julian harbors tremendous remorse and regret.

**IV.    Julian Khater's Arrest and Onerous Pretrial Detention**

As evidence of his contrition, on the very day of his arrest, March 14, 2021, Julian (1) signed a *Miranda* waiver form agreeing to speak with law enforcement, (2) executed a consent form authorizing federal agents to search his vehicle, (3) spoke to federal agents for more than two hours, (4) identified himself and Mr. Tanios in photographs at the riot on January 6th, and (5) admitted that he deployed the pepper spray during that riot. To be clear, Julian has never falsely denied his

TACOPINA SEIGEL & DEOREO

involvement in the events of January 6th. Even during his bail hearing before this Court, Julian, through counsel, acknowledged that he used the pepper spray during a moment of being emotionally overwhelmed. M.23:14-15 ("[T]his is not a premeditated, planned out event. It's reactionary, emotional reactionary").

Because Julian has been detained pretrial, by the time of his sentencing, he will have been in custody for 680 days (22½ months). And, notably, he will have served such time under extraordinarily harsh conditions at the Correctional Treatment Facility. As the Court will recall, in November of 2021, defense counsel was impelled to seek the Court's assistance because the CTF withheld discovery from Julian without any explanation and then falsely advised defense counsel that he was granted access to such discovery, which falsehood the facility later attributed to some vague "miscommunication." *See* November 11, 2021 letter regarding withheld discovery, ECF Doc. No. 46. As a result of such impropriety, Julian needlessly languished in pretrial detention at the CTF for additional months simply because of inexplicable problems relating to discovery caused by the D.C. Department of Corrections.

Beyond the fact the Department of Corrections' claim of "miscommunication" smacked of incredulity on its face, its systematic ill treatment of Julian evinced that its obstructionist conduct with regard to his discovery was deliberate. By way of background, from the moment he was first detained at the CTF in April of 2021, Julian was tormented by his jailers. The laundry list of abuses within the D.C. prison system have been widely reported, prompting the Hon. Royce Lamberth to rebuke such jail conditions as "deplorable" and "beyond belief."[2] In addition, Judge Lamberth made public a report from the Marshals Service, dated November 1, 2021, documenting that the officers at the Central Detention Facility ("CDF"), among other things, (1) withheld water and food from detainees for punitive reasons, (2) caused large amounts of standing urine and feces to remain within the toilets of multiple occupied cells, resulting in an overpowering stench, (3) served hot meals in a cold and congealed condition; and (4) antagonized detainees. *United States v. Worrell*, docket no. 21-cr-00292 (RCL), document no. 123. Although that same report noted that conditions at the CTF, where Julian has been jailed, were "largely appropriate," as Judge Lamberth noted with regard to such cautious language, "The marshal did not say conditions at the CTF were not egregious," clarifying, "He simply said they were not as egregious as at the [CDF]."[3]

---

[2] Judge Lamberth issued that scathing indictment of the D.C. jail in connection with the release (to home detention) of January 6th defendant Christopher Worrell, who stands accused of assaulting law enforcement with pepper spray in *United States v. Worrell*, docket no. 21-cr-00292 (RCL). *See* CNN article, dated November 3, 2021; https://www.cnn.com/2021/11/03/ politics/jan-6-rioter-released-unsafe-jail -conditions/index.html.

[3] *See* Washington Post article, dated November 3, 2021; https://www.washingtonpost.com/local /legal-issues/dc-jail-conditions-inspection/2021/11/03/c75d08ea-3c27-11ec-bfad-8283439871ec story. html.

TACOPINA SEIGEL & DEOREO

The conditions at the CTF, which Julian has been compelled to endure for 22½ months, are indeed egregious. As an initial point, Julian has been confined to a small cell, approximately 7 feet by 11 feet in area. Moreover, because mold was discovered in various cells, Julian was forced to share that diminutive space with another detainee for a period of time. Further adding to its claustrophobic atmosphere is the fact that there is virtually no space for movement, as one half of the cell is occupied by a metallic bunk bed, while the other half houses a toilet and sink. Worse still, the only window within the cell is approximately one foot wide and covered in a mesh that prevents viewing of the outside world. And as if those bleak circumstances were not sufficiently dispiriting to break one's resolve, during his first year of detention, Julian was largely subject to solitary confinement within that cold, dismal setting, locked within his cell for 25½ consecutive hours every other day. In short, based on these circumstances, Julian could not look up at the open sky or breathe fresh air for almost an entire year. Although these restrictions have since lessened, Julian has still only been afforded access to breathe fresh in outdoor space about two dozen times over the course of the past year.

Unfortunately, what has not ameliorated are the everyday living conditions which Julian has been made to endure. Being afforded a flattened one-inch mattress upon which to slumber, without any pillow, Julian has suffered inordinate difficulty sleeping, causing his emotional state to deteriorate. And to ensure that he has suffered sleep deprivation, Julian's jailers have customarily delivered his breakfast at 2:30 am, banging loudly on his cell to disturb any possible respite. Clearly, such tactics could only be designed to dehumanize Julian. And lest there be any question about that fact, for the better part of a year, the CTF would not permit Julian the dignity of even grooming, causing his outward appearance to become as unkempt as his crumbling emotional state.

