**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-CR-00222-001 (TFH)** |
| **JULIAN ELIE KHATER** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Julian Elie Khater to 90 months of incarceration, three years of supervised release, a restitution payment of $2,000, and $200 as a mandatory special assessment on each count of conviction. The sentencing guidelines range for this defendant, as detailed further below and agreed to by the parties, is 78 to 97 months of incarceration, and the government's requested sentence falls at the approximate midpoint of the guidelines range.

### I.    FACTUAL BACKGROUND

#### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 80, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters who attempted to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

1

***Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds***

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.   The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore

numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Figure 1[1] as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Figure 1.   They flooded the area labeled "Lower West Plaza" Area C on Government's Figure 1, pushing against the barricade there.

---

[1] Figures 1-4 in this memorandum are provided to the Court and the parties as additional factual evidence relating to the January 6 riot at the Capitol. Exhibits 1-17, previously produced to the Court and the parties during prior detention proceedings for both Khater and his co-defendant, George Tanios, are hereby incorporated into this memorandum and will be referred to by their original Exhibit numbers, as the government anticipates referencing these exhibits during sentencing. Time stamp references followed by "p.m." refer to the actual time stamp marked on the video footage, located in the upper left (surveillance footage) or upper right (body worn camera) of the video frame. Otherwise, the time reference will refer to the time of the video clip itself.



*Figure 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Figure 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

*Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than one hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See*

8

*id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.    Julian Khater's Role in the January 6, 2021, Attack on the Capitol

The defendant, Julian Khater, violently participated in the January 6, 2021, attack on the United States Capitol. Khater arrived in Washington, D.C. on the evening of January 5 after driving with his friend and co-defendant, George Tanios, from West Virginia in a rented car. Khater and

Tanios stayed in a Virginia hotel and then made their way by rideshare to the White House area where they attended the "Stop the Steal" rally and listened to those speaking at the event. *See Exhibit 18.*



*Exhibit 18[2] - Khater (green circle) and Tanios (yellow circle) at Washington Monument*

At the conclusion of the rally in front of the White House, Khater and Tanios joined the throngs of protestors marching towards the Capitol. The government's investigation has uncovered no evidence that either Khater or Tanios planned to advance to the Capitol prior to January 6 or that, prior to January 6, they intended to either enter the Capitol building or interfere with the lawful counting of the Electoral College votes. According to Khater's own admission in his post-arrest statement to FBI agents, he did not know what to expect when he joined the throngs of people marching from the White House to the Capitol. Defendant's Statement at 1:47:37.[3] At the

---

[2] Available at https://www.youtube.com/watch?v=1Bk0wBcle64&t=373, timestamp 6:12, last visited on January 23, 2023.

[3] *See* Defendant Khater's Motion to Suppress, Exhibit B, filed on February 24, 2022 (ECF No. 54). The government incorporates this exhibit by reference and refers to it as Defendant's

same time, Khater and Tanios had arrived in Washington, D.C., armed with two containers of bear spray, which were never used, and two containers of hand-held pepper spray, one of which Khater ultimately did use in his assault on officers, as described further below. These cannisters were purchased by Tanios the night before, ostensibly, as Khater later told FBI agents, for their own protection during a political event. Defendant's Statement at 00:08:25 – 00:09:10.

Whether or not Julian Khater planned to participate in a riot the day before, or even the morning of, January 6, 2021, once he arrived at the U.S. Capitol around 2:00 p.m., his intentions became clear. Khater observed the raging violence occurring against police officers, as described in detail *supra* at Section I-A, and he willingly and voluntarily joined that attack. As shown in Government Exhibit 3, at 2:09:45 p.m., Khater and Tanios walked from the south grassy area of the Capitol grounds toward the Lower West Terrace. In this video, Khater is wearing a beanie with a pom-pom on top, a dark jacket, and has a beard. Tanios is wearing a red hat, black backpack, dark hooded sweatshirt, and has a beard.

