**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-222-02 (TFH)** |
| **v.** | : | |
| | : | |
| **GEORGE PIERRE TANIOS,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant George P. Tanios to a custodial sentence of time served, which is five months and six days, and is within the Guidelines range (0-6 months imprisonment, ECF 86 at ¶ 91),[1] a twelve-month term of Supervised Release, 250 hours of community service, a Special Assessment of $25 per count (a total of $50), and $500 in restitution.

**I.      Introduction**

The defendant, who is 41 years-old and self-employed (*see* ECF 86 at ¶¶ 71-73), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[2]

---

[1] The defendant was arrested on March 14, 2021, and remained in custody until August 20, 2021, thus serving five months and six days in custody.

[2] Although the Statement of Offense in this matter, filed on July 27, 2022, (ECF 78 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount

On July 27, 2022, the defendant pleaded guilty to two counts of Title 18, United States Code, Sections 1752(a)(2) and (b)(2)), Disorderly and Disruptive Conduct in a Restricted Building or Grounds (ECF 77).  As explained herein, a sentence within the Guidelines range is appropriate in this case because Tanios (1) joined an unprecedented mob that attacked the United States Capitol on January 6, 2021 and unlawfully entered the restricted grounds of the Capitol; (2)  purchased and later provided pepper spray to co-defendant Julian Khater who then unprovoked, viciously, and cowardly assaulted three police officers who were protecting the U.S. Capitol and its members, by spraying them in the face with the pepper spray; and (3) has yet to sincerely express genuine remorse for his criminal conduct on January 6 that substantially contributed to the assault on the three officers.

The Court must also consider that Tanios's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed. Here, Tanios's participation in a riot that succeeded in halting the Congressional certification combined with his lack of remorse, and the potential for future violence renders a Guidelines sentence both necessary and appropriate in this case.  Therefore, the facts and circumstances of Tanios's crime support a sentence within the Guidelines range in this case.

reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

II.     **Factual and Procedural Background**

A.  **The January 6, 2021 Attack on the Capitol**

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 78 (Statement of Offense), at 1-7.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.  The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.

Figure 1,[3] below, is a diagram of the Capitol Building Grounds as they appeared on January 6.

---

[3] Figures 1-4 in this memorandum are provided to the Court and the parties as additional factual evidence relating to the January 6 riot at the Capitol. Exhibits 1-17, previously produced to the Court and the parties during prior detention proceedings for both Tanios and his co-defendant, Julian Khater, are hereby incorporated into this memorandum and will be referred to by their original Exhibit numbers, as the government anticipates referencing these exhibits during sentencing. Time stamp references followed by "p.m." refer to the actual time stamp marked on the video footage, located in the upper left (surveillance footage) or upper right (body worn camera) of the video frame. Otherwise, the time reference will refer to the time of the video clip itself.



*Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Figure 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to

engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Figure 1.  They flooded the area labeled "Lower West Plaza" Area C on Government's Figure 1, pushing against the barricade there.



*Figure 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and

reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject

you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Figure 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and*

*many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than one hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous

weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B. Defendant Tanios' Role in the January 6, 2021 Attack on the Capitol

Tanios lives in Morgantown, West Virginia.  In the early evening of January 5, 2021, Tanios entered ATR Performance in Morgantown, West Virginia, a retail seller of firearms. Tanios told one of the store employees that he was going to the "Trump rally," and that the

individual he was speaking to on his cellular telephone was going to accompany him.  Tanios asked the store employee if he could bring his firearm to Washington, D.C., to which the store employee told Tanios no.  Tanios next asked the store employee if he could bring a pepper ball gun (that was available for purchase in the store) to Washington, D.C., to which the store employee said no because the weapon fires projectiles.[4]  Tanios then asked the store employee if he could carry mace to Washington, D.C.  The store employee told Tanios he could as long as the mace was aerosol based.

Tanios purchased two, 7.9-ounce canisters of Frontiersman Bear Spray.  Tanios also purchased two canisters of pepper spray.  Tanios told the store employee that he and his companion (who turned out to be Khater) would carry the pepper spray on their person while in Washington, D.C., and they would put the bear spray in the car.  Tanios later gave one of the pepper spray cannisters to Khater prior to arriving in Washington, D.C.

Later in the evening of January 5, Tanios and Khater arrived in Washington, D.C., after driving from West Virginia in a rented car.  Tanios and Khater stayed in a Virginia hotel, and then the next morning made their way by rideshare to the White House area where they attended the "Stop the Steal" rally and listened to the speakers.  *See Exhibit 18*.