Unfortunately, Julian's physical state has not been immune from the prison's abuse, as the CTF has provided him with subhuman sustenance. Separate and apart from him only being given two square slices of processed cheese and broccoli tips as an excuse for dinner, the so-called "meals" have apparently been doused with toxic chemicals, as they have emitted the smell and taste of ammonia.

In addition to undermining Julian's emotional and physical health, the CTF has trampled upon his spiritual well-being, as it has continued to cruelly deprive him of religious services. And, to aggravate matters, Julian has been made to suffer all these indignities while being cut off from his loved ones. In fact, for inexplicable reasons, Julian has been denied the opportunity to receive visits from his family members. As a result, for nearly the past two years, while suffering under extraordinarily harsh conditions of confinement, Julian was not once able to embrace a loved one for comfort and support.[4] Beyond the numerous torments he has endured during his captivity,

---

[4]Approximately a week and a-half ago, on January 13, 2023, the CTF finally allowed Julian the opportunity to receive a visitation, from his father and his brother, John. That visitation marks the first time Julian has been able to physically touch, or even be in the same room as, a loved one in almost two years.

TACOPINA SEIGEL & DEOREO

Julian's compelled separation from his family and inability to practice his religion have inflicted a particularly severe punishment on him, especially considering the paramount importance of both in his life, as detailed above.

Yet, even under these painful circumstances, Julian has proven himself to be the paradigm of rehabilitation. With seemingly nothing but endless time before him, as days, weeks and months have faded into one another, Julian has had ample opportunity to reflect upon his conduct. In so doing, true to his character, he feels tremendous remorse. In fact, the letters submitted on Julian's behalf are replete with references to his contrition. For instance, his father, Elie Khater, recognizes that he has had "ample time to reflect and be remorseful about the events of January 6th." Exhibit B. Similarly, his aunt, Leila Khater, his family friend, Kamil Saber, and his cousins, Josephine Khater and Jennifer Bozovic, have all independently made the same observation, namely that Julian is "very remorseful" for his conduct in this matter. Exhibits H, L, C, and I.

As evidence of his remorse, Julian has sought to atone while in custody by being of service to others. Specifically, as explained by his father, Elie Khater:

> Even in jail, Julian found time to serve others. He volunteered to distribute the food trays, to clean the general areas, to collect the laundry, and to perform any other task that will provide a service to his peers.

Exhibit E.

As proof of the foregoing, annexed hereto as Exhibit R is a D.C. Department of Corrections Work Performance sheet relating to Julian's service to the CTF. As reflected therein, the quality and quantity of his work, his initiative, his dependability, his response to supervision, and his overall job performance have all been deemed "excellent" by the facility. Exhibit R. In fact, as noted in that document, Julian "[d]oes superior work" and "more work than is expected or required" of him, performs "[s]uperior work and exceeds expected productivity," generates "[g]ood ideas to improve work, does work to improve [his] skills, [and] works with [a] positive attitude," conducts "work [that] is very reliable, consistent and thorough, always completes [his] tasks on time," and "[m]akes a real effort to please [his] supervisor." Id.[5]

The fact of the matter is that Julian, notwithstanding his own adversities, is a compassionate human being whose emotionally charged conduct on January 6th was an aberration in an otherwise exemplary life. Moreover, with respect to such conduct, he feels genuine remorse and has already been severely punished. We respectfully ask that the Court give significant weight to these considerations in relation to the Guidelines in this case.

---

[5] Based on his excellent performance, Julian's supervisor recommended that he be promoted to a more demanding job with added pay. Id.

TACOPINA SEIGEL & DEOREO

## V.    The Applicable Guidelines

As evidence of his contrition and acceptance of responsibility, on September 1, 2022, Julian Khater pled guilty pursuant to a plea agreement, a copy of which is annexed hereto as Exhibit A. As set forth therein, the parties have agreed that the following Guidelines apply to both Counts One and Two, charging him with assaulting an officer using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b):

| | |
|---|---|
| Base Offense Level [U.S.S.G. § 2A2.2(a)]: | 14 |
| Dangerous Weapon Used [U.S.S.G.§ 2A2.2(b)(2)(B)]: | + 4 |
| Bodily Injury [U.S.S.G.§ 2A2.2(b)(3)]: | + 3 |
| Convicted under 18 U.S.C. § 111(b) [U.S.S.G. § 2A2.2(b)(7)]: | + 2 |
| Official Victim [U.S.S.G. § 3A1.2] | + 6 |
| Adjusted Offense Level: | 29 |

Additionally, because each count constitutes a separate group of equal seriousness under the Guidelines, two units are generated resulting in an increase of two levels to the adjusted offense level under U.S.S.G. § 3D1.4(a). Consequently, a grouping analysis results in a total adjusted offense level of 31. Furthermore, because Julian Khater has fully accepted responsibility by means of his timely guilty plea, an additional three-point total reduction is warranted, pursuant to U.S.S.G. §§ 3E1.1(a) and (b), resulting in a total adjusted offense level of 28. Given that his Criminal History Category is I [PSR, ¶ 65], the Guidelines range applicable to Counts One and Two is therefore 78 to 97 months.