---

Statement.

 

*Exhibit 3.1 (Tanios under yellow arrow) and 3.2 (Khater under red arrow)*

Khater quickly worked his way towards the center of the Lower West Terrace, separating from Tanios. For the next few minutes, Khater could see exactly what was unfolding at the Capitol: outnumbered officers, some in riot gear and some unprotected, fending off hundreds of violent rioters; chemical spray being deployed by rioters against officers, and officers using spray to try and control the mob; rioters throwing batteries, makeshift spears, and other blunt objects directly at officers; and a continuous press of rioters against officers in an attempt to move the makeshift barricade line further back.   Government Exhibits 3 and 4 show Khater moving closer towards this ongoing violence.   All of this was accompanied by the deafening roar of the crowd, which can be heard on the body-worn camera ("BWC") exhibits previously submitted to the Court, as the rioters screamed vitriol and hate against police. *See* Government Exhibits 7 and 10. Against this backdrop, in the midst of a lawless, violent riot aimed at attacking police officers and reaching the U.S. Capitol Building, Julian Khater did not walk away from this effort—he decided to join it.

12

When Khater reunited with Tanios at 2:14 p.m., he was visibly incensed and ready to join the fray. Surveillance video shows Khater reaching inside Tanios' backpack and retrieving one of the cannisters of chemical spray they had brought to Washington. *See* Government Exhibit 3. This same moment in time was captured by open-source video, which has been provided to the Court as Government Exhibit 5. That video, which bears a stamp entitled "The Convo Couch" on the top right of the frame, shows Khater making his way towards Tanios. Khater then clearly states, "Give me that bear shit," and reaches into the backpack on Tanios' back. Tanios then states, "Hold on, hold on, not yet, not yet… it's still early." Khater then emphatically tells Tanios, "They just fucking sprayed me." The video shows Khater holding a white can with a black top that appears to be a can of chemical spray. His right hand, which is holding the spray, has a black glove on it with the word "Trump" visible on the glove.   *See* Government Exhibit 5.1, below.



*Exhibit 5.1 (Still shot from Government Exhibit 5 at timestamp 00:36)*

Khater's tone of voice and his facial expressions in this video betray his emotion, his anger, and his loss of control. He is incensed at having been personally sprayed by police chemical spray while standing on the front line of a riot, as if he had been an innocent victim. Government Exhibit 3 shows Tanios and Khater engage each other in animated conversation while they are standing together. At one point, Tanios appears to lunge for the spray Khater is holding. Then Khater appears to calm down and continues to speak to Tanios and other unidentified individuals.

The next six minutes offered Khater a substantial opportunity to cool down and come to his senses. The surveillance video shows he is standing still and engaging in conversation with those around him. After having ample time to contemplate his actions, he made the decision to physically join the riot and aid the massive effort to breach the police lines by launching a timed and coordinated pepper spray attack on the officers manning the barricades.

At 2:20 p.m., Khater walked away from Tanios to get closer to the front line on the Lower West Terrace. He weaved his way through the crowd and positioned himself within a few feet of the bike rack barrier. *See* Government Exhibit 4. It took approximately two minutes for Khater to squeeze his way forward to the front of the line. Then he stood and waited. He stared straight ahead, waiting for the right moment to attack the line. *See* Government Exhibits 4 and 7. At approximately 2:23 p.m., that moment arrived when multiple unidentified rioters positioned to Khater's right attached long straps to the bike rack barricades and began pulling them away. Government Exhibit 7. At this precise moment, in conjunction with the other rioters, Khater began his attack. He aimed his cannister of pepper spray towards the defenseless officers who were distracted by the group effort to remove the barricade. Khater held his right arm up high in the air and began spraying the smaller, hand-held cannister of pepper spray at any officer he could find.