---

[4] The device that the defendant was discussing with the employee was a HDP Prepared to Protect .50 caliber pepper ball pistol, https://www.google.com/search?q=HDP+Prepared+to+Protect+.50+caliber+pepper+ball+pistol.&sxsrf=AJOqlzU_KBS09hwoWltIGi92WzD9pyN6Ug:1673555494809&source=lnms&tbm=vid&sa=X&ved=2ahUKEwiOrJ6G8ML8AhWrGjQIHWcTACQQ_AUoA3oECAEQBQ&biw=2133&bih=1076&dpr=0.9#fpstate=ive&vld=cid:3d949569,vid:YAj8xZ1jKGc



*Exhibit 18[5]*

At the conclusion of the rally, Tanios and Khater joined the mass of protestors marching towards the U.S. Capitol.  The government's investigation has uncovered no evidence that either Tanios or co-defendant Khater planned to advance to the U.S. Capitol in advance of this date. Similarly, the government's investigation has uncovered no evidence that, prior to January 6, they intended to either enter the Capitol building or interfere with the lawful counting of the Electoral College votes.  The defendants arrived in Washington, D.C., armed with two containers of bear spray, which were never used, and two containers of hand-held pepper spray, which Khater ultimately used to assault three police officers, as described further below.[6]

At 2:09:45 p.m., Tanios was walking on restricted grounds, from the south grassy area

[5] Available at  https://www.youtube.com/watch?v=1Bk0wBcle64&t=373, timestamp 6:12, last visited on January 10, 2023.

[6] During Khater's post-arrest statement, he stated that he did not know what to expect when he walked from the White House to the Capitol, and cannisters were purchased by the defendant the night before, ostensibly for their own protection during a political rally.

of the United States Capitol grounds toward the Lower West Terrace.  Khater was walking behind Tanios.   Government Exhibit 3.  That video shows Tanios wearing a red hat, black backpack, dark hooded sweatshirt, and sporting a beard. Khater was wearing a beanie with a pom-pom on top, a dark jacket, and has a beard.

Khater worked his way towards the center of the Lower West Terrace, separating from Tanios.  For the next few minutes, Khater could see exactly what was unfolding at the U.S. Capitol; outnumbered officers, some in riot gear and some unprotected, fending off hundreds of violent rioters; chemical sprays being deployed by rioters against officers, and officers using spray to try and control the mob; rioters throwing batteries, makeshift spears, and other blunt objects directly at officers; a continuous press of rioters pushing against officers in an attempt to move the makeshift barricade line further back.  Government Exhibits 3 and 4 show Khater moving closer towards this ongoing violence. All of this was accompanied by the deafening roar of the crowd, which can be heard on the body worn camera exhibits previously submitted to the Court, as the rioters screamed vitriol and hate against police.  Government Exhibits 7 and 10.

When Tanios and Khater reunited at 2:14 p.m., Khater was incensed and ready to join the fray.  Surveillance footage showed Khater reaching inside Tanios's backpack and retrieving one of the cannisters of chemical spray they had brought to Washington, D.C.  Government Exhibit 3. This same moment in time was captured by open-source video, which has been provided to the Court as Government Exhibit 5.  That video, which bears a stamp entitled "The Convo Couch" on the top right of the frame, showed Khater making his way towards Tanios.  Khater then clearly stated, "Give me that bear shit," and reached into the backpack on Tanios's back.  Tanios then stated, "Hold on, hold on, not yet, not yet . . . it's still early."  Khater then emphatically told Tanios, "They just fucking sprayed me."  The video showed Khater holding a white can with a black top

that appears to be a can of chemical spray.  Khater's right hand, which is holding the spray, had a

black glove on it with the word "Trump" visible on the glove.  *See* Government Exhibit 5.1, below.



*Exhibit 5.1 (Still shot from Government Exhibit 5 at timestamp 00:36)*

Khater's tone of voice and his facial expressions in this video betray his emotion, his anger, and

his loss of control.  He is incensed at having been personally sprayed by police chemical spray

while standing on the front line of a riot, as if he had been an innocent victim.  Government Exhibit

3 showed Tanios and Khater engage each other in animated conversation while they stood together.

At one point, Tanios appeared to lunge for the spray that Khater is holding.  Then Khater appeared

to have calmed down and continued to speak to Tanios and other unidentified individuals.