Despite the preceding range, we respectfully ask that the Court sentence Julian Khater to a period of time-served, coupled with supervised release that requires mental health treatment. The defense respectfully submits that such a non-Guidelines sentence is warranted based on the relevant sentencing factors contained within 18 U.S.C. § 3553(a).

## VI.    The Appropriate Sentence

### A.    The Applicable Law

The Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 245-46 (2005), requires sentencing courts to consider, in addition to the Guidelines themselves, the broad directives set forth in 18 U.S.C § 3553(a).[6] That section directs courts to "impose a sentence sufficient, but not

---

[6]In *Rita v. United States*, the Supreme Court stated that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines should apply." 127 S.Ct. 2456, 2465 (2007) (*citing Booker*, 543 U.S., at 259-260).

TACOPINA SEIGEL & DEOREO

greater than necessary, to comply with the purposes set forth in paragraph 2." 18 U.S.C. § 3553(a). Paragraph (2) states that such purposes are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider such diverse factors as: the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwanted sentencing disparities; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7). The Court's holding in *Booker* also permits this Court to consider those factors listed in U.S.S.G. § 5H1 such as the defendant's mental and emotional condition, employment record, and childhood difficulties.

One of the primary infirmities of the Guidelines is their broad failure to incorporate these factors. Moreover, the Guidelines do not – and indeed cannot – produce sentencing ranges that account for each of the various factors and purposes a court must consider when imposing sentence. In fact, a sentence within the Guidelines can create an "an unwarranted sentencing disparity" by treating, in the same way, individual defendants who have different characteristics and personal circumstances which are relevant for sentencing.[7]  As a result of these inherent limitations, this Court cannot impose upon Julian Khater a sentence based solely on the Guidelines that adequately takes into account all factors germane to his sentencing.

The Supreme Court has continued to clarify the relative weight which sentencing courts should afford the Guidelines. Specifically, in *United States v. Gall*, 552 U.S. 38 (2007), the Court rejected a standard of review which would require the strength of the underlying justification for a departure from the Guidelines to be "proportional" to the degree of the departure and confirmed that the abuse of discretion standard applies to sentences both within and outside the Guidelines. In arriving at this decision, the Court also rebuffed any notion that sentences outside the Guidelines required extraordinary circumstances. Based upon these developments, we submit that the Guidelines carry no greater weight than the other sentencing factors under 18 U.S.C. § 3553 or U.S.S.G. § 5H1.

---

[7] Ilene Nagel, one of the original sentencing Commissioners, acknowledged this problem – which she dubbed the "overreaching uniformity" of the Guidelines – noting that "the emphasis [in creating the first set of guidelines] was more on making sentences alike, and less on ensuring the likeness of those grouped together for similar treatment. Nagel, *Structuring Sentencing Discretion: The New Federal Sentencing Guidelines*, 80 J. Crim. L. & Criminology 883, 934 (1990).

TACOPINA SEIGEL & DEOREO

The preceding framework provides ample support for the sentence now sought of time-served and supervised release with a condition of treatment to redress Julian's anxiety.

### B.   The Onerous Impact of Pretrial Detention

First, as detailed above, Julian has already been severely punished for his misconduct over nearly the last 2 years.  During that lengthy time, he has been imprisoned under the most onerous of conditions at the CTF, with limited contact to the outside world, during the midst of a once-in-a-lifetime pandemic, while denied access to his loved ones, and tormented by staff members.  As a result, Julian has not only been in a physical prison for almost the past two years but a psychological one as well, as his emotional and mental states have deteriorated.

In *United States v. Salerno*, the Supreme Court contemplated some point "at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." 481 U.S. 739, 747, n.4.  Here, the abuses Julian has suffered during his pretrial detention, irrespective of its duration, have been unquestionably punitive.  Indeed, such onerous pretrial conditions have advanced no regulatory purpose and instead have served only to inflict upon Julian unacceptable suffering, pain, and humiliation.

In *United States v. Francis*, 129 F.Supp.2d 612 (S.D.N.Y. 2001), the Court granted a downward departure because the defendant was subjected to conditions in a state correctional facility for 13½ months that were qualitatively worse than conditions at a federal correctional facility, including overcapacity, poor food and sanitation, the denial of access to materials that he could read, and the occasional denial of contact visits with his family.  Here, Julian was not only subject to overcrowding, substandard food, and poor sanitation but he was unduly placed in solitary confinement for an inordinate period, denied access to his discovery materials without reason, tormented by staff members who deliberately interfered with his sleep, wrongly prevented from participating in religious services, and cruelly deprived of the ability to see a single loved one in nearly two years.  While the Court in *Francis, supra*, redressed these circumstances with a downward departure, we respectfully submit that the Court should do so here by means of a variance from the Guidelines under 18 U.S.C. § 3553.