14



*Government Exhibit 7.1 (Still shot of Government Exhibit 7 at 2:23:10 p.m.)*

As described further below, Khater sprayed at least three officers at close range on the Lower West Terrace. He continued spraying, pointing his cannister at any officers he saw guarding the barricade.



*Government Exhibit 8.1 (Still shot of Government Exhibit 8 at 2:23:13 p.m.).*
*The red arrow points to Khater, the green arrow points to Ofc. Caroline Edwards,*
*and the yellow arrow points to Ofc. D.C.*

15

MPD Lt. Jason Bagshaw saw Khater spraying the police. Surveillance video and body worn camera captured Lt. Bagshaw observing Khater continuing to spray officers, and then pursuing Khater, and deploying police issued chemical spray on Khater at 2:23:26 p.m. *See* Government Exhibit 4 and Government Exhibit 16, below. Khater did not stop spraying the officers until he was himself sprayed by Lt. Bagshaw. Khater's spraying spree lasted for nearly half a minute.



*Government Exhibit 16*

Khater's attack, in conjunction with attacks from hundreds of other rioters, resulted in the collapse of the police line. Police officers retreated from the Lower West Terrace approximately five minutes after Khater's spray assault on the police line. Government Exhibit 17 shows that the area where Khater committed his assaults quickly became overrun with rioters, allowing people to access and climb the scaffolding supporting the presidential inauguration podium, and to access the stairs leading to the Upper West Terrace.

The government's investigation has not uncovered evidence that Khater committed any more assaults or acts of violence that day. By his own admission, he climbed up the scaffolding in order to take a picture. *See* Defendant's Statement at 01:54:00 – 01:55:17. The government's investigation has not uncovered evidence that he entered the U.S. Capitol Building, and by his own admission, after taking pictures and reuniting with Tanios, the two lingered on the Capitol grounds for awhile and then left the area. *Id.* The government's investigation has not uncovered evidence that Khater posted on social media or made any public comments regarding his involvement in the assault on the Capitol.

### *Injuries to Police Officers*

Julian Khater was directly responsible for injuries inflicted on three police officers during his attack on the police line. All three officers had strong, visible reactions to Khater's spray attack, and all three were forced to immediately retreat from the police line on the Lower West Terrace to try and wash off the pepper spray, contributing to the rioters' ability to breach the Capitol.

Khater's first victim was United States Capitol Police Officer Brian Sicknick. Officer Sicknick was guarding the police barricade on the Lower West Terrace, wearing a blue uniform and a bicycle helmet. He was sprayed in the face by Khater at a close distance of approximately 5 to 10 feet. Officer Sicknick immediately recoiled from the spray and stumbled backwards while rubbing his eyes.

17



*Government Exhibit 4.1 (Still shot of Government Exhibit 4 at 2:23:25 p.m.)*

Struggling to recover from the assault, Officer Sicknick retreated up the stairs of the Capitol, being assisted up the stairs by another officer, to an empty terrace just outside the Capitol building. He remained on this terrace for approximately 20 minutes, pouring water on his eyes, pacing around the terrace, and sometimes leaning over on the wall as he tried to decontaminate and recover. Government Exhibits 11 and 12.

By the time Officer Sicknick had recovered from the assault, the police line had already broken down on the Lower West Terrace and other officers had joined him at the top of the stairs. Officer Sicknick, along with a group of other officers, then responded to a call of shots fired on the House floor at 2:44 p.m. After re-entering the Capitol building, he continued on duty for the remainder of the siege until approximately 6:30 p.m., when the building was cleared of rioters. Officer Sicknick remained on duty at the Capitol into the evening. Just before approximately 10:00 p.m., Officer Sicknick began slurring his speech while talking to fellow officers. He slumped

backwards and lost consciousness, and emergency medical technicians were summoned for assistance. He was transported to the George Washington University Hospital where he remained on life support for nearly 24 hours and was pronounced dead at 8:51 p.m. the following day.