At 2:20 p.m., Khater walked away from Tanios to get closer to the front line on the Lower

West Terrace.  He weaved his way through the crowd and positioned himself within a few feet of

the bike rack barrier.  *See* Government Exhibit 4.  It took approximately two minutes for Khater

to squeeze his way forward to the front of the line.  Then he stood and waited.  He stared straight

ahead, waiting for the right moment to attack the line. Government Exhibits 4 and 7.   At

approximately 2:23 p.m., that moment arrived, when multiple unidentified rioters positioned to Khater's right attached long straps to the bike rack barricades and began pulling them away. Government Exhibit 7.  At this precise moment, in conjunction with the other rioters, Khater began his attack.  He aimed his cannister of pepper spray towards the defenseless officers who were distracted by the group effort to remove the barricade.  Khater held his right arm up high in the air and began spraying the smaller, hand-held cannister of pepper spray at any officer he could find.



*Government Exhibit 7.1 (Still shot of Government Exhibit 7 at 2:23:10 p.m.)*

As described further below, Khater sprayed at least three officers at close range on the Lower West Terrace.  He continued spraying, pointing his cannister at any officers he saw guarding the barricade. MPD Lt. Jason Bagshaw saw Khater spraying the police. As he continued spraying, he was noticed by.  Surveillance video and body worn camera captured Lt. Bagshaw observing Khater continuing to spray officers, and then pursuing Khater, and deploying his police issued chemical spray on Khater at 2:23:26.  *See* Government Exhibit 4 and Government Exhibit 16,

below.  Khater did not stop spraying the officers until Lt. Bagshaw sprayed him.  Khater's spraying

spree lasted for nearly half a minute.



*Government Exhibit 16*

The result of Khater's attack, in conjunction with attacks from hundreds of other rioters,

was that the police line ultimately fell.  Police officers retreated from the Lower West Terrace

approximately five minutes after Khater's spray assault on the police line.  Government Exhibit

17 shows that the area where Khater committed his assaults quickly became overrun with rioters,

allowing people to access and climb the scaffolding supporting the presidential inauguration

podium, and to access the stairs leading to the Upper West Terrace, where rioters ultimately

entered the U.S. Capitol building.  The Upper West Terrace subsequently became a flash point in

the hours to follow for some of the most egregious and intense violence that occurred on January

6, as other rioters continued to aggressively assault police officers in their efforts to forcibly enter

the U.S. Capitol.  Tanios and Khater reuniting on the restricted area of the U.S. Capitol, the two

lingered on the Capitol grounds for a while and then left the area.

The government's investigation has uncovered no evidence that Tanios entered the U.S. Capitol Building.  Tanios did post on Facebook a photograph of him in the restricted area of the U.S. Capitol. Government Exhibit 17; he did not make any public comments regarding his involvement in the assault on the U.S. Capitol.

*Government Exhibit 17*



On March 14, 2021, in Morgantown, West Virginia, FBI agents arrested Tanios pursuant to a warrant, and executed a warranted a search of Tanios's residence.  Among other items, they recovered from Tanios's residence:

one red MAGA hat

two cans of bear spray (Frontiersman)

one keychain OC spray in a black case

### III.    Statutory Penalties

Tanios faces a sentencing on Count One: violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), and Count Two: violating 18 U.S.C. § 1752(a)(2) and (b)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) (ECF 77).  As noted by the plea agreement and the U.S. Probation Office, Tanios faces up to six months of imprisonment and a fine of up to $100,000.  Tanios must also pay $500 restitution under the terms of his or her plea agreement.

### A. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government does not agree with the Sentencing Guidelines analysis set forth in the PSR, however, it does not change the Guidelines calculation.  According to the PSR, U.S.S.G. § 2A2.4 is the Chapter Two Guideline that applies to the Count One offense of violating 18 U.S.C. § 1752(a)(1).  *See* PSR ¶ 36. Virtually every judge to have sentenced defendants in the January 6 cases for a violation of that statute—which prohibits trespassing—has found, the applicable Chapter Guideline is U.S.S.G. § 2B2.3, which applies to trespassing.

On the other hand, virtually every judge to have sentenced defendants in the January 6 cases for a violation of 18 U.S.C. § 1752(a)(2)—which prohibits disorderly and disruptive conduct in a restricted area—has applied U.S.S.G. § 2A2.4, which applies to impeding officers, to that offense.  The parties stipulated to the correct Guidelines analysis in the plea agreement.  *See* ECF No. 77, ¶ 4.

Probation's calculation is correct because the calculation for Count Two drives the combined offense level.