### C.   Julian's Upstanding Character and the Aberrational Nature of his Conduct

As set forth above, Julian has used his time in custody to reflect on his conduct, feel genuine contrition, and provide service to the facility.  Plainly, the harsh treatment he has received while in pretrial detention has not sullied his upstanding character.  In that regard, while it is difficult to encapsulate a person's character in a series of letters, those annexed hereto as Exhibits B through P do tend to reflect what is most central about Julian – that he genuinely is a kind, compassionate and gentle soul.  When one reads them, a continuity becomes readily apparent.  They present the portrait of a "calm, quiet, and easygoing person" who is "polite and respectful," a "hard worker," "an honorable man, with good morals and a pure heart" who "always put others' needs before his own," a "caring soul," a "warm, loving and caring" person, a "humble, caring and tender ... gentleman,"

TACOPINA SEIGEL & DEOREO

a "big loving heart and [ ] helping hand," a "gentle, shy and loving" human being with a "laid back and humble personality," a "symbol of tenderness," an "absolutely devoted, doting, loving uncle,"a "great, loyal friend" full of "thoughtfulness and compassion," a person with a "calm demeanor," a "responsible adult," a "great son, a loving brother, and a caring individual," a "hard-working, dedicated employee," a person who has "always conducted himself with dignity and respect," a "great, upstanding, extremely polite, intelligent, very respectful, and hard working person with [an] amazingly kind personality," a "peaceful, home-to-work, work-to-home type of person," a "person of great faith and family values," a "compassionate, considerate, calm, and kind" person who "couldn't hurt a fly," a "levelheaded, responsible and humble person," a "reliable, trustworthy and loving person," and a "person of high moral character" who "operates with integrity." These are just some of the terms used to describe Julian by those who know him best. As the Court will undoubtedly recognize, a person does not suddenly develop such a character after he is arrested. Rather, it is the hallmark of a person's true nature. We respectfully invite the Court to review the letters in their entirety, as they, along with the contents of this submission, show why Julian is an appropriate candidate for the Court's leniency and compassion.

Moreover, these letters corroborate what Julian's oldest brother, Michael Khater, makes plain: "The isolated incident at the center of Julian's case does not, and should not, in any way, be a gauge to determine or judge his character." Exhibit G. In short, Julian's offense conduct truly is a shocking aberration in his life. In fact, it qualifies as the legal definition of aberrant conduct in this Circuit. As explained in *United States v. Dyce*, such behavior "generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning." 91 F.3d 1462, 1470 (D.C. Cir. 1996) (internal quotations and citations omitted). While the Court in *Dyce* further observed that a district court may depart from the Guidelines based on a finding that a defendant acted aberrationally, in light of *United States v. Booker*, *supra*, such recourse is no longer necessary in order to show leniency based on that mitigating factor. Indeed, a Court can simply grant a variance from the Guidelines in accord with 18 U.S.C. § 3553(a)(1), which requires it, when determining the particular sentence to impose, to consider "the nature and circumstances of the offense."

Here, Julian's aberrant behavior is in stark contrast to his upstanding character. For that matter, as demonstrated below, such behavior also stands in contradistinction to the typical premeditated conduct which was so prevalent on January 6th. Rather than being driven by some effort to undermine the election, Julian's actions constituted a momentary lapse in judgment, triggered by his anxiety during an extremely stressful event. It is respectfully submitted that this consideration warrants leniency. After all, as stated by his cousin, Chantal Nagy, "[w]hile he had a very serious lapse in judgement and behaved irrationally, this does not erase the person he has always been." Exhibit M.[8]

---

[8] Because Julian's conduct is so shockingly out of character for him, his father's friend, Perla Kfouri, has stated that "[l]earning about Julian's offense was surprising" and "difficult ... to believe." Exhibit N.

TACOPINA SEIGEL & DEOREO

### D.   Julian's Anxiety

In addition, it bears emphasis that although Julian takes prescribed medication to address his anxiety, he has never received ongoing therapy to do so. Accordingly, what would be best to redress his conduct is mental health treatment mandated as a condition of supervised release. Notably, 18 U.S.C. § 3553(a)(2)(D) directs that courts should consider, in determining a particular sentence, the need for that sentence to provide a defendant with medical care "in the most effective manner." In this case, that solution is not found with further incarceration, as prison medical records annexed hereto as Exhibit Q establish that detention has actually triggered Julian's anxiety. *See* p.4, *supra*. Julian's father, Elie Khater, corroborates that fact:

> As recently as Friday, January 13[th], 2023, the date that was arranged for us to see Julian at the jail for the first time in 611 days, I found out that Julian had an anxiety attack that evening upon speaking to him over the phone the next day.

Exhibit E.

With the foregoing in mind, what would be most effective for Julian's mental health treatment is enabling him to participate in such rehabilitative care at home, surrounded and supported by his family. And that is because Julian's family means the world to him. As conveyed by his cousin, Josephine Khater, "family is so important to him [and] he comes from a very loving tight knit family." Exhibit C. Thus, rather than subjecting Julian to further incarceration, we respectfully submit that both he and the community would be better served by directly and effectively remedying that condition which gave rise to his impromptu conduct on January 6th, through mandated therapy as a requirement of supervised release, so as to facilitate his ongoing rehabilitation.