An autopsy conducted by the Office of the Chief Medical Examiner for the District of Columbia concluded that the manner of Officer Sicknick's death was natural. Specifically, according to the medical examiner, Dr. Francisco Diaz, Sicknick suffered two strokes that evening at the base of the brain stem, caused by a clot in an artery that supplies blood to that area of the body.[4] Dr. Diaz further noted that Sicknick had engaged with rioters on January 6, and "all that transpired played a role in his condition."[5]

While Julian Khater's spray assault on Officer Sicknick ultimately was not determined to be the direct cause of his death, Office Sicknick's tragic demise, so close in time to the traumatic events of that day, underscores the seriousness of the offense committed by Khater and his fellow rioters. Officer Sicknick's death should serve as a solemn reminder to Khater, and to all of the rioters who committed acts of violence against police officers on that day, that their actions contributed to immense trauma, stress and suffering for all police officers who were physically attacked at the Capitol. Officer Sicknick's family members have provided victim impact statements to the Court, attached to this memorandum as Exhibits 1-5, and will address the Court at the time of sentencing.

---

[4] "Capitol Police officer Brian Sicknick, who engaged rioters, suffered two strokes and died of natural causes, officials say," by Peter Hermann and Spencer S. Hsu, *The Washington Post*, April 19, 2021, available at: https://www.washingtonpost.com/local/public-safety/brian-sicknick-death-strokes/2021/04/19/36d2d310-617e-11eb-afbe-9a11a127d146_story.html.
[5] *Id.*

Khater's second victim was United States Capitol Police Officer Caroline Edwards. After spraying Officer Sicknick, Khater advanced closer to the line, and sprayed Edwards directly in the eyes, at close range, while she was looking in the other direction. *See Government Exhibit 8.1, supra.* Edwards was wearing no helmet and no protective eyewear. Khater's deliberate advance towards and assault of Officer Edwards, captured in Government Exhibit 4, is particularly egregious, as she was completely defenseless and not even looking in his direction. Officer Edwards immediately lost her ability to see and required assistance from another officer to escape to safety. See Government Exhibit 4.2, below, and Government Exhibit 10. Officer Edwards intends to provide a victim impact statement directly to the Court on the day of sentencing.



*Government Exhibit 4.2 (Still shot of Government Exhibit 4 at 02:23:15 p.m.)*

Khater's third victim was Officer D.C. Officer D.C.'s reaction to the spray is evident in his own BWC footage, and as captured in additional video footage. *See* Government Exhibit 7. He began jumping up and down in reaction to the pain and sting of the pepper spray in his eyes. He was forced off the line and required time to recover, further weaking the police presence on the line that fell only minutes later. Officer D.C. has declined to provide a victim impact statement to the Court.

## II.      THE CHARGES AND PLEA AGREEMENT

On March 17, 2021, a federal grand jury returned an indictment charging Julian Khater with ten counts, including assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). *See* Indictment (ECF No. 8). On September 1, 2022, Julian Khater was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement. ECF No. 79.

## III.     STATUTORY PENALTIES

Julian Khater now faces sentencing on two counts of assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).   As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Khater faces a maximum sentence of 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for each count.

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the pre-sentence report's calculation of the applicable Guidelines range, based on a total adjusted offense level of 28, PSR ¶ 56, and a criminal history category I. PSR ¶ 65. Specifically, the defendant's guidelines are calculated as follows:

| | | |
|---|---|---|
| U.S.S.G §2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G §2A2.2(b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G §2A2.2(b)(3) | Bodily Injury | +3 |
| U.S.S.G §2A2.2(b)(7) | Convicted Under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G §3A1.2 | Official Victim | +6 |
| U.S.S.G. §3D1.2-1.4 | Grouping of both counts at level 29 (2 units) | +2 |

| | |
|---|---|
| Total Offense Level: | 31 |
| Acceptance of Responsibility | -3 |
| **Total Adjusted Offense Level:** | **28** |

Accordingly, Khater's Guidelines imprisonment range is 78 to 97 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. PSR ¶ 56 and Plea Agreement at p. 2-3 (ECF No. 79).