Tanios's adjusted offense level under the Sentencing Guidelines as follows:

**COUNT ONE**

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |

**COUNT TWO**

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | 10 |
| Greater of Adjusted Offense Levels (U.S.S.G. §3D1.4) | 10 |
| Combined Adjusted Offense Level (U.S.S.G. §3D1.4) | 10 |
| Accepted Responsibility (U.S.S.G. §3E1.1) | -2 |
| | |
| Total Offense Level | 8 |

The U.S. Probation Office calculated Tanios's criminal history score as One, which is a Criminal History Category of I.  PSR at ¶ 48.  Accordingly, the U.S. Probation Office calculated Tanios's corresponding Guidelines imprisonment range at 0-6 months imprisonment.  PSR at ¶ 91.  Tanios's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of a Guidelines sentence.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters."  *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Tanios's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Although Tanios, unlike Khater, did not personally assault the police officers on January 6, Tanios purchased and supplied Khater with the pepper spray he used for those assaults.  Tanios did so after learning from a knowledgeable clerk in a sportsmen store in West Virginia that he could not bring a firearm or a weapon that fired projectile pepper balls into the District of Columbia, but could bring different dangerous weapons, bear spray and pepper spray, instead.  His decision to purchase such weaponry underscores the dangers associated with bringing weapons to a rally or a riot – it undoubtedly brings harms to others.

In sum, Tanios's conduct of purchasing the bear and pepper spray, transporting it to Washington, D.C., providing some of the cannisters to Khater prior to their arrival at the U.S. Capitol, both defendants carrying the substances to federal grounds, is certainly more serious

conduct than merely entering a restricted area of the U.S. Capitol.  Thereafter, Khater peppered sprayed three federal police officers from a very close distance.  Tanios then reunited with Khater, and they later traveled home together.  Accordingly, the nature and the circumstances of this offense establish the clear need for a Guidelines sentence.

### B.  The History and Characteristics

As set forth in the PSR, Tanios's criminal history consists of a 2010 misdemeanor conviction for False Pretenses; and a 2016 Making/Issuing a Worthless Check.  PSR ¶¶ 46-47.

Since Tanios's August 20, 2021 release from custody, it appears he has been in compliance with his release conditions.  The government also recognizes that Tanios has accepted responsibility for his actions by pleading guilty in this matter and sufficiently owning his conduct. The history and character of Tanios warrant a Guidelines sentence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a Guidelines sentence, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the U.S. Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

22

*Specific Deterrence*

In the instant case, the Guidelines sentence will provide deterrence to Tanios it that it will discourage future criminal conduct.  The goal of the government's sentencing recommendation is that it will promote the respect the law and make more lawful decisions, and over have Tanios follow society's norms.  Additionally, through community service, Tanios can provide a positive message to others who may consider violating the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.  This Court must sentence Tanios based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).  Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.  *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

23

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

In *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), a case very similar to the instant case where both defendants were initially charged with felony offenses but later pled guilty to misdemeanor offenses, Judge Amy Berman Jackson noted that, "[e]nsuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately." Aug. 4, 2021 Sent. Hrg. Tr. at 34 statement of Judge Berman Jackson.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.  *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

That aside, the government's recommendation of a time-served sentence in this case would not create an unwarranted disparity with comparable cases.  In *United States v. Michael Curzio*, D.D.C. 21-cr-41 (CJN), the defendant briefly entered the Visitor Center of the Capitol building during the January 6 riot, and was ordered by police officers to leave.  He refused to do so and was arrested.  He pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G).  By the time of the sentencing hearing, he had been detained in that case for six months. Judge Nichols sentenced Curzio to a time-served sentence.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence t defendant to a sentence within the Guidelines range (0-6 months imprisonment, ECF 86 at ¶ 91) with credit for time-served, a term of Supervised Release for one year, 250 hours of community service, a Special Assessment of $25 per count (a total of $50), and $500 in restitution.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a

consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

Matthew M. Graves
United States Attorney
DC Bar No. 481052

By:      _____/s/_____
Anthony Scarpelli
D.C. Bar No. 474711
Gilead Light
D.C. Bar No. 980839
Assistant United States Attorneys
601 D Street, NW, 5th Floor
Washington, DC 20530
(202) 252-7707 (Scarpelli)
(202) 252-6880 (Light)
Anthony.Scarpelli@usdoj.gov
Gilead.light@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 23rd day of January, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:        /s/
          Anthony Scarpelli
          Assistant United States Attorney