### E.   The Need to Avoid Unwarranted Sentencing Disparities

In addition to the preceding considerations, 18 U.S.C. § 3553(a)(6) includes the need for any sentence imposed to "avoid unwarranted sentence disparities." Here, a review of sentences imposed for other defendants involved in the January 6th riot supports the propriety of the sentence now sought. For demonstrative purposes, the defense has set forth below the sentences imposed for a dozen defendants charged for their conduct on January 6th along with a description thereof. Notably, the first three listed defendants deployed chemical spray at officers. And all of the defendants listed below received sentences considerably below Julian's Guidelines. Yet, unlike Julian's conduct which was spontaneous and fleeting, these defendants all engaged in more extensive and premeditated conduct designed to strike at the heart at our democracy. Thus, imposing upon Julian a sentence equal to or greater than that received by these defendants would create an unwarranted sentencing disparity.

19

TACOPINA SEIGEL & DEOREO

With the foregoing in mind, the defense respectfully directs the Court to the following January 6th defendants:

1.   **Ricky Willden** ("Willden") was sentenced to *24 months' incarceration*, for spraying officers with a chemical irritant, in violation of 18 U.S.C. § 111(a)(1).[9]

On January 6, 2021, Willden traveled all the way from California to the District of Columbia to participate in the January 6th attack on the Capitol. During the riot, Willden, standing in the crowd near the steps of the U.S. Capitol building, used a cellular telephone to record the crowd around him. On the back of the cellular phone was the distinctive writing, "I [heart] my proud boy."

In addition, after officers succeeded in closing the Rotunda doors of the Capitol building during the riot, the mob outside continued yelling, chanting, and skirmishing with officers, trying to breach the doors again. Willden, close to the officers, initially joined his fellow rioters in singing the "Star Spangled Banner." And then he attacked those officers, deploying a canister containing chemical spray at them. After he did so, Willden threw the canister at the officers, as other rioters joined in, dousing them in chemical spray. Then, Willden entered the U.S. Capitol building and walked towards the Rotunda.

At least six officers were identified as guarding the doors when Willden set out to assault them with his chemical spray. Willden's assault on the officers guarding the doors helped facilitate the eventual breach of the Capitol building and aided rioters who succeeded in injuring officers and destroying property. Moreover, Willden's violent conduct served to incite and embolden other violent rioters around him.

Subsequently, showing no remorse, Willden later posted to Facebook, "I think they got the message from everyone of all ages." *See* Government's sentencing memorandum in *United States v. Willden*, 21-cr-423-RC, doc. no. 38.

2.   **Cody Mattice** ("Mattice") was sentenced to *44 months' incarceration*, for spraying officers with chemicals, pursuant to 18 U.S.C. § 111(a)(1).

---

[9]The Government permitted Willden, unlike Julian Khater, to plead guilty to assault under subsection (a) of 18 U.S.C. § 111, rather than subsection (b) thereof. While fact bargaining may play a role in the distinction between the charges and attendant Guidelines of various defendants, the ultimate sentence to be imposed upon Julian Khater should not turn a blind eye to the relevant facts of each case when seeking to avoid an unwarranted sentencing disparity.

TACOPINA SEIGEL & DEOREO

Mattice's pre-riot text message conversations with his co-defendant, James Mault, reveal that they anticipated and planned for violence on January 6th. In addition, before setting foot on Capitol grounds, Mattice recorded a video conveying his criminal intent and foreshadowing his violent conduct that afternoon. He explained, "We're all getting ready to go march on Capitol Hill. We're gonna go fuck some shit up. It's about to be nuts." He then added, "let's do this. Let's fucking do this. I can't wait." Mattice subsequently recorded another video in which he said, "It's a march on Capitol Hill. Nobody's happy, no one's satisfied. Time to fuck shit up." After arriving on Capitol Hill, Mattice recorded another video, in which he said, "Here we are, Capitol Hill. We're getting up front, and we're taking this shit. Make no mistake, over 1,000,000 fucking people here. Done. Done."

During the riot, Mattice violently attacked the police guarding the Capitol building. When the officers refused to give way, Mattice pulled down a section of bike rack fencing separating the officers from the crowd. Then, Mattice led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. During this conflict, Mattice texted his family and bragged about breaking the police line. Later, Mattice reached the Lower West Tunnel to the Capitol building, then either grabbed onto and hung from the wooden frame directly beneath the arch and/or was supported by members of the crowd. Once there, Mattice obtained a canister of chemical spray from another rioter, then sprayed the contents at police officers defending the tunnel. He held his thumb on the canister, discharging chemicals at police officers for about ten seconds. Mattice showed no remorse for his crimes in the immediate aftermath of the riot. On the night of January 6th, Mattice sent his mother a "selfie" style photograph from the riot and then later bragged about his participation.

Moreover, during his custodial interview, Mattice lied to FBI agents that he did not fight with police and refused to acknowledge his role in breaking a police line. And even worse, Mattice maintained that when he was at the mouth of the Lower West Terrace tunnel, armed with chemical spray, he was not spraying police. He maintained this lie even when confronted with evidence to the contrary. *See* Government's sentencing memorandum in *United States v. Mattice*, 21-cr-657-BAH-1, doc. no. 60.

3.    **James Mault** ("Mault") was sentenced to *44 months' incarceration*, for spraying officers with chemicals, pursuant to 18 U.S.C. § 111(a)(1).