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As detailed in Section I(B) of this memorandum, Julian Khater's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Julian Khater's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 90 months of incarceration.

### B.  The History and Characteristics of the Defendant

The defendant, 32 years old at the time of the assault, was a resident of New Jersey at the time of his arrest. He has a minor record of violations involving charges of consuming alcoholic beverages in public in 2011, driving under the influence in 2014, and traffic infractions in 2020, PSR ¶ 63-65, none of which affect his criminal history score. The government submits that

Khater's lack of a serious or violent criminal record is reflected in the plea agreement offered to the defendant and the government's request for a sentence at the approximate midpoint of the sentencing guidelines range.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Julian Khater's criminal conduct on January 6, 2021, was the epitome of disrespect for the law. His willingness to attack defenseless, uniformed police officers, and to enthusiastically join a violent, unruly mob as it attacked the United States Capitol Building calls for a lengthy period of incarceration that will reflect the gravity of his crimes against police and promote respect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. While the government investigation

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

may have uncovered no evidence that Julian Khater planned to join the violent attack on the Capitol prior to January 6, his purchase of multiple cannisters of bear and pepper spray notwithstanding, his actions at the front line reflect the actions of a man with malice and hatred in his heart. By his own admission, Julian Khater became "emotional" and "riled up" by the crowds and the speakers. Defendant's Statement at 00:12:30 and 01:46:00. This susceptibility to extreme violence, at the urging of violent ringleaders, is an example of conduct that requires the utmost deterrence to ensure that law and order continue to govern our society. The attack on the Capitol required the willing contributions of hundreds of individuals like Julian Khater – people who may not have actively planned, advanced or coordinated the riot prior to January 6, but who jumped into the fray and supported the attack on police once it got underway. Julian Khater's willingness to resort to such extremes requires a sentence sufficient to provide specific deterrence from committing future crimes of violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

25

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

## VI.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8] *United States v. Papagno*, 639

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Khater must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Khater played in the riot on January 6.[9] Plea Agreement at ¶ 15, ECF No. 79. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.*

Paragraph 15 of the plea agreement states that, in addition to paying restitution for the damage to the Capitol Building and its contents, Khater must pay restitution to the individual victims of his assaults, Officers Sicknick, Edwards, and D.C. ECF No. 79. If the MPD had expenses for medical treatment of any of those officers that are not covered by the $1.4 million loss figure identified above, the MPD is entitled to restitution from Khater for expenses attributable to the offenses of conviction. *See* 18 U.S.C. § 3664(j)(i) ("If a victim has received compensation

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

from insurance *or any other source* with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation,") (emphasis added). A violation of 18 U.S.C. § 111(b) is a crime of violence under the MVRA, *see* 18 U.S.C. § 3663A(c)(1)(A)(i) (requiring mandatory restitution for "a crime of violence, as defined in [18 U.S.C.] section 16"). That means that restitution for that offense is mandatory. 18 U.S.C. § 3663A(a)(1). The Court should delay a final determination of the amount of any loss to the MPD for 90 days following the sentencing hearing to give the government and the MPD sufficient time to calculate the amount of those expenses. *See* 18 U.S.C. § 3664(d)(5).   Khater's final restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and, if applicable, the MPD. *See* PSR ¶ 122.

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 90 months of incarceration, three years of supervised release, a restitution payment of $2,000, and $200 as a mandatory special assessment on each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    _Gilead Light_____
Gilead Light
D.C. Bar No. 980839
Anthony Scarpelli
D.C. Bar No. 474711
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530
(202) 252-6880 (Light)
(202) 252-7707 (Scarpelli)
Gilead.light@usdoj.gov
Anthony.Scarpelli@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 23rd day of January, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By: _____/s/_____
              Gilead Light
              Assistant United States Attorney