On January 2, 2021, Mault, who planned for violence on January 6th, told friends who would travel with him to Washington, D.C. to arm themselves with batons, pepper spray, and "asskicking boots." Subsequently, during the riot, Mault encouraged police officers to stand aside and allow the rioters to invade the Capitol building

TACOPINA SEIGEL & DEOREO

while it was still occupied by Members of Congress. When the officers refused to give way, Mault led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. Later, with great personal effort, Mault made his way to the mouth of the Lower West Terrace tunnel and used chemical spray against the police officers who refused to yield to Mault and his confederates. Mault then obtained another canister of pepper spray that he gave to another rioter who used it to attack officers in the tunnel.

Moreover, during his offense conduct, Mault told officers "Your jobs will be here when you come back after we kick the shit out of (inaudible)." He also sought to justify the mob's conduct, telling officers, "This shit's [*i.e.*, the rioters' shared cause is] fucking right. What we're doing is right, or there wouldn't be this many fucking people here. And you guys fucking know this shit." Then, Mault told officers, "I obey the fucking law every goddamn fucking day. Every fucking day. Where the fuck's it get me? Everyone else (inaudible) breaks the law and they get away with (inaudible)."

After committing these offenses, Mault lied to FBI agents, minimized and denied his unlawful conduct, and parroted baseless conspiracy theories. According to the Government, Mault's past statements and attitude demonstrate that he poses a substantial risk of committing future political violence. *See* Government's sentencing memorandum in *United States v. Mault*, 21-cr-657-BAH-2, doc. no. 60.

4.     **Scott Fairlamb** ("Fairlamb") was sentenced to *41 months' incarceration* for Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), and Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

Specifically, Fairlamb, a former Mixed Martial Arts fighter, joined the storming of the police line on the West Terrace, obtaining a police baton, and screaming "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!" Fairlamb then brandished that same police baton while entering the U.S. Capitol through the Senate Wing Door, which had been kicked out by rioters who entered through a broken window, just one minute before Fairlamb's entry. After exiting the U.S. Capitol, Fairlamb aggressively followed a line of Metropolitan Police Department ("MPD") officers, screaming vitriol at them as they attempted to traverse the over-run Terrace. After isolating an MPD officer from his fellow officers, Fairlamb shoved the officer and then punched his face shield. Two days after the riot, on January 8th, Fairlamb filmed a chilling video threatening future violence, stating, "they pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot," and, immediately after being visited by FBI agents on January 15, 2021, said that he would "go again" to the U.S. Capitol. *See* Government's sentencing memorandum in *United States v. Fairlamb*, 21-cr-00120-RCL, doc. no. 50.

TACOPINA SEIGEL & DEOREO

5.   **Devlyn Thompson** ("Thompson") was sentenced to *46 months' incarceration* for using a metal baton against officers while trying to enter the Capitol building, in violation of 18 U.S.C. §§ 111(a) and (b).

Thompson was amidst a crowd of protestors who were pushing against and assaulting D.C. Metropolitan Police Department and U.S. Capitol Police Officers in an attempt to gain entry into the U.S. Capitol. For several minutes, Thompson and others were forcibly trying to make entry though the doorway at which the officers had gathered. At some point, Thompson bent down and gained possession of a metal baton that he found on the floor, approached the entrance to the U.S. Capitol where law enforcement was blocking the door, and swung the baton overhead and downward against the police line. Thompson also yelled at law enforcement holding the line, "You wanna fight, let's fight! One on one." Additionally, in his enthusiasm to throw a box speaker at the police line, Thompson caused a head wound to a fellow rioter, who needed medical treatment for a gash on his head. *See* Government's sentencing memorandum in *United States v. Thompson*, 21-cr-461-RCL, doc. no. 30.

6.   **Nicholas Languerand** ("Languerand") was sentenced to *44 months' incarceration* for, among other things, attacking officers with various dangerous objects, in contravention of 18 U.S.C. §§ 111(a) and (b).

Languerand was standing near the archway leading from the Lower West Terrace to the interior of the U.S. Capitol. While there, he threw various dangerous objects at U.S. Capitol Police ("USCP") and Metropolitan Police Department officers protecting the Lower West Terrace entrance as other rioters also attacked the law enforcement officers. The objects included an orange traffic barrier and two sticklike objects. Languerand then took possession of a police riot shield, struck it against the ground, and then held it in front of him as he confronted the USCP and MPD officers defending the Lower West Terrace archway. *See* Government's Statement of Offense in *United States v. Languerand*, 21-cr-3w53-JDB, doc. no. 28.

Further, Languerand's social media posts demonstrate that prior to his arrest, he had no remorse for his conduct on January 6th. To the contrary, Languerand bragged about his assaults on police, posting to Instagram, "I never made it inside but I got some good shots in" and in another post, after recounting his conduct at the Capitol, Languerand said "it felt good." Languerand also stated that a merely peaceful protest would not have been successful in pressuring Congress, and posted messages showing that he anticipated and welcomed further violence, telling his Instagram followers that "Violence isn't always the answer but in the face of tyranny violence may be the only answer" and "Next time we come back with rifles." *See* Government's Sentencing Memorandum, *Id.*, doc. no. 34.

TACOPINA SEIGEL & DEOREO

7.   **Kevin Douglas Creek** ("Creek") was sentenced to *27 months' incarceration* for punching, shoving, and/or kicking to the ground law enforcement officers, pursuant to 18 U.S.C. § 111(a)(1).

On January 6, Creek, carrying a backpack with supplies which included a first aid kit, mace, a boot knife, and binoculars, headed towards the Capitol with two associates, wanting, himself, to be at the front of the crowd. During the riot, Creek and a mob pushed up against a bike-rack barrier backed by a thin line of police officers. The mob, including Creek, pushed through the barrier, breaking the line of bike-rack fencing and the police officers behind it. Creek ran through the front of the crowd, grabbing a Metropolitan Police Department officer and driving him backward forcefully several feet. After letting go of the officer, Creek hit him in the face shield of his helmet. Thereafter, Creek made a beeline for a U.S. Capitol Police officer who was attempting to protect himself behind a bike rack barrier and a police shield. Creek went around the bike rack barrier, gave that second officer a hard shove in the shoulders, and then kicked him, causing the officer to fall backward to the ground. The officer tried to get up when another rioter pushed him back down to the ground. *See* Government's sentencing memorandum in *United States v. Creek*, 21-cr-645-DLF, doc. no. 48.

8.   **Matthew Miller** ("Miller"), who, among other things, used a fire extinguisher as a dangerous weapon against law enforcement, was sentenced to *33 months' incarceration* for obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2), and assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1).

Specifically, on January 6, 2021, Miller, once on restricted grounds of the U.S. Capitol, encouraged rioters to get closer to the U.S. Capitol building, waving his arm in a "come this way" fashion at least 30 times and calling out, "Come on!" Then, on the Lower West Terrace, Miller took several actions against the police guarding the entrance to the Capitol building. There, he urged other rioters to push against the police, threw batteries at police officers, and ultimately used a fire extinguisher as a dangerous weapon, releasing its contents directly onto law enforcement officers protecting the entry point into the Capitol building. *See* Government's sentencing memorandum in *United States v. Miller*, 21-cr-75-RDM, doc. no. 67.

9.   **Howard Richardson** ("Richardson") was sentenced to *46 months' incarceration* for multiple attacks against officers using a metal flagpole and a metal billboard, in violation of 18 U.S.C. § 111(a)(1).

TACOPINA SEIGEL & DEOREO

With respect to his conduct during the riot, Richardson joined the storming of the police line on the West Terrace just in front of the media tower that had been constructed ahead of the Presidential Inauguration. He brought a metal flagpole with him to the Capitol that day. During the riot, as he stood at the very front of the line of police officers struggling to maintain their position and hold the mob back, Richardson, unprovoked, used his metal pole to strike a police officer three times, stopping only when the metal pole broke in his hands. Then, moments later, he eagerly helped a group of rioters force a very large metal billboard into the same line of besieged officers, using it as a battering ram to break through a bike rack barrier. The effort was successful, as rioters broke through the bike rack barrier and created a gaping hole in the police line. Thereafter, Richardson also lied to law enforcement about his involvement, falsely claiming that he swung his flagpole only after an officer swung at him. *See* Government's sentencing memorandum in *United States v. Richardson*, 21-cr-721-CKK, doc. no. 35.

10.   **Marshall Neefe** ("Neefe") was sentenced to *41 months' incarceration* for conspiracy to commit obstruction under 18 U.S.C. § 1512(k), and assault under 18 U.S.C. § 111(a)(1).

In the weeks leading up to the riot, Neefe and his co-defendant, Charles Smith, coordinated and planned to travel to Washington, D.C. on January 6th and were prepared to violently ensure that the former president would remain in office following Congress's certification proceeding. Neefe discussed bringing weapons to Washington and fabricated a wooden club—which he named the "Commie Knocker"—that he carried on to the Capitol grounds. During the riot, Neefe participated with other members of a mob in thrusting a large metal sign frame into a defensive line of U.S. Capitol Police and D.C. Metropolitan Police Department officers. After the officers' line broke, Neefe entered the Capitol, disregarded police officers' commands to leave the Capitol Rotunda, and exited the building after spending over 40 minutes inside. During the evening hours following the Capitol breach, Neefe showed no remorse. Through Facebook, he expressed pride about breaching the Capitol; vowed he would "bring[] a gun next time"; opined that the events earlier that day were "total pussy shit"; and stated, "If I had my way every cop who hurled a baton or maced on [sic] of us would be lined up and put down ... We made sure they knew we fucking OWN them." *See* Government's sentencing memorandum in *United States v. Neefe*, 21-cr-567-RCL, doc. no. 84.

11.   **Nicholas Ochs** ("Ochs"), who, among other things, threw a smoke bomb at police, was sentenced to *48 months' incarceration* for obstruction under 18 U.S.C. § 1512(c)(2).

TACOPINA SEIGEL & DEOREO

In the days immediately following the 2020 presidential election, Ochs, a previous Proud Boys Elder (member of a small leadership group within the organization) told his fellow Proud Boys that he was prepared to "chimp out" if the result was not overturned, and his favored candidate – the former president – installed. On January 6th, he made good on that plan, throwing a smoke bomb at police during the riot. In addition, among other things, Ochs breached the Capitol building, smoked cigarettes in the Rotunda, pointed rioters toward the Speaker's Office, and celebrated with fellow Proud Boys. Further, according to the Government, Ochs never expressed any remorse or contrition and posed a danger that he would do something similar again, including with the Proud Boys. *See* Government's sentencing memorandum in *United States v. Ochs*, 21-cr-73-BAH, doc. no. 94.

12.     **Alan Byerly** ("Byerly"), who engaged in three separate assaults and used a stun gun, was sentenced to *34 months' incarceration* for assault under 18 U.S.C. § 111(a)(1), and for striking, beating, or wounding of another person within the territorial jurisdiction of the United States under 18 U.S.C. § 113(a)(4).

Prior to January 6, 2021, Byerly purchased a stun gun, capable of emitting an electronic shock to a victim. Byerly carried the stun gun with him when he traveled from his home in Pennsylvania to the District of Columbia, and had it with him as he marched on the Capitol on January 6th. Byerly engaged in three separate assaults on the west side of the Capitol building, two against police and one against a news reporter. First, he assisted a large group of rioters who used a large Trump sign inside a heavy steel frame with steel caster wheels as a battering ram against barricades and a line of police officers that separated the rioters from the Capitol on the stairs leading to the Capitol building. Second, Byerly participated in a vicious assault against an Associated Press reporter, who was dragged up and down the stone staircase on the Lower West Terrace of the Capitol's grounds. Later still, Byerly used his stun against United States Capitol Police and Metropolitan Police Department officers who had formed a line of bike racks to act as a barrier between themselves and against the crowd forming on the Capitol grounds. After officers removed the stun gun from Byerly's hands, he continued to charge toward the officers, physically striking and pushing against them. He also grabbed an officer's baton. Subsequently, Byerly lied to federal agents about his involvement in the riot and concluded the interview by stating, "This is political fucking persecution. This is a simple citation and me go to court and pay a fine locally and now the federal government's in it and it's all politically fucking pushed for to persecute any Trump supporters." *See* Government's sentencing submission in *United States v. Byerly*, 21-cr-527-RDM, doc. no. 47.

TACOPINA SEIGEL & DEOREO

Contrary to the foregoing, Julian Khater did not plan his assault. He did not belong to some militia or extremist organization. He did not enter the Capitol building. He did not brag on social media or elsewhere about his conduct. He did not urge others to engage in violence. He did not engage in political rhetoric justifying his actions. He did not verbally antagonize or insult officers. He did not boast about committing future acts of violence. And he did not lie to law enforcement about his actions. Instead, he acted momentarily, impulsively and aberrantly, in the heat of the moment, fueled by his anxiety and extremely stressful circumstances. He left the area after his conduct. Immediately upon his arrest, he cooperated with law enforcement, honestly admitting that he deployed the spray, and identifying his co-defendant. And he has expressed genuine remorse. In light of such circumstances which distinguish him from the above-referenced defendants and mitigate his conduct, subjecting Julian Khater to further imprisonment at this stage will produce an unwarranted sentencing disparity.

**F.     Section 3553 Factors**

Based on the foregoing, the defense respectfully submits that the factors outlined in § 3553(a) support the imposition of time-served and supervised release, with a condition of mental health treatment. First, "respect for the law" and "just punishment for the offense" could reasonably be achieved with such a sentence. Through his plea of guilty and acceptance of responsibility, Julian has demonstrated his respect for the law. And, his imprisonment at the CTF has more than justly punished him. Second, Julian is not the type of person of whom to make an example for the sake of "adequate[ly] deterr[ing] criminal conduct" by others. As evidenced by the letters annexed hereto, despite his own hardships, he has shown himself to be a kind and compassionate man. Third, no additional imprisonment is needed to "protect the public from further crimes of the defendant." To the contrary, what is needed is Court-mandated mental health treatment for Julian to redress his anxiety. For that matter, Julian has been chastened by this ordeal and poses no real risk of recidivism. Indeed, given what he has endured over nearly the last two years in prison, Julian is more desirous than ever to lead a healthy, law-abiding, and gainful life. Lastly, imprisonment, rather than fostering Julian's rehabilitation, will undoubtedly hamper it.

Plainly, any imprisonment at this stage will only serve to advance the unnecessary aim of retribution for its own ritualistic sake. In contrast to imprisonment, however, permitting Julian to return home and tend to his mental health, surrounded by his family, would best further his ongoing rehabilitation. In short, imposing additional imprisonment at this stage is a punishment "greater than necessary, to comply with the purposes set forth in [§3553]."

TACOPINA SEIGEL & DEOREO

## VII.  Conclusion

Given all of the mitigating circumstances present in this case, the Court rightfully has the discretion to show Julian Khater compassion and lenity.  In summary, for all the reasons set forth above, we respectfully ask that the Court render a non-Guidelines sentence, so as to impose upon him a period of time-served with supervised release that includes a condition requiring him to undergo mental health treatment.

Your consideration in this matter is greatly appreciated.

Respectfully submitted,

Joseph Tacopina

Chad D. Seigel

cc:   AUSA Anthony Scarpelli
      AUSA Gilead Light